IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

PA ADVISORS, LLC

                Plaintiff,

v.

GOOGLE, INC., *et al.*,

                Defendants.

Civil Action No. 2:07-cv-480-DF

JURY DEMANDED

## PLAINTIFF'S OPENING BRIEF REGARDING CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I.  BACKGROUND AND NATURE OF CASE ................................................................ 1

II.  TECHNOLOGY AT ISSUE ............................................................................ 2

III.  APPLICABLE LEGAL PRINCIPLES ............................................................... 3

IV.  DISPUTED CLAIM TERMS ........................................................................... 4

    A.  Data Item:  Documents, Web Sites Or Other Textual Data That May Be Searched. . 4

    B.  Data Item Profiles:  A Collection Of Information About A Data Item. ..................... 5

    C.  Linguistic Characteristics:  Features Relating To Language That Can Be ................ 8

    C.  Used To Infer Information About The Data Or Its Author. ...................................... 8

    D.  Linguistic Data:  Text. ............................................................................... 10

    E.  Linguistic Pattern:  Identifiable Combination Of Linguistic Characteristics, Such As, For Example A Combination Of Various Parts Of Speech (Nouns, Verbs, Adjectives, Etc.) That Appears In A Sentence And Reflects A Specific User's Cultural, Educational, Social Background, And The User's Psychological Profile. ........... 11

    F.  Match Factor:  No Construction Needed.  Or:  "A Value That Represents How Closely Two Things Match, And Whose Calculation Includes Adding A First And Second Similarity Factor." ............................................................................ 13

    G.  Personal Textual Data:  No Construction Necessary  Or  "Texts Composed By A Specific User." ...................................................................................... 14

    H.  Psychological Profile:  A Description Of Behavioral And/Or Personality Traits Of A Person. .............................................................................................. 16

I.   Search Request Data:  A Search String Entered By A User To The System. ............ 17

J.   Search Request Profile:  Collection Of Information About A Search Request.......... 18

K.   Segment: "A part of a sentence." ................................................................................ 19

L.   First/Second "Similarity Factor": "Information Representative Of  The Degree Of
     Correlation Between Two Things." ........................................................................ 20

M.   Text Item: "A Piece Of Text." .................................................................................. 22

N.   Textual Data: "One Or More Pieces Of Text." ........................................................ 23

O.   User Profile And User Data Profile: "A Collection of Information About A User." 24

P.   User Linguistic Data: "Text, Including Text Either Generated Or Adopted By The User."
     ...................................................................................................................... 26

Q.   User Segment Group: No Construction Needed Or "A Group Of Identical Segments."
     ...................................................................................................................... 28

V.   CONCLUSION ...................................................................................................... 29

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 (Fed. Cir. 2003)....................... 7

*Cross Med. Prods. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) . 10, 11, 16, 19

*Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371 (Fed. Cir. 2001)........................ 16, 17

*Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928 (Fed. Cir. 2003) .......................................................... 14

*Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346 (Fed. Cir. 2003)........................................ 15

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 3, 6, 8, 21

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008)........................................................... 3, 20

*Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298 (Fed. Cir. 2008)....................... 14

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)............................................. 3, 7

# I.     BACKGROUND AND NATURE OF CASE

This case involves a dispute over the infringement by Google and Yahoo of United States Patent No. 6,199,067 (the "'067 Patent") (attached as Exhibit A). The '067 Patent was invented by Ilya Geller, a Russian immigrant who came to the United States to follow his dream of becoming a computer scientist. Having a particular interest in language and philosophy, Ilya conceived of the invention claimed in the '067 Patent and invested the majority of life savings to create a product embodying his vision of creating a superior method of searching vast collections of information. Ilya spent the remainder of his life savings to prosecute the '067 Patent so that the intellectual property at the core of his product would be protected. Once his product was developed and the patent application on file, Ilya sought to market his product. For example, in 1999, Ilya demonstrated his product and discussed his patented technology at a New York City trade show. Ilya's hope was that this type of demonstration would lead to his being able to receive funding for his company and allow him to invest additional funds in his novel technology. Unfortunately for Ilya, another company participating in that same New York City trade show was a fledgling startup search engine company co-founded by fellow Russian Sergey Brin - Google.[1] Rather than forge a partnership with Ilya, Google, along with other companies in the computer search field such as co-defendantYahoo, instead appropriated Ilya's technology without any compensation, and ultimately drove Ilya back into the poverty that he fled the Soviet Union to avoid. All attempts by Ilya to discuss this matter with Google and its founder Sergey Brin were wholly ignored. At the same time Google's actions have served to validate Ilya's technology by citing the '067 Patent in a number of its own patents and patent applications. Google's attitude towards Ilya was that it could take his inventions – the product of his years of hard work without any compensation whatsoever to the inventor of the technology it had built its

---

[1] As his Wikipedia entry indicates, Google co-founder Sergey Brin was born in Moscow, and currently ranks as the world's 26th richest person. Sergey Brin, From Wikipedia, the free encyclopedia, *available at* http://en.wikipedia.org/w/index.php?title=Sergey_Brin&oldid=297340073. Ilya Gellar does not have a Wikipedia entry.

company upon.

The motion before this Court today will construe the disputed terms of the '067 Patent, and thus determine the metes and bounds of the '067 Patent and the intellectual property that Ilya invented.

## II. <u>TECHNOLOGY AT ISSUE</u>

The Internet is composed of a massive collection of information found on a variety of computer networks. Unfortunately, this information exists largely in "unstructured" format and as a result the internet is effectively a massive collection of mostly unorganized information. "Search engines" have long been developed and implemented that search an indexed listing of websites for information relevant to the search string provided. However, prior to the conception of the '067 Patent, a search engine failed to capture a user's "unexpressed" interests or otherwise accommodate a user's background. In addition, the '067 Patent attempted to bring the ability to obtain relevant internet searches to a lay person. For example the '067 Patent cites the growing use of the internet by ordinary people: "While originally, the Internet was used mostly by scientists, the advent of the World Wide Web has brought the Internet into mainstream use." Ex. A, 1:39-41. The challenge that Ilya attempted to overcome was to make this huge amount of information contained on the internet accessible to anyone searching the internet.

The '067 Patent relates to computer data search technology, and a system and method for generating personalized user profiles to perform adaptive Internet or computer data searches. The goal of the '067 Patent is to utilize the personalized user profiles to improve prior art search engines to deliver more relevant search results. As explained by the inventor Ilya Geller, "a twelve year old child using key word searches on the Internet for some information on computers may be presented with a multitude of documents that are far above the child's reading and educational level. In another example, a physician searching the Internet … may be presented with dozens of websites that contain very generic information." Ex. A, 3:7-17. To address this problem, Ilya conceived of a way to profile a particular user based on linguistic patterns in the

texts the user reads or creates, and to use that user profile to tailor the search results to the person seeking the information. This approach was novel and has since been adopted by a number of companies such as Google and Yahoo in order to deliver a more personalized search experience to their respective users.

