# EXHIBIT A

PA Advisors, LLC v. Google Inc. et al     Doc. 418 Att. 2

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| PA ADVISORS, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>GOOGLE INC., ET AL.<br><br>            Defendants. | Civil Action No. 2-07CV-480-RRR |

**EXPERT REPORT OF THE HONORABLE GERALD J. MOSSINGHOFF**

INTRODUCTION

    1.    Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I hereby submit this expert report as a statement of the opinions that I intend to express in the above-captioned action and the bases therefor. This report discloses the information that I have reviewed. Attached to this report as exhibits are my curriculum vitae (Exhibit A); a list of publications that I have authored or co-authored (Exhibit B); a list of the Congressional hearings that I participated in as a principal witness (Exhibit C); a list of the intellectual property cases in which I have testified in court or in deposition as an expert (Exhibit D); and a list of documents and materials in addition to those materials cited in this report, which I have reviewed to a greater or lesser extent, as appropriate (Exhibit E).

    2.    I am a member of the Bars of Missouri, the District of Columbia and Virginia and have been registered to practice before the United States Patent and Trademark Office ("USPTO") since 1961. From 1957 to 1961, I was a Patent Examiner in the USPTO. From

1965 to 1967, I was Director of Legislative Planning in the USPTO. With the advice and consent of the Senate, President Reagan appointed me as Commissioner of Patents and Trademarks on June 30, 1981, and I served in that position until January 19, 1985. At the time of my appointment I was a career civil servant, serving as the Deputy General Counsel of the National Aeronautics and Space Administration. While I was Commissioner of Patents and Trademarks, Congress elevated my position to that of an Assistant Secretary of Commerce. During that time also, President Reagan appointed me as U.S. Ambassador to the Diplomatic Conference on the Revision of the Paris Convention. I was also elected by the member nations as Chairman of the General Assembly of the United Nations World Intellectual Property Organization. From 2000-2008, I served three terms on the Patent Public Advisory Committee, established pursuant to P.L. 106-113, among other things, to advise the Under Secretary of Commerce on the policies, goals and performance of the USPTO. Since January 1997, I have engaged in the private practice of intellectual property law as Senior Counsel with the firm of Oblon, Spivak, McClelland, Maier & Neustadt, L.L.C., 1940 Duke Street, Alexandria, Virginia 22314. In addition, I currently teach intellectual property law at the George Washington University Law School. In 2007 I was inducted into the Intellectual Property Hall of Fame.

3. I have been retained by Quinn Emanuel Urquhart Oliver & Hedges, LLP and Howrey LLP, counsel for the defendants in the above-captioned action, to prepare this expert report and to be available to testify in the action. The law firm that employs me bills my time in this matter at my standard fee rate of $960.00 per hour for time spent on this matter, with reimbursement for actual expenses. No part of my compensation depends on the outcome of this litigation.

4. At the present time, I expect to testify, both at deposition and at trial, on the rules and procedural requirements governing the filing and prosecution of patent applications in the USPTO and the grant of U.S. patents by the USPTO, and on the duty of candor and good faith that those substantively involved in the preparation and prosecution of a patent application owe to the USPTO.

5. The opinions stated in this report are based on information currently available to me. I reserve the right to continue my investigation and study, which may include a review of documents and information that may yet be produced, as well as deposition testimony from depositions for which transcripts are not yet available and that may yet be taken in this case. Therefore, I reserve the right to expand or modify this report as my investigation and study continue, and to supplement my opinions in response to any additional information that becomes available to me, to any matters raised by the parties, and/or other opinions provided by the parties' expert(s). In my testimony I may use exhibits and demonstratives.

**GENERAL OVERVIEW OF PATENT EXAMINATION PROCEDURES**

6. Under a grant of authority in the U.S. Constitution, Congress established the U.S. patent system in 1790 to encourage the creation of new inventions and their disclosure to the public. To administer the U.S. patent system Congress established the United States Patent and Trademark Office, a key agency in the U.S. Department of Commerce. The USPTO has a staff of more than 6,000 patent examiners, each of whom is a scientist or engineer, and many of whom have legal education as well. As a performance-based federal agency, the USPTO has established production goals for each examiner. These goals do not limit the time available on any specific application but rather apply to the average time spent per case per reporting quarter. The average time allotted varies depending on the complexity of the technology. The *average*

time per application throughout the USPTO when the U.S. patent involved in this action was pending was approximately 20 hours.

