# EXHIBIT B

PA Inventors, LLC v. Google Inc. et al.          Doc. 109.36 2

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

_____

PA ADVISORS, LLC

                Plaintiff

    -v-           Civil Action No. 2-07CV480-RRR

GOOGLE, INC., et al.

                Defendants

_____

DEPOSITION OF

HON. GERALD J. MOSSINGHOFF

VOLUME 1 OF 1

Friday, February 12, 2010

11:09 A.M. TO 2:48 P.M.

held at

Washington, District of Columbia

1    Mr. Edkin.  And I relied upon that and put that

2    in my report.

3         Q.     Anything else?

4         A.     I don't believe so, no.

5         Q.     Did you actually read the Geller

6    patent?

7         A.     I did.

8         Q.     What is your understanding of the

9    invention of the Geller patent?

10        MR. YOVITS:  Objection to the form of

11    the question.

12         A.     I really don't have one.  I didn't

13    understand it.  I read it twice when I was

14    preparing the report, and twice yesterday, and I

15    still don't understand it.

16    BY MR. GIZA:

17         Q.     Did you read the Dasan patent?

18         A.     I did at the time -- I didn't read it

19    carefully.  I did at the time that I was reading

20    my report, in preparing for Mr. Edkin's

21    deposition.

22         Q.     Did you read the Ahn patent?

23         A.     Same answer.  I scanned it.  I scanned

24    that, and I think there's a Siefert patent also.

25        So all three of those patents are part

1   of the transcript -- they're exhibits of

2   Mr. Edkin's deposition.  And so I scanned them at

3   the time I was preparing my report.  But I didn't

4   try to read them or understand them.

5        Q.    You don't have any technical opinion

6   about those patents; is that correct?

7            MS. ROBERTS:  Objection to form.

8        A.    That's correct.

9   BY MR. GIZA:

10       Q.    Did you read the Hoffberg patent?

11       A.    No.  I read the prosecution history,

12  and I don't recall whether that -- that was a

13  patent that was cited by the examiner, and I

14  don't remember whether the patents were part of

15  the prosecution history or not.  If they were, I

16  scanned them; if they were not I did not.  And I

17  can't tell you today whether I did or didn't.

18       Q.    Did you consider any of the cited

19  prior art?

20            MS. ROBERTS:  Objection, form.

21       A.    No, not in any -- not in any way in

22  which I would try to understand them.

23  BY MR. GIZA:

24       Q.    So you have no opinion as to the

25  content of the prior art cited in the prosecution

1    of the Geller patent.

2              MS. ROBERTS:  Objection, form.

3        A.     And what's the question?  I'm sorry?

4    That sounded like a statement to me but ...

5     BY MR. GIZA:

6        Q.     Well, I'm asking to you confirm it.

7              So, do you have an opinion as to the

8    content of the prior art cited in the prosecution

9    of the Geller patent?

10       A.     No.

11       Q.     Did you read the court's claim

12   construction?

13       A.     No.

14       Q.     Did you read any other expert reports

15   in this case?

16       A.     Well, I was given the -- Mr. Gordon's

17   report some time ago, and I read that once

18   yesterday in preparing for this deposition.

19       Q.     Have you ever worked with Mr. Gordon

20   before?

21       A.     I don't believe so.  If someone were

22   to hand me a picture of me shaking his hands at

23   some Patent and Trademark Office event, I

24   wouldn't deny it, but I can't put a name with the

25   face -- or a face with the name.

1    Q.    Did you read the expert report of

2  Mr. Peters?

3    A.    Yes.

4    Q.    Is that on your Exhibit E?

5    A.    No.  It's referred to, though,

6  specifically in my -- in my -- it's specifically

7  cited in the text of the expert report, so it's

8  not on Exhibit E.  But I did read that.

9         That was signed, as I recall, on

10  December 30, and I didn't sign my report until I

11  had an opportunity to read the final version of

12  it, which I did at that time.

13    Q.    Did you read the entire report?

14    A.    I paged through the entire report.

15  The part that I was -- that I read more

16  carefully, I think was entitled "materiality of

17  the references that weren't disclosed to the PTO"

18  or something like that.  And so that's what I

19  read and quoted from in my report.