The '067 Patent was issued on March 6, 2001, by the United States Patent and Trademark Office. nXn has asserted claims 1, 3, 4, 6, 43, 45, 47, 56 and 61. Exhibit B shows the asserted claims with terms that either party contends require construction in bold.

## III.  APPLICABLE LEGAL PRINCIPLES

While the Court is clearly familiar with the law as it relates to claim construction, nXn highlights for the Court the overriding legal principles that are relevant to claim construction in this matter. First, a disputed claim term must be considered in the context of the entire claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("To begin with, the context in which a term is used in the asserted claim can be highly instructive."). "It is well settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e. the patent itself, including the claims, the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Second, the danger of reading limitations from the specific embodiments described in the specification must be avoided. *Phillips*, 415 F.3d at 1319-20 ("one of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Finally, the doctrine of claim differentiation instructs that features of exemplary embodiments that are captured in dependent claims should ordinarily not be imposed on the claims as a whole. *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008).

## IV. DISPUTED CLAIM TERMS[2]

### A. The Term "Data Item" Should Be Construed By This Court As "A Document, Web Site Or Other Piece of Textual Data That May Be Searched."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A document, web site or other piece of textual data that may be searched. | Documents, web sites, and other textual data that may be subjected to search by user. |

nXn proposes that this Court construe the term "Data Item"[3] as: "A document, web site or other piece of textual data that may be searched." nXn's proposed construction is consistent with the specification of the '067 Patent. Defendants, on the other hand, propose the construction: "Documents, web sites, and other textual data that may be subjected to search by user." Both parties agree that a Data Item includes information that may be searched. Ex. A at 5:24-25 ("data items *may include* documents, websites, and other textual data."). The dispute, however, is whether a Data Item must have all three types of information (i.e., documents, web sites and other textual data). The answer provided by the specification is no. *See* Ex. A at 5:21-28. The specification expressly states that a Data Item can be either a document, web site or other textual piece of data. *Id.* nXn's proposed construction embraces the specification and makes this clear. Alternatively, the Defendants' use of "and" as opposed to nXn's "or" conjunction is an improper attempt to import limitations into the claim construction geared at the non-infringement positions of Google and Yahoo in this case.

Furthermore, the Defendants proposed construction for the term "Data Item Profile" (See Section B below) contradicts their proposed construction of the term "Data Item." Specifically,

---

2 Although nXn only identified one term (linguistic pattern) as needing construction, Defendants have demanded construction of 23 additional terms. nXn has met and conferred with the Defendants on a number of occasions in an attempt to reach compromise on all of the terms proposed for construction by the Defendants. Unfortunately, nXn's efforts to reach compromise agreements on these proposed constructions only resulted in agreement on five terms.

3 The term "Data Item" is contained in Claims 1 and 43.

the Defendants state that a "Data Item Profile" is "a file containing information about **a specific document, website, or other text that may be subjected to a search by a user**." (emphasis added). This proposed construction expressly acknowledges that a "data item" may be a document, a web site or other textual data. To adopt both the Defendants' proposed constructions of "Data Item" and "Data Item Profile" would result in two different and distinct constructions for the term "Data Item" and would create confusion for a jury.

Because nXn's construction of the term "Data Item" accurately reflects the intrinsic evidence by embracing the specification of the '067 Patent, and Defendants' construction of the term is contrary to both the specification and its own construction of "Data Item Profile", the Court adopt nXn's proposed construction for the term "Data Item."

### B. The Term "Data Item Profile" Should Be Construed As "A Collection Of Information About A Data Item."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A collection of information about a data item. | A file containing information about a specific document, website, or other text that may be subjected to a search by a user, comprising the data item's address, the linguistic patterns of the data item, and the frequencies with which those patterns recur. |

The term "Data Item Profile"[4] is a simple term for construction, especially given the fact that the term "Data Item" will also be construed. The issue for the Court is whether to accept the Defendants' attempt to narrow the construction of "Data Item Profile" by incorporating certain cherry picked examples from the specification into the term's construction so that each and every example of such information must be present to meet the claim limitation.

Data Item Profile should be given its plain and ordinary meaning in view of the claims

---

4 The term "Data Item Profiles" is contained in Claims 1 and 43.

and specification of the '067 Patent, which is "a collection of information about a data item." The claims of the '067 Patent demonstrate that Data Item Profiles contain information about a corresponding Data Item. Ex. A at Claim 1, Element (b). For example, Claim element 1(b), requires only that this information be representative of a second linguistic pattern *of the corresponding Data Item*. Nowhere do the claims of the '067 Patent require that a Data Item Profile *must* include *all* of the types of information included in Defendants' construction. The specification also supports nXn's proposed construction. *See e.g.*, Ex. A at 5:21-24 (describing generation of data item profile computer files that are representative of linguistic patterns and their respective frequencies), and 19:48-50 (in one embodiment, data item profile may contain segments extracted from the data items). Because nXn's proposed construction of "Data Item Profile" reflects the use of the term within the claims and the specification of the '067 Patent and embraces the ordinary meaning of the term, nXn's proposed construction is proper and should be adopted by this Court.

Defendants' proposed construction should be rejected because it improperly imports limitation from, and is inconsistent with, the specification.

Defendants' efforts to limit the composition of Data Item Profiles to "the data item's address, the linguistic patterns of the data item, and the frequencies with which those patterns recur" is improper because these limitations are improperly imported from specific embodiments described in the specification. Such importation of limitations from the specification is improper as a matter of law. See *Phillips*, 415 F.3d at 1319-20 ("one of the cardinal sins of patent law [is] reading a limitation from the written description into the claims.") (quoting *SciMed*, 242 F.3d at 1340). The Data Item's address and the frequencies of recurrence are features of the Data Item Profiles used by specific embodiments described in the specification of the '067 Patent. Ex. A, 17:34 – 20:40. In addition, the Summary of the Invention speaks of "data item profile computer files, *representative* of linguistic patterns and their respective frequencies, of all data items." Ex. A, 5:22-24. Defendants have not cited any evidence that the inventor intended to limit Data Item Profile to only Data Item addresses and frequencies of recurrence, because no such evidence

exists.  Moreover, Defendants' proposed construction of "Data Item Profile" would wholly exclude one of the preferred embodiments.  Specifically, the specification describes an embodiment in which the Data Item Profile includes segments extracted from the Data Items. See Ex. A at 19:48-50; 19:66-20:6; 20:31-40.  Based on the Defendants narrow construction seeking to import certain limitations from examples in the specification while ignoring others, the embodiment where a Data Item Profile includes segments extracted from the Data Items would be wholly excluded from the claim's construction.  Because Defendants' proposed construction would exclude this preferred embodiment, it must be rejected.  *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) ("It is axiomatic that claim construction that excludes a preferred embodiment … is rarely if ever correct.") (citing *Vitronics*, 90 F.3d at 1583).  As described above, Defendants' construction leaves out at least one example disclosed in the specification.  Applying Defendants' improper approach to claim construction would require this limitation's inclusion.  In addition, this methodology would necessarily require reciting every example in the specification.  Defendants cannot provide any legal basis for this approach to claim construction.