7. After a preliminary review to ensure that an application meets the formal requirements of the USPTO, an examiner is responsible for deciding whether the patent application meets a number of substantive requirements.

    (a) Under 35 U.S.C. § 101:

        (1) The invention must involve patentable subject matter, i.e., be the type of technology that can be patented. § 706.03(a) of the Manual of Patent Examining Procedure[1] ("MPEP").

        (2) The invention must have utility or industrial application. § 2107 MPEP.

        (3) Only one patent can be granted for an invention. Ch. 800 MPEP.

    (b) Under 35 U.S.C. § 102, the invention must not be disclosed in what patent professionals refer to as "prior art." § 706.02 MPEP.

    (c) Under 35 U.S.C. § 103, even if the invention is not specifically disclosed in the prior art, a patent should not be granted if the invention would have been obvious to "a person having ordinary skill in the art" based upon what is in the prior art. § 706.02 MPEP.

    (d) Under 35 U.S.C. § 112, § 706.03(c) MPEP, several requirements are imposed:

        (1) The specification must contain a "written description."

---

[1] As stated by the Federal Circuit in *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997) regarding the Manual of Patent Examining Procedure:

    ... although it does not have the force of law, is well known to those registered to practice in the PTO and reflects the presumptions under which the PTO operates.

4

(2) It must be in "full, clear, concise and exact terms."

(3) It must enable a person skilled in the art to make and use the invention (referred to as the "enablement requirement").

(4) It must set forth the "best mode" contemplated by the inventor of carrying out his invention.

(5) It must conclude with claims (that are a part of the specification and thus the disclosure of the invention) "particularly pointing out and distinctly claiming" the invention.

8. After the review of a patent application for formal matters, the application is assigned to an examiner in a Group Art Unit, who examines the claims in an application and prepares an *Office Action* recording his/her conclusions. In the examination of a patent application, the examiner is required initially to decide whether the application satisfies the requirement set forth above in ¶ 7(a) and (d). The claims of an application define what the applicant regards as his/her invention. The examination of claims in an application requires an examiner to search the prior art to decide whether the requirements set forth in ¶ 7(b) or (c) above are satisfied. An applicant can respond to an Office Action by filing an *Amendment* or *Remarks* or both. This process continues until the application is *Allowed* to be issued as a patent or it is *Abandoned*. An applicant can *Appeal* an adverse decision of an examiner to the USPTO Board of Patent Appeals and Interferences and then to the Federal courts.

**PATENT IN SUIT**

9. The following U.S. patent is involved in this action:

| Patent No. | Referred to as |
|---|---|
| 6,199,067 | '067 patent |

10. The '067 patent was granted on March 6, 2001, to Ilya Geller for System and Method for Generating Personalized User Profiles and for Utilizing the Generated User Profiles to Perform Adaptive Internet Searches. The prosecution history of the '067 patent in the USPTO included the following:

(a) The '067 patent resulted directly from U.S. Patent Application No. 09/422,286 ("the '286 application"), filed October 21, 1999, and for examination to Assistant Examiner Shahid Alam, acting under the supervision of Primary Examiner Hosain T. Alam in Art Unit 2172.

(b) The '286 application claimed priority of Provisional Application No. 60/116,582, filed on January 20, 1999.

(c) On October 24, 2000, Examiner Hosain T. Alam issued a Notice of Allowability of the '286 application, allowing claims 1-62 and including the following Reasons for Allowance:

> The following is an examiner's statement of reasons for allowance:
>
> The prior art of record does not teach or fairly suggest in combination elements as recites in each of Applicant's independent claims 1, 44, 45, 59, and 60 and more specially to a system and method for extracting, by one of the local computer system and the remote computer system, a user profile from user linguistic data previously provided by the user, said user data profile being representative of a first linguistic pattern of the said user linguistic data and constructing, by the remote computer system, a plurality of data item profiles, each plural data item profile corresponding to a different one of each plural data item stored in the remote data storage system, each of said plural data item profiles being representative of a second linguistic pattern of a corresponding plural data item, each said plural second linguistic pattern being substantially unique to each corresponding plural data item as recited in claims 1, 44, 59 and 60;

for determining a user segment count, by the computer
system, for each user segment group of said at least one
user segment group, each said user segment count being
representative of a number of identical segments in the
corresponding user segment group of said at least one user
segment group, and linking each said user segment count to
the corresponding user segment group of said at least one
user segment group as recites in claim 45.