20         The remainder of the report, I leafed

21  through it, but I didn't try to understand it,

22  because it had nothing to do with exactly what I

23  was trying to do at the time, and that is to

24  quote Mr. Peters and sign my report.

25    Q.    Did you look at any of the exhibits to

1 Mr. Peters' report?

2 A. Yes, I'm sure I did. I don't

3 recall ... I don't recall what was in them, but I

4 would have -- I had the entire report, and I

5 would have leafed through them. But again,

6 focused on his section entitled "materiality."

7 Q. There were exhibits that were actually

8 separate documents. That's why I'm asking the

9 question separately.

10 Did you see any claim charts?

11 A. I can't tell you today that I did. I

12 don't know that I did.

13 Q. So is it fair to say you didn't rely

14 on any claim charts from Mr. Peters' report?

15 A. Basically what I relied upon is quoted

16 in my report.

17 Q. Did you look at the expert report of

18 Dr. Ryan?

19 A. No.

20 Q. Did you discuss your report with

21 anyone? Excepting counsel?

22 MS. ROBERTS: Objection, form.

23 A. And excepting Ms. Narrish, who typed

24 it for me, my secretary.

25 BY MR. GIZA:

1    his or her attorney, in urging the patentability

2    of a claim.

3              So in general, that's it.  That's the

4    first part of it.

5              And if someone breaches their Duty of

6    Candor and Good Faith under either the pre-1992

7    standard or the post-1992 standard, then the

8    courts look to see whether they did so with

9    intent to deceive the U.S. Patent and Trademark

10   Office.  And if the answer to both those

11   questions is yes, there was a breach of the Duty

12   of Candor and Good Faith, and there was intent to

13   deceive the U.S. Patent and Trademark Office,

14   then a court can hold the entire patent

15   unenforceable under the Doctrine of Inequitable

16   Conduct.

17    BY MR. GIZA:

18      Q.    So you just described two standards

19   for determining materiality; right?

20              MS. ROBERTS:  Objection, form.

21      A.    Yes.

22    BY MR. GIZA:

23      Q.    Which standard did you apply in your

24   analysis in this case?

25      A.    In this case, I applied the standard

1  that was set forth in Mr. Peters' -- and that the

2  reasonable examiner would want to know about

3  these cases; and also the second standard that,

4  if, as he said, the missing documents -- the

5  documents that the patentee's attorney knew

6  about, but didn't cite to the Patent and

7  Trademark Office, that that would have rendered

8  obvious the claims of the '067 patent.

9          So really, I applied both standards:

10  The prima facie case of unpatentability, and the

11  reasonable examiner's test.

12      Q.    Do you have any opinion on whether the

13  patentee refuted or was inconsistent before the

14  PTO?  That prong of the test?

15          MS. ROBERTS:  Objection, form.

16      A.    I think the answer is yes.  By urging

17  the allowance of claims which would otherwise be

18  determined as being obvious, I think the attorney

19  satisfied both tests of what a reasonable

20  examiner would want to know, and the question of

21  whether the missing references would have been

22  inconsistent with positions they took.

23          And I use as my basis for that the

24  actual Digital Control case, which actually said

25  something like that, that by urging the allowance

1    of a claim, which an attorney does when he

2    includes a claim in an application supported by a

3    declaration and submits it to the office, that

4    that attorney is urging the allowance of that

5    claim; that the prima facie case of

6    unpatentability is satisfied, and the test of

7    whether or not the lack of submitting the

8    documents was inconsistent with positions that

9    the examiner -- or that the applicant took.

10                    (DEPOSITION EXHIBIT 3

11                    MARKED FOR IDENTIFICATION)

12                    MR. GIZA:  The witness has been handed

13   Exhibit 3.  It is a copy of the Mossinghoff

14   report.

15    BY MR. GIZA:

16        Q.    Mr. Mossinghoff, can you confirm what

17   that document is?

18        A.    This is the first part of my expert

19   report in this case.  I now have Exhibits E and

20   D.  There is A, B and C missing at this point.

21        Q.    So, can you point out for me where in

22   your report you make the argument that the

23   applicant was either refuted or was inconsistent

24   in the positions it took before the PTO?

25                    MR. YOVITS:  Objection to the form of

1    the question.