Defendants' proposed construction would be confusing for a jury.  In addition to being unnecessarily repetitive, Defendants' proposed construction is also confusing because it **contradicts** the Defendants' proposed construction for Data Item alone (as discussed above). Furthermore, the claims as written already define the required contents of the Data Item Profiles. For example, Claim 1(b) requires that the Data Item Profiles include information representative of a second linguistic pattern.  It would therefore be confusing and repetitive to also construe the term Data Item Profiles to also include "linguistic patterns of the data item."

This Court should recognize the Defendants' inappropriate importing of claim limitations as what it is – an attempt by the Defendants to forward their non-infringement arguments in the guise of a claim construction position.  nXn's proposed construction is fully supported by the intrinsic evidence while Defendants' proposed construction improperly imports limitations from embodiments described in the specification.  In addition, the Defendants' proposed construction

would be confusing for a jury. Accordingly, Defendants' proposed construction should be rejected and nXn's proposed construction should be adopted.

      **C.**      **The Term "Linguistic Characteristics" Should Be Construed By The Court As "Features Relating To Language That Can Be Used To Infer Information About The Data Or Its Author."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- |
| Features relating to language that can be used to infer information about the data or its author. | Repeating combinations of various parts of speech in sentences that reflect the user's cultural, education, social background, and the user's psychological profile. |

nXn proposes that this Court construe the term "Linguistic Characteristics"[5] in accordance with its common, ordinary meaning as: "Features relating to language that can be used to infer information about the data or its author." Defendants once again seek to advance their non-infringement positions by improperly narrowing the term by proposing the following construction: "Repeating combinations of various parts of speech in sentences that reflect the user's cultural, education, social background, and the user's psychological profile."

"Linguistic Characteristics" is not defined in the specification of the '067 Patent, is not a term of art, and should therefore be given its common, ordinary meaning. *See Phillips*, 415 F.3d at 1312-14. nXn's proposed construction of the term "Linguistic Characteristic" is consistent with the common, ordinary meaning of the term, the intrinsic evidence, and the context of claims in which the term appears. According to Claim 1, Linguistic Characteristics are aspects of Data Items. Ex. A at 26:15-16 ("a data item *having* linguistic characteristics"). Claim 1 specifies that the method taught by Claim 1 must use Linguistic Characteristics that "correspond to the user's social, cultural, educational, economic background as well as to the user's psychological profile." *Id.* Thus, nXn has proposed to construe Linguistic Characteristics as features related to

---

5 The term "Linguistic Characteristics" is contained in Claims 1 and 43.

language (*i.e.*, characteristics) that can be used to infer information about the data being analyzed or the author of the data.

In addition to the intrinsic evidence, nXn's proposed definition is also supported by extrinsic evidence. For example, the term "characteristic" is defined as "a feature that helps to identify, tell apart, or describe recognizably." The American Heritage Dictionary of the English Language (Fourth Ed. 2004), *at* http://dictionary.reference.com/browse/characteristic (attached as Exhibit C). Elsewhere, "characteristic" is defined as "a distinguishing feature or quality." (Exhibit C). These extrinsic definitions fully support the construction proposed by nXn.

The Defendants' proposed construction for the term "Linguistic Characteristic" is "Repeating combinations of various parts of speech in sentences that reflect the user's cultural, education, social background, and the user's psychological profile." Unlike nXn's proposed construction, the Defendants' proposal improperly creates artificial claim limitations and should be rejected by this Court. For example, nowhere in the intrinsic specification does the patent teach that a Linguistic Characteristics are "repeating combinations." There is also no intrinsic evidence that limits Linguistic Characteristic to "speech in sentences."[6] Defendants are also improperly proposing to import limitations from the specification that are wholly unrelated to the term "Linguistic Characteristic" into their proposed construction of that term in an attempt to further narrow the proper construction of the claims of the '067 Patent. For example, Claim 1 specifically teaches that the claim Linguistic Characteristics will "correspond to the user's social, cultural, educational, economic background as well as to the user's psychological profile." The inclusion of an artificial limitation to insert these terms (that separately appear in the claim language) into the construction of "Linguistic Characteristic" is an improper attempt by the Defendants to narrow the construction of this term. In addition, the claim itself implies that the term Linguistic Characteristics, by itself, may correspond to additional types of data and not be

---

6 This limitation proposed by the Defendants is puzzling on a number of levels. For example, nXn does not even understand what the phrase "speech in sentences" means. It appears that the Defendants are trying to imply that Linguistic Characteristics can only be found in full sentences and not shorter linguistic constructs like phrases or keywords. This approach is clearly improper. In any event, this awkward, unclear language is likely to confuse the jury just as it has confused nXn.

limited to only these items (which appear separately in the claim).  Therefore, it is improper to import these limitations into the construction of Linguistic Characteristics.  *Cross Med. Prods. v. Medtronic Sofamor Danek, Inc*., 424 F.3d 1293, 1307 (Fed. Cir. 2005) (refusing to enter a construction that would render other claim language redundant).

Accordingly, nXn respectfully requests the Court to adopt its proposed construction.

### D.    The Term "Linguistic Data" Should Be Construed By This Court As "Text."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Text. | Texts from which linguistic patterns and their frequencies of occurrence are extracted. |

nXn proposes that this Court construe the term Linguistic Data[7] as "text."  Defendants propose to construe the term as "texts from which linguistic patterns and their frequencies of occurrence are extracted."  nXn's proposed construction is preferable because it is consistent with the common, ordinary meaning and the intrinsic evidence, while Defendants' proposed construction has no support in the intrinsic evidence and is yet another attempt to improperly narrow this claim term and further advance their non-infringement positions.

nXn's proposed construction is consistent with the intrinsic evidence.  Claim 1 makes it clear that Linguistic Data is the input which drives the invention.  The specification teaches that the input data used by the invention include "[a]ll texts composed by the user."  Ex. A at 3:46; *see also* Ex. A at 9:17-21 ("In summary, in accordance with the present invention, particular linguistic patterns and their frequencies of recurrence are **extracted from the texts provided by the users** of the system of the present invention and stored in a user profile data file." (emphasis added)); 4:53-57 (describing a first stage of the invention involving analyzing texts).  Thus, nXn's proposal to construe the term Linguistic Data as "text" is accurate and fully consistent with the intrinsic evidence.