(d)     Included with the October 24, 2000, Notice of Allowability was the

Examiner's Form PTO-892, which cited ten U.S. patents and three nonpatent

documents. Neither the applicant's attorney nor the applicant cited any references

in an Information Disclosure Statement.

(e)     The '067 patent was granted on March 6, 2001.

**DUTY OF CANDOR AND GOOD FAITH TO THE USPTO**

11.     Under Rule 56, 37 C.F.R. § 1.56, of the USPTO, those substantively involved in

patent application preparation and prosecution are under a duty of candor and good faith to the

USPTO. Based upon earlier Supreme Court decisions,[2] Rule 56 was first promulgated as a

formal rule in 1977. The original Rule 56 stated:

> A duty of candor and good faith toward the Patent and Trademark
> Office rests on the inventor, on each attorney or agent who
> prepares or prosecutes the application and who is associated with
> the inventor, with the assignee or with anyone to whom there is an
> obligation to assign the application. All such individuals have a
> duty to disclose to the Office information they are aware of which
> is material to the examination of the application.

And "material" was defined as follows:

> Such information is material where there is a substantial likelihood
> that a reasonable examiner would consider it important in deciding
> whether to allow the application to issue as a patent. The duty is
> commensurate with the degree of involvement in the preparation or
> prosecution of the application.

---

[2] See, e.g., *Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co.* 324 U.S. 806 (1945).

In 1992, Rule 56 was extensively amended to make it more objective in its implementation. The 1992 Rule 56 amended the definition of "material information" to its current form:

> (b) Under this section, information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>    (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or
>    (2) It refutes, or is inconsistent with, a position the applicant takes in:
>       (i) Opposing an argument of unpatentability relied on by the Office, or
>       (ii) Asserting an argument of patentability.
> A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

And it specified in greater detail who was bound by the duty:

> Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:
>    (1) Each inventor named in the application;
>    (2) Each attorney or agent who prepares or prosecutes the application;
>    (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

    12.    In *Digital Control Inc. v. The Charles Machine Works*,[3] the Federal Court stated:

> Although we have affirmed findings of materiality based upon the new Rule 56 standard, . . . we have declined to address whether the new Rule 56 standard replaced the old 'reasonable examiner' standard. . . . That is, we have not yet determined whether the new Rule 56 is the same as the 'reasonable examiner' standard of the old Rule 56, or, if the new standard is narrower, whether a misstatement that is material under the 'reasonable examiner'

---

[3] 437 F.3d 1309 (Fed. Cir. 2006).

standard, but arguably not material under the new Rule 56 standard, still meets the threshold level of materiality required for a finding of inequitable conduct.

* * *

Even though the PTO's 'reasonable examiner' standard became the dominant standard invoked by this court, in no way did it supplant or replace the case law precedent. Rather, it provided an additional test of materiality, albeit a broader and all-encompassing test. Similarly, the PTO's recent adoption of an arguably narrower standard of materiality does not supplant or replace our case law. Rather, it merely provides an additional test of materiality. That is, if a misstatement or omission is material under the new Rule 56 standard, it is material. Similarly, if a misstatement or omission is material under the 'reasonable examiner' standard or under the older three tests, it is also material. As we reasoned in *American Hoist*, to the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower. (Case citations omitted.)[4]

**BREACH OF THE DUTY OF CANDOR AND GOOD FAITH WITH RESPECT TO THE '067 PATENT IN CONCEALING DOCUMENTS MATERIAL TO PATENTABILITY KNOWN TO THE APPLICANT'S ATTORNEY DURING THE PROSECUTION OF THE '067 PATENT**

13. On January 20, 2000, Patent Cooperation Treaty ("PCT") application No. PCT/US00/01373 was filed, claiming priority to the '286 application. On April 12, 2000, James R. Matthews, acting for Kim Yeh Vu, mailed an International Search Report that cited three U.S. patents: Nos. 5,696,963; 5,761,662 and 5,778,380. Each of those references was designated as being a "Y" reference, that is . . .

> document of particular relevance, the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art.[5]

---

[4] *Id.*, at 1314 and 1316.
[5] On October 9, 2000, Ms. Peggy Harrod, acting for Mr. Vu, completed a PCT International Preliminary Examination Report that included the following statement:

> Claims 1-62 meet the criteria set out in PCT Article 33(2)-4), because the prior art does not teach or fairly suggest a method and system in combination elements as recited in claims 1, 44, 45, 59, 60 and specially to constructing a plurality of data item profiles, each plural data item profile corresponding to a different one of each data item stored in the remote data storage system;

9

The claims of the PCT application and those of the '286 application are the same.