2         A.    I quote the report of Mr. Peters, in

3    my paragraph 17 on page 10, where he says, "The

4    prior art cited by the '067 patent in combination

5    with the Dasan and Siefert patents render the

6    '067 patent obvious."

7              And I use the fact that the Federal

8    Circuit has -- in the Digital Control case, has

9    said that submitting a claim, and in effect,

10   telling the Patent Office that it's an allowable

11   claim, and not disclosing references which would

12   make it not allowable, is inconsistent with a

13   position that the applicant took.  And those are

14   almost the exact words of the Federal Circuit.

15             So if my report doesn't specifically

16   cite that, then I want to be very clear in this

17   deposition that that is my opinion, that there

18   are three grounds:

19             One is the pre-'92 ground that says a

20   reasonable examiner would have wanted to know

21   about prior art which renders claims obvious.

22             Two, the -- so that's the first one.

23             Secondly, that it would create a prima

24   facie case of patentability.

25             And third, using the Digital Control

1  court interpretation, it would be inconsistent

2  with urging the allowance of a claim which would

3  otherwise not be allowable because it would be

4  obvious under section 35 USC Section 103.  So ...

5  　　　　　(REPORTER REQUESTED CLARIFICATION)

6  BY MR. GIZA:

7  　　　Q.　　So where specifically in your report

8  do you disclose your third argument that you just

9  made?

10  　　　　　MR. YOVITS:  Objection to the form of

11  the question --

12  　　　　　MS. ROBERTS:  Object, form.

13  　　　A.　　Yeah, I don't see that I've disclosed

14  it specifically here.  And that's why I'm being

15  so clear in deciding to tell you it is my third

16  ground in this deposition, so there's no

17  surprises to you that that would be my opinion.

18  BY MR. GIZA:

19  　　　Q.　　Did you cite the Digital Controls case

20  in your report at all?

21  　　　A.　　I did, indeed.  (Perusing document)

22  On page 8, paragraph 12, I cite the Digital

23  Control versus Charles Machine Works case.

24  　　　Q.　　And is there an explanation for why

25  you cited that in your report?

1        MS. ROBERTS:   Objection, form.

2     A.    No.  I think the case speaks for

3  itself by the fact that, if something satisfies

4  the -- what they refer to as a reasonable

5  examiner test, which was the pre-1992 test, that

6  it is material.  And then it goes on to say ...

7  "That is, we have yet to determine whether the

8  new standard is the same as the reasonable

9  examiner or if the new standard is narrower,

10  whether a misstatement is material under the

11  reexamination but arguably not material under

12  this, but still meets the threshold of

13  materiality."

14        It's cited, from what I indicated, the

15  fact that the case itself says that if one is

16  urging the allowance of a claim, and has material

17  not disclosed, which would render the case not

18  allowable, that that does satisfy the test of --

19  it's (b)2, I think, in the regulation Rule 56,

20  that not citing it is inconsistent with -- not

21  with the -- not citing the reference is

22  inconsistent with urging allowance of a claim,

23  and satisfies that part of the new regulation.

24  BY MR. GIZA:

25     Q.    So I hear you articulating the

1  argument regarding Digital Control's case, but we

2  agree that it's not specifically articulated in

3  your report; right?

4          MS. ROBERTS:  Objection, form.

5     A.     That part of it is not particularly --

6  not specifically articulated in my report, and

7  that's why I want to be very clear at this

8  deposition that that is my opinion, and I would

9  propose to testify to that effect.

10          MR. GIZA:  Okay.  Let's go ahead and

11  take a break.

12          THE VIDEO OPERATOR:  This includes

13  videotape number 1 in the deposition of Gerald J.

14  Mossinghoff.  We are going off the record at

15  12:07 P.M.

16

17          (LUNCH RECESS TAKEN AT 12:07 P.M.)

18

19                    *   *   *

20

21

22

23

24

25

1    granted as a patent.

2         And there is the test that says it's

3    inconsistent with assertions of patentability.

4    That would fall under asserting an argument of

5    patentability, which the circuit has said --

6    Federal Circuit has indicated, urging the

7    allowance of a claim which is otherwise not

8    allowable is inconsistent with that.

9         So you named one of three.

10        The non-cumulativeness applies to all

11   three.  And then there are three separate ones

12   after that, and you named one of the three, and I

13   named the other two.