---

[7] The term "linguistic data" is contained in asserted claims 1, 3, 4, 43, 45 and 47.

Defendants' proposal to add narrowing functional limitations to the "text" construction has no support whatsoever in the intrinsic evidence. For example, the specification includes no requirement that the term Linguistic Data should be limited only to specific texts. Instead, the limitation that Defendants seek to import into the construction of the term "Linguistic Data" already exists elsewhere in the claims and is thus not properly included in the construction of this term. *See, e.g.*, Ex. A at Claim 1(a) (using Linguistic Data to generate a "user data profile…representative of a first linguistic pattern"). These limitations should not be imported into the construction of Linguistic Data. *Cross Med.*, 424 F.3d at 1307

**E.     The Term "Linguistic Pattern" Should Be Construed By This Court As "A Combination Of Various Parts Of Speech (Nouns, Verbs, Adjectives, Etc.)."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A combination of various parts of speech (nouns, verbs, adjectives, etc.). | A repeating combination of various parts of speech (nouns, verbs, adjectives, etc.) that appears in a sentence and reflects a specific user's cultural, educational, social background, and the user's psychological profile. |

nXn proposes that the Court construe the term Linguistic Pattern[8] as: "A combination of various parts of speech (nouns, verbs, adjectives, etc.)." Defendants propose to construe Linguistic Pattern as: "A repeating combination of various parts of speech (nouns, verbs, adjectives, etc.) that appears in a sentence and reflects a specific user's cultural, educational, social background, and the user's psychological profile." The Court should adopt nXn's proposed construction because it is consistent with the intrinsic evidence and claim construction principles, unlike Defendants' proposed construction.

The term "Linguistic Pattern" is fully defined in the specification of the '067 Patent. nXn's proposed construction is taken almost verbatim from the specification and is therefore

---

[8] The term "Linguistic Pattern" is contained in Claims 1 and 45.

clearly supported. The specification specifically refers to Linguistic Patterns as "combinations of various parts of speech (nouns, verbs, adjectives, etc.)." Ex. A at 3:48-49 and 9:10-11. The only changes made by nXn were to make the specification's language singular.

Defendants have also quoted directly from the specification, but they have also chosen to artificially import the limitation that a Linguistic Pattern must be a *repeating* combination. Presumably, Defendants are relying on the specifications reference to "recurring linguistic patterns." Ex. A at 3:48. Although the inventor discussed the possibility of "recurring linguistic patterns," the inventor did not include this language in the claims, and this limitation should not be read into the claims now. Defendants have pointed to no evidence whatsoever that the inventor intended to limit the term Linguistic Patterns to only "repeating" Linguistic Patterns. Moreover, the specification makes clear that "Linguistic Patterns" were not intended to be defined as "repeating." By describing "recurring linguistic patterns", the specification would, according to Defendants' construction, mean "recurring repeating combinations," which would be redundant. In addition, Defendants have imported a limitation that a Linguistic Pattern must "appears [sic] in a sentence and reflects [sic] a specific user's cultural, educational, social background, and the user's psychological profile." Defendants take this language from the specification, adjacent to nXn's cited support, above, which refers to "sentences that reflect the user's cultural, educational, social backgrounds and the user's psychological profile." Ex. A at 3:50-51, and 9:11-13. However, the quoted description of Linguistic Pattern occurs in the context of a specific type of Linguistic Pattern – those that occur in "texts composed by the user, or adopted by the user as favorite." Ex. A at 3:46-47, and 9:8-9. In other words, the cited passages from the '067 Patent discuss Linguistic Pattern in the context of extracting a user profile. In Claim 1, for example, this type of linguistic pattern is referred to as a "first linguistic pattern." Ex. A, Claim 1, at 25:34-35. However, Claim 1 goes on to describe a "second linguistic pattern" referring to data items. Ex. A, Claim 1, at 35:41. The data items are not necessarily composed by, nor adopted by, the user. Consequently, defining Linguistic Pattern to require "sentences that reflect a specific user's cultural, educational, social backgrounds and the

user's psychological profile" would mean that a "second linguistic pattern" is not a Linguistic Pattern as defined by the Court.  Such a result is untenable. Defendants' proposed construction should be rejected, and this Court should adopt nXn's proposed construction.

      **F.**      **The Term "Match Factor" Should Be Construed By This Court As "A Value That Represents How Closely Two Things Match, And Whose Calculation Includes Adding A First And Second Similarity Factor."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A value that represents how closely two things match, and whose calculation includes adding a first and second similarity factor. | A value that is calculated by adding together the first and second similarity factors for every data item. |

nXn asserts that the proper construction of the term "Match Factor" is "a value that represents how closely two things match, and whose calculation includes adding a first and second similarity factor."[9]  Defendants propose a construction of "a value that is calculated by adding together the first and second similarity factors for every data item."

nXn's proposed construction is derived from both the specification as well as the claims of the '067 Patent.  The specification describes a Match Factor as a mathematical representation of the similarity between two things.  *See* Ex. A at 6:7-9 ("A match value is then determined by the system for each segment in the data item profile that also appears in the search profile and in the user profile").  In one embodiment the specification describes that the Match Factor may be calculated by "adding the frequency of the segment's occurrence in the data item profile to the frequency of the segment's occurrence in the user profile."  *Id.* at 6:9-12.  Claim 1 of the '067 Patent requires calculating a "final match factor" "by adding said first similarity factor to at least one of said plural second similarity factors in accordance with at least one intersection between said first correlation and said second correlation."  Ex. A at 26:1-7.   Because nXn's proposed

---

9 The term "Match Factor" is contained in Claims 1 and 43.

construction reflects the definition of Match Factor taught by the intrinsic evidence, nXn's proposed construction should be adopted.

Defendants' proposed construction should be rejected because it is unnecessarily limiting and not supported by the intrinsic evidence. First, Defendants' proposed construction should be rejected because it limits the construction of the term "Match Factor" to the addition of two similarity factors, an approach not supported by the claims or the specification. The claims and specification of the '067 Patent never limit the calculation of Match Factor to just two factors. While the claim requires that the addition of the two similarity factors must at least be *part* of the calculation, it does not require that the calculation is limited to the addition of those two similarity factors.[10] Second, Defendants' proposed construction is factually inaccurate. The specification of the '067 Patent doesn't say anywhere that a Match Factor is the adding together of similarity factors for ***every*** Data Item. Indeed, it is unclear what "the first and second similarity factors for every data item" even means. This limitation is wholly invented by the Defendants in another attempt to limit the proper scope of the claims of the '067 Patent. The claims and specification teach the determination of similarity factors" for data item profiles and user profiles, but not the Data Items themselves. Accordingly, the Court should adopt nXn's proposed construction.