14. Neither of the three references cited in the PCT International Search Report was cited to Examiner Alam during the prosecution of the '286 application leading to the grant of the '067 patent.

15. Each of these PCT references would have been considered by Examiner Alam had they been provided by the Applicant. Specifically, Examiner Alam would have reviewed each reference and then placed his initial next to the reference indicating that he fulfilled his duty to consider references cited on an Information Disclosure Statement. MPEP 609.01 Examiner Checklist for Information Disclosure Statements.

16. The PCT International Search Report was mailed to the attorney prosecuting the '286 application, Mr. Edward Etkin, at his Brooklyn, N.Y. office on April 12, 2000, prior to the October 24, 2000 Notice of Allowance of the '286 application or the grant of the '067 patent. I am informed by counsel for the defendants that the PCT International Search Report (ETKIN00235-83) was provided to them by Mr. Etkin from his files in connection with this action.

17. In his expert report signed December 30, 2009, Mr. Stanley Peters states in part:

> The Dasan and Siefert patents each disclose elements of the '067 patent that were not disclosed by the prior art that was submitted to the United States Patent and Trademark Office for the '067 Patent, and are therefore material. The prior art patents cited by the '067 Patent, in combination with the Dasan and Siefert patents, render the '067 Patent obvious. A person of ordinary skill in the art would

---

extracting a search request profile from search request data; determining a first similarity factor representative of a first correlation between said search request profile and said user profile by comparing said search request profile to said user profile; determining a plurality of second similarity factors, each said plural second similarity factor being representative of a second correlation between said search request profile and a different one of said data item profile by comparing said search request profile to each of said plural data item profile; and calculating a final match factor for each of the said plural data item profiles.

have been able to combine the concepts of information retrieval,
natural language processing, and user profiles that are taught by
those patents in order to create the invention claimed in the '067
Patent.

18. Based upon ¶¶ 11-17, it is my opinion that the inventor, Mr. Geller, and his attorney, Mr. Etkin, breached their duty of candor and good faith to the USPTO in failing to disclose the three U.S. patents cited in the PCT International Search Report. According to Mr. Peters, the prior art that was submitted by the United States Patent and Trademark Office examiner for the '067 Patent discloses information retrieval, as well as the use of natural language processing and frequency patterns. The prior art does not, however, discuss the use of user profiles or retrieving search results that reflect a user's social, cultural, educational, economic background or psychological profile. The Dasan and Siefert patents disclose the use of user profiles. Therefore, they are material pieces of prior art.

19. MPEP § 2001.06(a) (July 1998) states in part:

> Applicants and other individuals, as set forth in 37 CFR 1.56, have
> a duty to bring to the attention of the Office any material prior art
> or other information cited or brought to their attention in any
> related foreign application. The inference that such prior art or
> other information is material is especially strong where it is the
> only prior art cited or where it has been used in rejecting the same
> or similar claims in the foreign application.

20. In his deposition on April 23, 2009, Mr. Etkin testified in part as follows:

> Q. Do you think that you have a duty to review the art that the PCT or
> that the International Search Report considered to be relevant --
>
> * * *
>
> A. No, I don't believe there's a separate duty. I mean the prior art is out
> there for every patent but there's no duty to search for it so no, I don't
> believe so.
>
> Q. So you don't believe there's a duty to review art that somebody else
> has identified to be relevant?

* * *

A. No, I don't, I don't believe there is. (Etkin Deposition 87:1-16)

I respectfully disagree with Mr. Etkin. He was the U.S. attorney who prosecuted the '286 application ('067 patent) and he was the principal attorney who filed the PCT application and received the PCT search report, which he had in his files and provided to the defendants' attorneys during document production in this case. As such, he could not adopt a "head-in-the-sand" approach to avoid his clear obligations under Rule 56 and MPEP § 2001.06(a). Under Rule 56, Mr. Etkin was substantively involved in the prosecution of the '286 application from the time it was filed until the '067 patent was granted. He was also officially involved in the PCT application when the International Search Report was completed and set to him. Short of revoking his power of attorney, his client could not alter or lessen Mr. Etkin's substantive and continuing obligations to the USPTO and the public under Rule 56.

Respectfully submitted,

Date: Dec. 31, 2009

Gerald J. Mossinghoff