14        Q.    Okay.  So let's break it down.

15        If the undisclosed references are

16   cumulative to the cited prior art in the

17   prosecution, then under no circumstances can

18   there be materiality; correct?

19        A.    That's correct.  Yes.

20        Q.    And with the same condition.

21        So if the undisclosed prior art is

22   cumulative of the cited prior art references in

23   the prosecution, then there can be no inequitable

24   conduct finding; correct?

25        A.    I believe that's correct, yes.

1    MS. ROBERTS:  Objection, form.

2  A. Again, that sounds like a statement,

3 again, not a question.

4 BY MR. GIZA:

5  Q. Let me rephrase.

6    So outside of the opinion provided by

7 Mr. Peters, do you have any separate opinion as

8 to whether the undisclosed prior art establishes

9 a prima facie case of unpatentability --

10  A. No --

11  Q. -- in this case?

12  A. No.  Sorry I interrupted you.  The

13 answer is no.

14  Q. That's okay.

15    So, in your opinion, the sole support

16 that the undisclosed prior art establishes a

17 prima facie case of unpatentability is the

18 statement by Mr. Peters, and I'll quote:  "The

19 prior art patents cited in the '067 patent, in

20 combination with the Dasan and Siefert patents

21 render the '067 patent obvious."  Correct?

22    MS. ROBERTS:  Objection to form.

23  A. Well, I think you could add that an

24 independent reason is that those two patents were

25 identified in the search report, the PCT search

1    Q.    Okay.  So just so that we're clear:
2  You've expressed no independent opinion about
3  obviousness in this case; right?
4    A.    That is correct --
5        MS. ROBERTS:  Objection to form.
6    A.    I'm relying upon Dr. Peters -- or
7  Mr. Peters' opinion that I state in my report.
8  BY MR. GIZA:
9    Q.    Okay.  Let's talk about intent.
10        It's your understanding that,
11  inequitable conduct requires an intent to
12  deceive; is that right?
13    A.    Well, it requires a breach of the Duty
14  of Candor and Good Faith, and added to that, an
15  intent to deceive the U.S. Patent and Trademark
16  Office.
17    Q.    And how does one determine whether
18  there is an intent to deceive the U.S. Patent
19  Office?
20    A.    Well, it's a determination by the
21  trier of fact, and in the case of inequitable
22  conduct, that is usually the judge acting alone,
23  although there have been cases where a judge will
24  ask a jury for special instructions.
25        The courts have generally recognized

1    from the surrounding circumstances.

2              There are cases where there is even

3    lack of specific knowledge of what was not

4    disclosed to the Patent and Trademark Office, and

5    the courts have held that that was inequitable

6    conduct.  And probably the most often cited case

7    in that regard is the Brasseler case, Judge

8    Gajarsa's decision in Brasseler.

9              So I think direct evidence of intent

10   would be an e-mail from some applicant who writes

11   to his brother-in-law and says, boy, I really

12   fooled the Patent Office today.  I didn't tell

13   them about this reference that's a dynamite

14   reference.  That would be direct evidence.  And I

15   don't think that's required, or even present in

16   most cases.

17        Q.    So I'm asking a little bit of a

18   different question.  I'm asking whether

19   inequitable conduct requires a finding of

20   subjective intention to deceive; in other words,

21   was there a person with a duty to the Patent

22   Office who, as an individual, had an intent to

23   deceive the Patent Office?

24        A.    I don't know how to answer that.  I

25   don't testify on intent; I don't give opinions.

1    If someone asks me -- one of the people that
2    engage me ask me to give an opinion on intent, I
3    would not do that.
4            I would give opinions -- or statements
5    regarding intent.  And I have done that in court.
6            I have given evidence in court that a
7    material misrepresentation was made in a
8    declaration to the Patent and Trademark Office
9    had a very, very high materiality, probably as
10   high as one could imagine in the Patent and
11   Trademark Office.  That evidence was received by
12   the court, and in effect, adopted by the court in
13   finding that there was inequitable conduct.
14           The Critikon case, which I cite in my
15   footnote one on page ... on page 4, beginning on
16   page 4 in footnote 1.  That case -- I don't cite
17   it for intent.  I cite it for a totally different
18   proposition, and I think it's a good proposition
19   to put in an expert's report, and that is what
20   the MPEP is, the fact that it does not have a
21   force of law but is well-known to those
22   registered to practice and reflects presumptions,
23   that case later on had Judge Giles Sutherland
24   Rich, who was a great fan of inventors, and
25   inventive activity, say that if all a person had