G.     The Term "Personal Textual Data" Should Be Construed By This Court As "Texts Composed By A Specific User."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Texts composed by a specific user. | Texts composed by a specific user that contain certain recurring linguistic patterns that reflect the user's cultural, educational, social background, and the user's psychological profile. |

---

10 Furthermore, to the extent that the claims refer to the calculation of a Match Factor using two factors, this description is not limiting. An accused instrumentality infringes a method claim, such as the calculation of Match Factor, even if the method used by the accused instrumentality uses additional steps. *See, e.g., Predicate Logic, Inc. v. Distributive Software, Inc.*, 544 F.3d 1298, 1304 (Fed. Cir. 2008); *and Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003) (noting that the transitional term "comprising" denotes an open-ended claim structure that does not exclude additional features).

nXn proposes that the term "Personal Textual Data"[11] be construed as "texts composed by a specific user." Defendants assert that the term should be construed as "texts composed by a specific user that contain certain recurring linguistic patterns that reflect the user's cultural, educational, social background, and the user's psychological profile."

The specification of the '067 Patent fully supports nXn's proposed construction: "Personal textual data preferably consists of ***any documents created and composed by the user*** and may include, but is not limited to: books, articles, memorandums, essays, compositions, e-mails, reports, and web sites." Ex. A at 10:32-35 (emphasis added). The claims also support nXn's proposed construction. Ex. A at Claim 47 ("personal textual data generated by the user").

Although both parties agree that Personal Textual Data is properly construed as "texts composed by a specific user," Defendants seek to add the additional limitations that Personal Textual Data must have "certain recurring linguistic patterns that reflect the user's cultural, educational, social background, and the user's psychological profile." This approach is not supported by the specification and would render portions of the claims redundant. However, once again the defendants are attempting to selectively create an artificially narrow construction solely in advancement of their non-infringement positions. The inclusion of an artificial limitation to insert these terms (that separately appear in the claim language) into the construction of this term is an improper attempt by the Defendants to narrow the construction of this term. Because Defendants cannot present any evidence that the inventor intended to import such limitations in the construction of Personal Textual Data, Defendants proposed additional limitations must be rejected. *See Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1355 (Fed. Cir. 2003) ("Absent a *clear disclaimer* of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context.") (emphasis added). *See also*

---

11 The term "Personal Textual Data" is contained in asserted Claims 3 and 47.

*Cross Med.*, 242 F.3d at 1307.

**H.**     **The Term "Psychological Profile" Should Be Construed By This Court As "Information Regarding the Behavioral And/Or Personality Traits Of A Person."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Information regarding the behavioral and/or personality traits of a person. | Cannot be construed. |

nXn asserts that the term "Psychological Profile"[12] means "information regarding the behavioral and/or personality traits of a person."  Defendants assert that the term cannot be construed because the term is indefinite.  nXn respectfully requests that Court find that the term is not indefinite and that it is properly construed as proposed by nXn.

The Court should construe Psychological Profile according to its plain and ordinary meaning.  nXn's proposed construction was derived from its plain and ordinary meaning.  For example, "profile" is defined in the psychological context as "a description of behavioral and personality traits of a person compared with accepted norms or standards."  (Dictionary.com Unabridged (v 1.1), *at* http://dictionary.reference.com/browse/profile, attached as Exhibit D). nXn believes therefore, that its proposed construction accurately reflects the construction of the term in view of its use in the claims and specification.  *See, e.g.*, Ex. A at 3:51 ("the user's psychology profile").

Defendants refuse to propose a construction on the basis that the term is indefinite.  In order to support this position, Defendants must show that the term is "insolubly ambiguous." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001). Defendants' argument must fail, however, if "the meaning of the claim term is discernible, even though the task may be formidable and the conclusion may be one over which reasonable

---

12 The term "Psychological Profile" is contained in asserted Claims 1, 43 and 45.

persons will disagree." *Id.* Considering that Defendants have used the term Psychological Profile repeatedly in their proposed constructions, it is difficult to understand the Defendants' assertion. Defendants are either being disingenuous in their position, or are intentionally attempting to circumvent the purpose of claim construction by injecting ambiguity into claim terms that should be construed to remove any ambiguity.

Regardless of Defendants' intent, Defendants' argument must be denied. Determining the meaning of Psychology Profile is hardly "formidable." As described above, the inventor has used this term in an ordinary way and the plain and ordinary meaning of the term can be used to readily discern the meaning of the term. The Defendants' argument should therefore be rejected and nXn's proposed construction should be adopted. *See Exxon*, 265 F.3d at 1375.

I. **The Term "Search Request Data" Should Be Construed By This Court As "A Search String Entered By A User To The System."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
| --- | --- |
| A search string entered by a user to the system. | A search string entered by a user to the system that includes at least one linguistic pattern and that is representative of the data or information that the user wishes to locate. |

The parties agree that Search Request Data[13] is "a search string entered by a user to the system." This construction is supported by intrinsic evidence. *See, e.g.*, Ex. A at 5:41-43 ("[t]he search program is initiated when the user provides a search string representative of data requested by the user."); 21:17-19 ("the user provides a Search_String consisting of a number of words representative of the subject matter of the data desired by the user.").

The dispute is about whether Search Request Data should be further limited to include "at least one linguistic pattern and that is representative of the data or information that the user wishes to locate." nXn respectfully asserts that this limitation should not be included because it

---

13 The term "Search Request Data" is contained in asserted Claim 1.

lacks support in the intrinsic evidence and is contradicted by the surrounding claim language. In Claim 1(c), Search Request Data is "***representative of the user's expressed desire*** to locate data substantially pertaining to said search request data." Ex. A, Claim 1, at 25:46-47 (emphasis added). In other words, there is no requirement that the Search Request Data ***actually*** be representative of the sought-after data.

Accordingly, Defendants' proposed additional limitations should be rejected and nXn's proposed construction should be adopted.

**J.** **The Term "Search Request Profile" Should Be Construed By This Court As "A Collection Of Information About A Search Request."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A collection of information about a search request. | A file that includes information about the linguistic patterns in search request data. |

nXn proposes that the term Search Request Profile[14] should be construed as "a collection of information about a search request." Defendants, on the other hand, propose that the term should be construed as "a file that includes information about the linguistic patterns in search request data." Defendants' proposed construction is inconsistent with the specification, overly narrow and should be rejected in favor of nXn's proposed construction.