1    disclosed; that the -- so I personally have --

2    and I think that word is often used -- an abiding

3    conviction, that the prior art cited by the PCT

4    in the PCT search as a "Y" references, and then

5    Mr. Peters' analysis, or opinion that it was

6    material when taken in connection with art that

7    was cited in the Patent and Trademark Office

8    grant of the '067 patent, I personally have an

9    abiding conviction that there was a breach of the

10   Duty of Candor and Good Faith.

11          Whether that would satisfy a

12   hypothetical instruction to a jury or not, I

13   don't know.  I'm not a civil procedure person.

14   BY MR. GIZA:

15   Q.    Okay.  So just to clean that up:  Is

16   it true that you have no opinion as to whether

17   the evidence of materiality in this case is clear

18   and convincing?

19          MS. ROBERTS:  Objection to form.

20   A.    I wasn't asked to reach that opinion,

21   and I don't have that opinion.

22   BY MR. GIZA:

23   Q.    Thank you.  Does the Dasan patent

24   disclose the use of user profiles?

25   A.    According to Mr. Peters, it does.  And

1    I'm relying upon that.

2       Q.    Did you independently verify that?

3       A.    No.  I don't believe I'm capable of

4    doing that.

5       Q.    Does the Siefert patent disclose the

6    use of user profiles?

7       A.    Same answer.  According to Mr. Peters,

8    it does have that feature.

9       Q.    Did you independently verify whether

10   Siefert uses -- strike that.

11          Did you independently verify whether

12   the Siefert patent discloses the use of user

13   profiles?

14      A.    No.  No.

15      Q.    Does the Dasan patent disclose

16   retrieving search results that reflect the user's

17   social, cultural, educational --

18       (REPORTER REQUESTED CLARIFICATION)

19      Q.    Does the Dasan patent disclose

20   retrieving search results that reflect a user's

21   social, cultural, educational, economic

22   background, or psychological profile?

23      A.    I don't know the answer to that.

24      Q.    Does the Siefert patent disclose

25   retrieving search results that reflect the user's

1 difference between the first sentence starting

2 with, "The prior art does not," and the following

3 sentence that talks about the Dasan and Siefert

4 patents.

5 You do not have the opinion that Dasan

6 and Siefert disclose retrieving search results

7 that reflect the user's social, cultural,

8 educational, economic background or psychological

9 profile; right?

10 A. I'm sorry, can we have that read back?

11 I didn't ... either have it repeated or read

12 back, one or the other. I didn't quite get it.

13 Q. I'll reiterate the question.

14 Do you have an opinion whether the

15 Dasan and Siefert patents disclose retrieving

16 search results that reflect a user's social,

17 cultural, educational, economic background or

18 psychological profile?

19 A. No, not specifically.

20 Q. If Dasan and Siefert do not disclose

21 retrieving search results that reflect a user's

22 social, cultural, educational, economic

23 background or psychological profile, does it make

24 any difference to the materiality analysis if the

25 prior art also does not disclose those?

1  Mossinghoff.  We're going off the record at 1:44

2  P.M.

3           (RECESS TAKEN FROM 1:44 TO 1:55 P.M.)

4           THE VIDEO OPERATOR:  This begins

5  videotape number 3 in the deposition of Gerald J.

6  Mossinghoff.  The time is now 1:55 P.M.  We are

7  back on the record.

8   BY MR. GIZA:

9      Q.    Mr. Mossinghoff, I'm trying to get an

10  understanding of paragraph 18 of your report; in

11  particular, the third to last sentence and the

12  penultimate sentence.

13           Can you take a look at those?

14     A.    It's the third sentence?

15     Q.    The third to last sentence.

16     A.    Third to last.

17     Q.    And the penultimate.

18     A.    So it's, "According to Mr. Peters"?

19     Q.    No, the sentence starting after that.

20  "The prior art does not, however."

21     A.    (Perusing document)  Yes.  Okay.

22     Q.    So, is it your opinion that the prior

23  art does not disclose the use of user profiles?