The parties agree generally that a Search Request Profile is information about a search request. The construction of Search Request Profile is not limited by the intrinsic evidence. *See* Ex. A at 5:44-45 (a Search Request Profile is "representative of a third linguistic pattern."); 5:48-51 ("Optionally, the system expands the search profile by generating additional segments that contain synonyms of the parts of speech in the existing segments already in the search profile"). Thus, nXn asserts that the proper construction is its plain and ordinary meaning of "a collection information about a search request."

Defendants, however, assert that Search Profile Request should be narrowly construed to

_____

14 The term "Search Request Profile" is contained in asserted Claim 1.

include information specifically about "the linguistic patterns in search request data." This definition is expressly contradicted by the specification, which expressly teaches that a Search Request Profile can include synonyms of the existing data already in the profile. Ex. A at 5:48-51. Furthermore, Defendants are presumably importing this limitation from the language of Claim 1(d). Importing such limitations is improper. *Cross Med.*, 242 F.3d at 1307. Therefore, nXn's proposed construction is proper and Defendants' proposed construction should be rejected.

**K.    The Term "Segment" Should Be Construed By This Court As  "A part of a sentence."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| A part of a sentence. | One or more predetermined types of parts of speech arranged in a predetermined order. |

nXn proposes that the term "Segment"[15] be construed as "a part of a sentence." The Defendants propose a construction of "One or more predetermined types of parts of speech arranged in a predetermined order" for this term.

Claim 45 recites that text items are retrieved from user linguistic data, at least one sentence is separated from the text items, and at least one segment is extracted from the sentence. Ex. A, 33:51-59. Thus, it is apparent from the context of the claims that a segment must be a part of a sentence.

nXn's proposed construction is also supported by the specification. For example, the specification states that in one embodiment a "segment comprises a triad of three parts of speech: noun-verb-adjective." Ex. A, 5:13-14. In another embodiment, a segment is described as "one or more predetermined types of [part of speech] arranged in a predetermined order." Ex. A, 14:60-61. Although these examples relate to one particular part of a sentence, a part of speech,

_____

15 The term "Segment" is contained in asserted Claim 45.

the inventor does not disclaim the use of other ways of breaking down parts of a sentence in the specification or the claims. Therefore, the term "segment" should be construed to mean "a part of a sentence" so as to capture the entire range of sentence parts that may be utilized as a segment.

On the other hand, Defendants clearly intend through their proposed construction to limit the meaning of the term "segment" just to the preferred embodiments discussed above. As discussed above, Claim 45 recites extracting a segment from a sentence. Claim 51 further recites additional steps including "tagging … different parts of speech" and "arranging a predetermined number of said tagged words … to compose at least one segment." Ex. A, Claim 51, at 34:58-64. Defendants improperly attempt to limit the meaning of "segment" to this exemplary embodiment, captured in dependent Claim 51. *Praxair*, 543 F.3d at 1326 (refusing to limit a claim term to require features "intended to be added by [a] dependent claim"). Once again, the Defendants are offering a proposed construction that is geared at artificially limiting the coverage of the claim and their construction is clearly intended to advance their non-infringement positions. Accordingly, the proposed restriction along with the Defendants' proposed construction is improper.

nXn respectfully requests that the Court decline to adopt Defendants' proposed construction and adopt nXn's proposed construction.

**L.     The Terms "First/Second "Similarity Factor" Should Be Construed By This Court, If At All, As "Information Representative Of The Degree Of Correlation Between Two Things."**

The parties have competing proposed constructions of the terms "first similarity factor" and "second similarity factor," as shown in the two charts below, respectively:

| **NXN TECH'S CONSTRUCTION** | **DEFENDANTS' CONSTRUCTION** |
|---|---|
| **First Similarity Factor** ||
| No construction needed. Alternate Construction: If the court determines construction is appropriate, nXn proposes: "Information representative of the degree of correlation between two things, e.g. between a user profile and a search request profile." | A correlation between a user profile and a search request profile that includes the number of segments that appear in both of the profiles and the total number of times that each such segment appears in the two profiles. |
| **Second Similarity Factor** ||
| No construction needed. Alternate Construction: If the court determines construction is appropriate, nXn proposes: "Information representative of the degree of correlation between two things, e.g. between a data item profile and a search request profile." | A correlation between a data item profile and a search request profile that includes the number of segments that appear in both of the profiles and the total number of times that each such segment appears in the two profiles. |

nXn proposes that no construction of these terms is necessary because both terms are adequately defined in the claim.[16]

The first and second similarity factors refer to correlations, and differ with respect to what items are being correlated. Claim 1 describes "first similarity factor" as "representative of a correlation between said search request profile and said user profile." Ex. A, 25:56-58. Claim 1 also describes "second similarity factor" as "representative of a second correlation between said search request profile and a different one of said plural data item profiles." Ex. A, 25:61-65. The words of the claims define the invention and, where a claim term is self-defining, there should be no need to create an alternative construction that might change the construction offered by the claim language itself. *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly instructive."). The proposed constructions of

---

16 The terms "first similarity factor" and "second similarity factor" appear in Claim 1.

"search request profile" and "data item profile" are addressed above, and the proposed construction of "user profile" is addressed below. Thus, once these terms are construed, no further construction is necessary to determine the meaning of "first similarity factor" and "second similarity factor." If the Court believes that a construction is necessary, it should adopt the construction provided by Claim 1. That is, a "similarity factor" is "information representative of the degree of correlation between two things."

Defendants' proposed constructions of each of these terms seeks to improperly narrow "similarity factor" by defining it in terms of just one way in which it can be generated, *i.e.*, by examining "the number of segments that appear in both of the profiles and the total number of times that each such segment appears in the two profiles." This construction is improper because the specification neither expressly defines "similarity factor" nor does it state that two profiles can only be correlated in this manner.

Thus, if the Court is persuaded that construction of one or both of these terms is necessary, nXn respectfully submits that its proposed construction more accurately captures the meaning of "similarity factor" than does Defendants' proposed construction.

**M.** **The Term A "Text Item" Should Be Construed By This Court As "A Piece Of Text."**

| <u>NXN TECH'S CONSTRUCTION</u> | <u>DEFENDANTS' CONSTRUCTION</u> |
|---|---|
| A piece of text. | A series of words that is long enough to be broken into sentences such that linguistic patterns can be extracted. |

nXn proposes that the term "text item" be construed as "a piece of text."[17] The Defendants' proposed construction for this term is: "A series of words that is long enough to be broken into sentences such that linguistic patterns can be extracted."

nXn's proposed construction is wholly consistent with the specification which describes

---

17 The term "Text Item" is contained in asserted Claims 4 and 45.

text items as either "individual text documents" or "data files." For example, the specification notes that "personal and favorite textual data are stored in User_Data as *Text_Items – i.e. individual text documents*." Ex. A, 10:67 – 11:2 (emphasis added). In addition, the specification provides a variety of examples for Text Items, including web sites (Ex. A, 11:45), and data files (Ex. A, 11:52). Thus, nXn proposes a construction that easily accommodates the inventor's understanding of Text Item.