24     A.    Well, I say, "The prior art does not,

25  however, discuss the use of user profiles or

1    retrieving search results that reflect a user's

2    social, cultural, educational and economic

3    background or psychological profile."

4              That was my understanding at the time.

5         Q.    Right.  I'm just trying to break it

6    down, the disjunctive "or"; right?

7              So you're saying that the prior art

8    does not discuss the use of user profiles, and

9    the prior art also does not discuss use of

10   retrieving search results that reflect the user's

11   social, cultural, educational, economic

12   background, or psychological profile; correct?

13        A.    Yes.

14        Q.    Okay.  Immediately after that, you

15   have a sentence that says, "The Dasan and Siefert

16   patents disclose the use of user profiles.

17        A.    Yes.  Based upon what Mr. Peters says.

18        Q.    So this is not your independent

19   opinion at all.

20        A.    No.  This is based upon the paragraph

21   that I cite of him, which is paragraph 17.

22        Q.    Okay.

23        A.    And I say, "Based upon paragraphs 11

24   through 17."

25        Q.    So, what I'm focusing on is the

1      A.     Not to me.  I would still rely upon
2    Mr. Peters.
3      Q.     Okay.  Did you read the Hoffberg
4    patent?
5      A.     No.  I think you asked that earlier.
6    The answer is no.  I -- if it was part of the
7    prior -- or the prosecution history, I looked at
8    it and paged through it, but I did not read it or
9    try to understand it.
10     Q.     And so you don't have any independent
11   opinion about what Hoffberg discloses.
12     A.     I do not.
13     Q.     And do you adopt the opinion that
14   Mr. Peters has about the Hoffberg patent?
15          MS. ROBERTS:  Objection, form.
16     A.     Not in connection with my specific
17   report, although he does mention, I think, in
18   his -- as I recall, he mentions it in his report.
19   But I didn't feel like I needed to quote it in my
20   report.
21   BY MR. GIZA:
22     Q.     So, if Hoffberg disclosed the use of
23   user profiles, wouldn't that be relevant to your
24   materiality analysis?
25     A.     Well, it would be contrary to what

1   opinion is, based on whatever hypothetical

2   disagreement you're referring to.

3   BY MR. GIZA:

4       Q.    So if the cited prior art discloses

5   the use of user profiles, then your opinion of

6   materiality will be affected.

7       A.    No.  I just would -- I wouldn't change

8   my opinion unless I knew what Mr. Peters would

9   say about whatever hypothetical disagreement

10  somebody has with what he's already said.

11      Q.    If Mr. Peters admits that the cited

12  prior art discloses the use of user profiles,

13  will that change your materiality analysis?

14              MS. ROBERTS:  Objection, form.

15      A.    I don't know.  I'd ask counsel to see

16  what he would say about whether or not the

17  undisclosed prior art that was identified as

18  being relevant, given the new opinion, whatever

19  hypothetical opinion that is, what he would say

20  about it.

21              In other words, I would rely upon him.

22  I wouldn't independently reach my own conclusion.

23  BY MR. GIZA:

24      Q.    Okay.  So, the comparison of the cited

25  prior art to Dasan and Siefert, that analysis you

1    BY MR. GIZA:

2        Q.    Let me just clarify.  So is it true

3    that your opinion in this case does not relate at

4    all to the undisclosed Ahn reference?

5        A.    Well, my opinion is based on

6    Mr. Peters' opinion, and his opinion does not

7    include the Ahn reference, and so my opinion does

8    not include the Ahn reference.

9        Q.    Okay.  Thank you.

10            Is it true that both the international

11   search report and the preliminary examination --

12   sorry, the international preliminary examination

13   report were reviewed by Mr. Kim Yeh Vu?

14       A.    I'm not sure of that.  I've got here

15   in my footnote 5 that Ms. Peggy Harrod, who

16   completed the PCT international preliminary

17   search report, did it as acting for Mr. Vu.

18            And then, I have in the text, in my

19   paragraph 13, that James R. Matthews is acting

20   for Kim Yeh Vu.

21            And I don't necessarily think that

22   necessarily means that it was reviewed by Mr. Vu.

23       Q.    Is it true that Mr. Vu is -- strike

24   that.

25            Is it true that the Mr. Vu you refer