Defendants' proposal is unnecessarily clunky and inconsistent with the claim language, and also imports a limitation of length that excludes a specifically claimed feature. Claim 4 recites that user linguistic data includes at least one text item, and that the text item comprises "at least one sentence." Ex. A, 26:32-33. Similarly, Claim 45 recites that at least one text item is separated into at least one sentence. Ex. A, 33:53-54. The phrase "at least one sentence" encompasses the singular "one sentence." Defendants' proposed construction would require that a text item be capable of being broken into "sentences." Defendants' proposed construction is thus flatly inconsistent with the patent claims and should be rejected in favor of nXn's proposed construction.

nXn respectfully requests that the Court adopt its proposed construction of "text item" because it is both more straightforward and consistent with the specification and claims.

### N. The Term "Textual Data" Should Be Construed By This Court As "One Or More Pieces Of Text."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| One or more pieces of text. | Texts composed by either a specific user or someone other than the user that contain certain recurring linguistic patterns that reflect the user's cultural, education, social background, and the user's psychological profile. |

nXn's proposed construction for the term "textual data" is "one or more piece of text."[18]

---

18 The term "Textual Data" is contained in asserted Claims 3 and 47.

The Defendants' proposed construction for this term is: "Texts composed by either a specific user or someone other than the user that contain certain recurring linguistic patterns that reflect the user's cultural, education, social background, and the user's psychological profile."

nXn's proposed construction is consistent with the specification which states that textual data may be stored as "individual text documents." Ex. A, 10:67 – 11:2. The specification provides examples of two types of textual data: "personal textual data generated by the user, and favorite textual data generated by a source other than the user." Ex. A, 10:30-33. Similarly, two examples of textual data are discussed in the claims: (i) "said user linguistic data comprises at least one of: personal textual data generated by the user; and (ii) favorite textual data generated by a source other than the user." Ex. A, Claim 3, at 26:28-31.

Defendants' proposed construction is cumbersome and inconsistent with the specification and bedrock claim construction principles. Defendants want to build into the construction a number of limitations including: (i) the source of the text (that it comes from a specific user or someone other than that user); (ii) the content of the text (that it contains recurring linguistic patterns); and (iii) the nature of the text (that it reflects the user's cultural, education, social background, and the user's psychological profile). These additional limitations are not necessary to facilitate a proper understanding of the claims. Moreover, both Claims 3 and 47 describe "textual data" as at least one of user-generated or user-adopted textual data. Ex. A, 25:28-31, and 34:26-32. Given that both types of textual data are identified by the claim language, any construction of "textual data" that purports to incorporate the descriptions of generated and adopted textual data is redundant.

nXn respectfully requests that the Court adopt its proposed construction of "textual data" because it is both more straightforward and consistent with the specification and claims.

### O. The Terms "User Profile" And "User Data Profile" Should Be Construed By This Court As "A Collection of Information About A User."

| **NXN TECH'S CONSTRUCTION** | **DEFENDANTS' CONSTRUCTION** |
|---|---|
| A collection of information about a user. | A file containing information about a specific user's linguistic patterns and the frequencies with which these patterns recur in texts that are: (i) submitted by the user or (ii) associated with the user and automatically acquired by the system, without identifying any background or private information about the user. |

The terms "User profile" and "user data profile" will be addressed jointly here because nXn and Defendants' respective constructions of those two terms are identical for each of those terms. nXn's proposed construction for the term "user data profile" is "A collection of information about a user."[19] The Defendants' proposed construction for this term is: "A file containing information about a specific user's linguistic patterns and the frequencies with which these patterns recur in texts that are: (i) submitted by the user or (ii) associated with the user and automatically acquired by the system, without identifying any background or private information about the user." Once again, nXn proposes a construction that is consistent with the claims and specification, while Defendants seek to import or create out of whole cloth specific limits from specific embodiments described in the specification.

nXn's proposed construction is based on the specification which demonstrates that a user profile includes information about a user. For example, the specification states that a user profile can be a computer file "representative of the user's linguistic patterns." Ex. A, 9:52-53. Similarly, Claim 1 states that the user data profile is "representative of a first linguistic pattern." Ex. A, 25:34-35. Meanwhile, Claim 45 describes a method for generating a user data profile that includes specific information about linguistic patterns and their frequencies of use that can be stored in the user data profile. Ex. A, 33:39 – 34:20. Although these examples all relate to one particular type of information about a user, linguistic patterns, the inventor never disclaimed the

---

19 The term "User Data Profile" is contained in asserted Claims 1, 45 and 56.

use of a user profile for other types of information about a user in the specification or the claims. Therefore, "user profile" and "user data profile" should be construed to mean "a collection of information about a user" so as to capture the entire range of information about a user that may be collected.

Defendants' proposed construction suffers from many defects. First, Defendants' proposal requires that a user profile contain information about a user's "linguistic patterns and the frequencies with which these patterns recur." As discussed above, the specification and claims contemplate that, where linguistic patterns are concerned, the user profile only has to contain information "representative of" the linguistic pattern. Second, Defendants' attempt to limit a user profile to storing only information about linguistic patterns and frequencies is improper and without support in the specification. Third, Defendants' attempt to further qualify the texts from which the linguistic patterns and frequencies are derived is also improper. Defendants attempt to exclude certain types of information from a user profile, presumably based on language from an exemplary embodiment that "the User_Profile does not contain any private information about the user." Ex. A, 11:14-15. There is no justification for Defendants' inclusion of this limitation, which is more likely an attempt to forward their non-infringement arguments in the guise of a claim construction position. nXn respectfully requests that the Court reject Defendants' proposed construction.

### P. The Term "User Linguistic Data" Should be Construed By This Court As "Text, Including Text Either Generated Or Adopted By The User."

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| Text, including text either generated or adopted by the user. | Textual data supplied by the user or adopted by that user as favorite that contain certain recurring linguistic patterns. The user linguistic data is not part of the user profile, but is the text from which the patterns are extracted to create the user profile. |

nXn's proposed construction of the term "User Linguistic Data" is "Text, including text

either generated or adopted by the user."[20] The Defendants' proposed construction for this term is: "Textual data supplied by the user or adopted by that user as favorite that contain certain recurring linguistic patterns. The user linguistic data is not part of the user profile, but is the text from which the patterns are extracted to create the user profile."  Once again while nXn relies on clear support contained in the specification of the '067 Patent, the Defendants continue their practice of importing cherry picked limitations from the specification, creating limitations out of whole cloth along with proposed negative limitations in an attempt to improperly limit the scope of the '067 Patent to advance their non-infringement positions.

Although the term "user linguistic data" does not expressly appear in the specification, the specification does discuss that it is advantageous that "the User_Profile is based on sufficient linguistic data provided by the user before its utilization." Ex. A, 12:48-50.  This passage follows a general discussion of how a user profile (discussed above) might be developed by processing data derived from texts either generated by, *i.e.* created and composed by, or adopted by the user.  Ex. A, 10:24 – 12:47.  nXn's proposed construction is consistent with this discussion and the specification.

In contrast, Defendants' proposed construction is flawed in a number of ways.  First, Defendants are not content merely to construe what "user linguistic data" is, but they also want to construe what it *is not*.  Defendants proposed inclusion of a negative statement that "user linguistic data is not part of the user profile" is unnecessary and potentially confusing.  Second, Defendants' proposed construction imposes improper limitations on the meaning of "user linguistic data."  Defendants seek to impose the requirement that the texts "contain certain recurring linguistic patterns."  In the general discussion mentioned above (Ex. A, 10:24 – 12:47), the inventor does not impose such a limitation, and Defendants are improper in doing so.  Lastly, the Defendants' proposed construction is inconsistent with the specification.  For example, Defendants' contention that "user linguistic data" should include texts "supplied by" a user does

---

20 The term "User Linguistic Data" is contained in asserted Claims 1, 3, 4, 45 and 47.

not clearly encompass the case in which the texts are "created and composed by" the user, as described in the specification. Ex. A, 10:32-33. Thus, the use of Defendants' proposed "supplied by" language should be disfavored.

nXn respectfully requests that the Court adopt its proposed construction of "user linguistic data" because it is both more straightforward and consistent with the specification of the two proposals while the Defendants' proposed construction meets neither of these requirements.

Q.      **The Term "User Segment Group" Should Be Construed By this Court, If At All, As "A Group Of Identical Segments."**

| NXN TECH'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION |
|---|---|
| No construction needed. Alternate construction: If the court determines construction is appropriate, nXn proposes: "A group of identical segments." | A collection of identical segments extracted from a text item |

nXn proposes that no construction of the term "user segment group" is needed because it is adequately defined within the claim in which it is used.[21] To the extent that this Court deems it appropriate to construe this term, nXn proposes the construction of: "A group of identical segments." The Defendants' proposed construction for this term is: "A collection of identical segments extracted from a text item."

Claim 45 describes generating a "user segment group" as "grouping together identical segments." Ex. A, 33:65-67. The words of the claims alone define the invention and, where a claim term itself is self-defining, there should be no need to create an alternative construction that might change the construction offered by the claim language itself. *Phillips*, 415 F.3d at 1314 ("To begin with, the context in which a term is used in the asserted claim can be highly

---

21 The term "User Segment Group" is contained in asserted Claim 45.

instructive.").  The words "grouping," "together," and "identical" are clear in the context of the claim, and the proposed construction of "segment" is addressed above.  Thus, once the term "segment" is construed, no further construction is necessary to determine the meaning of "user segment group."

To the extent the Court decides to construe this term, the context in which the term "User Group Segment" is used within the claims of the '067 Patent should be adopted.  According to Claim 45, "generating at least one user segment group" means "grouping together identical segments."  It follows that the object being generated is what results after identical segments are grouped together, *i.e.*, "a group of identical segments."  This is the construction nXn proposes in the alternative.  This construction is also consistent with the specification's description that "the control unit 14 groups identical segments together into sets." Ex. A, 15:55-56.

In contrast, Defendants' proposed construction ignores the contextual claim language. For example, Claim 45 provides for "repeating … said steps (c) to (f) for each text item."  Ex. A, 33:62-64.  Thus, a "user segment group" is not limited to segments appearing within any one text item, as is inherent in Defendants' proposed construction.  Therefore, nXn's proposed definition more closely captures the meaning of "user segment group" in the context of Claim 45, and the surrounding claim language.

Thus, if the Court is persuaded that construction of this term is necessary, nXn respectfully submits that its proposed construction more accurately captures the meaning of "user segment group" than does Defendants' proposed construction.

## V.    <u>CONCLUSION</u>

nXn's proposed constructions properly rely on intrinsic evidence, and are not contradicted by extrinsic evidence.  More importantly, none of nXn's proposed constructions seek to import unwarranted limitations into the claims, nor do they violate basic structure of the dependent claims. For all of the foregoing reasons, nXn respectfully submits that its proposed constructions and proffered meanings be adopted by this Court.

Respectfully submitted,

Dated: June 29, 2009                    By: s/Patrick R. Anderson
                                        Andrew W. Spangler
                                        Spangler Law, P.C.
                                        208 N. Green Street, Suite 300
                                        Longview, Texas  75601
                                        Telephone:  (903) 753-9300
                                        Facsimile:  (903) 553-0403
                                        Email:  spangler@spanglerlawpc.com

                                        Marc A. Fenster
                                        Marc A. Fenster, CA SB # 181067
                                        E-mail: mfenster@raklaw.com
                                        RUSS, AUGUST & KABAT
                                        12424 Wilshire Boulevard 12th Floor
                                        Los Angeles, California 90025
                                        Telephone: 310/826-7474
                                        Facsimile: 310/826-6991

                                        David M. Pridham
                                        Law Office of David Pridham
                                        25 Linden Road
                                        Barrington, Rhode Island 02806
                                        Telephone:  (401) 633-7247
                                        Facsimile:  (401) 633-7247
                                        E-mail:  david@pridhamiplaw.com

                                        Ari Rafilson
                                        Texas State Bar No. 24060456
                                        The Rafilson Law Firm, PLLC
                                        1318 Royal Palm Lane
                                        Carrollton, TX 75007
                                        Telephone: (214) 789-4035
                                        Facsimile: (972) 236-5397
                                        Email: ari@rafilsonlawpllc.com

                                        Patrick R. Anderson
                                        Michigan Bar No. P68961
                                        4225 Miller Road, Bldg. B-9
                                        Suite 358
                                        Flint, MI 48507
                                        Telephone: (517)303-4806
                                        E-mail:  Patrick@prapllc.com

                                        **ATTORNEYS FOR PLAINTIFF**
                                        **PA ADVISORS, LLC**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by facsimile transmission and/or first class mail this 29th day of June, 2009.

s/Patrick R. Anderson