# EXHIBIT C

1

1    IN THE UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF TEXAS

3    MARSHALL DIVISION

4    ---o0o---

5  PA ADVISORS, LLC,

6    Plaintiff,

7    vs.                    Case No. 2-07CV-480-RRR

8  GOOGLE INC., ET AL.,

9    Defendants.
   _____/

10

11

12    DEPOSITION OF PAUL STANLEY PETERS, JR.

13    Tuesday, February 9, 2010

14

15

16

17  REPORTED BY:

18  HOLLY MOOSE, RDR-CRR-CRP

19  CSR NO. 6438

20

21

22

23

24

25

2

1            A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3      RUSS, AUGUST & KABAT
4      BY:  MARC A. FENSTER, ESQ.
5      12424 Wilshire Boulevard, 12th Floor
6      Los Angeles, CA  90025
7      (310)979-8278
8      Email: mfenster@raklaw.com
9
10  FOR THE DEFENDANT GOOGLE:
11     QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
12     BY:  ANDREA PALLIOS ROBERTS, ESQ.
13        BRIAN CANNON, ESQ.
14     555 Twin Dolphin Drive, Suite 560
15     Redwood Shores, CA 94065
16     (650)801-5000
17     Email: andreaproberts@quinnemanuel.com
18
19  FOR THE DEFENDANT YAHOO!:
20     HOWREY, LLP
21     BY:  JASON C. WHITE, ESQ.
22     321 North Clark Street, Suite 3400
23     Chicago, IL  60654
24     (312)846-5680
25     Email: whitej@howrey.com

3

1   APPEARANCES (CONTINUED)
2
3   ALSO PRESENT:  Carey Mook, Videographer
4            Hundt Reporting
5
6   TAKEN AT:
7      QUINN, EMANUEL, URQUHART, OLIVER & HEDGES
8      555 Twin Dolphin Drive, Suite 560
9      Redwood Shores, CA 94065
10     (650)801-5000
11
12
              ---o0o---
13
14
15
16
17
18
19
20
21
22
23
24
25

4

1            I N D E X
2
3   DEPOSITION OF PAUL STANLEY PETERS, JR.
4
5   EXAMINATION BY:                    PAGE
6      MR. FENSTER                  7
7      AFTERNOON SESSION                75
8
9   PLAINTIFF'S EXHIBITS
10  Exhibit 1  Report Of Defendant's Expert Stanley
11        Peters Concerning Invalidity,
12        59 pages                    24
13  Exhibit 2  Exhibit B, 6 pages            24
14  Exhibit 3  United States Patent No. US 6,199,067
15        B1, GGL-PA00003640-68, 29 pages        78
16  Exhibit 4  Exhibit D, 33 pages          130
17  Exhibit 5  Curriculum Vitae, Paul Stanley Peters,
18        Jr., 15 pages            173
19            ---o0o---
20  INSTRUCTIONS NOT TO ANSWER
21  19/12; 20/17; 21/12; 47/14; 73/8
22
23            ---o0o---
24
25

5

1        BE IT REMEMBERED that, pursuant to Notice and
2   on Tuesday, February 9, 2010, commencing at the hour of
3   10:04 a.m., before me, HOLLY MOOSE, CSR No. 6438, a
4   Certified Shorthand Reporter in the State of California,
5   there personally appeared
6
7        PAUL STANLEY PETERS, JR.,
8
9   called as a witness by the Plaintiff, who, having been
10  first duly sworn, was examined and testified as
11  hereinafter set forth:
12
13
14
15            ---o0o---
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

**6**

1　PROCEEDINGS　　　　　10:04 A.M.
2　　　　THE VIDEOGRAPHER: Good morning. We are now on
3　the record. This is the digital video deposition of
4　Stanley Peters, testifying in the matter of PA Advisors
5　versus Google, et al., in the United States District
6　Court, Eastern District of Texas, Marshall Division,
7　case number 2:07-CV-480-DVF [sic].
8　　　　This deposition is being held at Quinn Emanuel,
9　et al., 555 Twin Dolphin Drive, Fifth Floor, Redwood
10　Shores, California. Today's date is Tuesday,
11　February 9th, 2010, and the time on the video screen
12　is 10:04 a.m.
13　　　　My name is Carey Mook, and I'm a certified
14　legal video specialist with Hundt Reporting. The
15　certified shorthand reporter today is Holly Moose, also
16　in association with Hundt Reporting.
17　　　　Will all counsel now please state your
18　appearance for the record.
19　　　　MR. FENSTER: Marc Fenster with Russ, August &
20　Kabat on behalf of the plaintiff.
21　　　　MS. PALLIOS ROBERTS: Andrea Pallios Roberts
22　with Quinn Emanuel on behalf of Google.
23　　　　MR. WHITE: Jason White with Howrey on behalf
24　of defendant Yahoo!.
25　　　　MR. CANNON: This is Brian Cannon from Quinn

**7**

1　Emanuel.
2　　　　THE VIDEOGRAPHER: Okay. If there are no
3　stipulations, would the court reporter please administer
4　the oath.
5　　　　(Witness sworn.)
6　　　　PAUL STANLEY PETERS, JR.,
7　having been first duly sworn, testified as follows:
8　　　　EXAMINATION BY
9　　　　MR. FENSTER: Q. Good morning, Dr. Peters.
10　A. Good morning.
11　Q. Can you state your name and address for the
12　record, please.
13　A. I'm Stanley Peters, and I live at 128 Hillside
14　Avenue, Menlo Park, California.
15　Q. Have you been deposed before?
16　A. Once, yes.
17　Q. In what context?
18　A. I was deposed as an expert in another case.
19　Q. What other case was that?
20　A. It was a patent case about four years ago.
21　Q. Okay. What was the name of the case?
22　A. Truth to tell, I don't remember. It was the
23　University of Texas suing some cell phone companies.
24　Q. And did you testify at trial in that case?
25　A. I testified in a Markman hearing.

**8**

1　Q. And on behalf of which party were you
2　testifying?
3　A. I was testifying on behalf of the defendant.
4　Q. And what was the subject matter of your
5　testimony?
6　A. It was about the construction of one of the
7　terms in the patent.
8　Q. Did you have any other -- were there any other
9　topics that you opined on other than claim construction?
10　A. No.
11　Q. And what law firm did you -- were you retained
12　by in that case?
13　A. In that case, I was retained by Quinn Emanuel.
14　Q. What attorneys did you work with in that case?
15　A. Trying to remember the name. Kevin Johnson, I
16　think it was, and Evette Pennypacker.
17　Q. Okay. Have you ever been retained as an expert
18　in any other cases besides this one and the University
19　of Texas case?
20　A. Just one other.
21　Q. And what was that?
22　A. That was a criminal case about 25 years ago.
23　Someone was charged with perjury.
24　Q. Okay. Have you done any -- so you haven't been
25　retained as an expert in a patent case in any other

**9**

1　cases besides this one and the University of Texas case;
2　is that correct?
3　A. That's correct.
4　Q. Okay. Have you ever done any work regarding
5　invalidity prior to this case?
6　　　　MS. PALLIOS ROBERTS: Objection. Form.
7　　　　THE WITNESS: So have I testified about
8　invalidity; is that what you're asking? Or ...
9　　　　MR. FENSTER: Q. Have you ever done any expert
10　opinion or consulting work regarding patent invalidity
11　prior to this case?
12　A. Well, the validity of the patent was part of
13　what the claims construction -- I guess it was at issue
14　in the claims construction case.
15　Q. Did you render any opinions in the University
16　of Texas case regarding validity?
17　A. I rendered an opinion that the term about which
18　I was asked to testify was indeterminate.
19　Q. Was that a means plus function claim; do you
20　recall?
21　A. I'm sorry, I don't know what that means.
22　　　　MS. PALLIOS ROBERTS: Objection. Form.
23　　　　MR. FENSTER: Okay.
24　Q. Have you ever done any consulting or expert
25　work regarding validity based on prior art prior to this

10

1  case?
2    A.  Well, the question of prior art came up in that
3  other case as to whether the term was -- was definite in
4  terms of its use in prior art.  But I don't know if
5  that's what you mean here.
6    Q.  Have you ever been asked, prior to this case,
7  to do any analysis or render an opinion regarding
8  invalidity for obviousness?
9    A.  No.
10    Q.  Have you ever, prior to this case, been asked
11  to do any analysis or render an opinion regarding
12  invalidity under -- for anticipation?  Do you know what
13  that is?
14    MS. PALLIOS ROBERTS:  Objection.
15    THE WITNESS:  So do I know what anticipation
16  is.  I think anticipation is a legal term that means
17  claim of a patent is entirely encompassed by some prior
18  patent or other prior art.
19    MR. FENSTER:  Q.  Prior to this case, have you
20  ever been asked to render any opinion or do any analysis
21  regarding invalidity for anticipation?
22    A.  I guess I'm not quite clear on what the
23  question is.  I'm not -- I was asked to render an
24  opinion in this case about the validity of the claims,
25  not about anticipation or any other specific thing.

11

1    Q.  You were asked to analyze the -- all aspects of
2  validity of the claims in this case?
3    MS. PALLIOS ROBERTS:  Objection.  Form.
4    THE WITNESS:  I was asked -- I was asked about
5  the patent and the claims that are at issue and to study
6  them, and then I was asked to give my opinions about
7  validity.
8    MR. FENSTER:  Q.  Okay.  And did you consider
9  all potential aspects of validity?
10    A.  Insofar as I was aware of them.
11    Q.  And you were aware of anticipation at the time?
12    A.  Yes.
13    Q.  So my question was, prior to this case have you
14  ever been asked to do any analysis or render any
15  opinions regarding invalidity for anticipation?
16    MS. PALLIOS ROBERTS:  Objection.  Form.
17    THE WITNESS:  Well, I'm -- as I say -- so if --
18  if you're assuming that I was asked about anticipation --
19  as a part of the general question of validity in this
20  case, if that's what -- if that's the assumption you're
21  making, I was just asked the question in general terms
22  without any specific suggestions.
23    But no, I haven't -- I have not actually worked
24  on the question of anticipation in any other case.
25    MR. FENSTER:  Q.  Dr. Peters, it's important

12

1  that we get a clear record today.  And so if at any
2  point you don't understand a question, will you ask me
3  to clarify it?
4    A.  I will.
5    Q.  Okay.  And if you don't hear a question, will
6  you ask me to repeat it?
7    A.  Yes.
8    Q.  If you give an answer, is it fair to assume
9  that you've heard the question and you understood it?
10    A.  I'm trying to give you the best answers that I
11  can to the questions as I understand them.  And I
12  will -- that's why I was asking for clarification about
13  what you meant by had I been asked before this case to
14  render an opinion as to anticipation.
15    As I say, your question seems to presuppose I
16  was asked specifically about anticipation, and that's
17  not the case.  That's why I did try to get you to
18  clarify the question in this case.
19    To the best of my ability, I'll answer every
20  question accurately and as I --
21    Q.  Fair enough.
22    A.  -- best understand it.
23    Q.  Is there anything that would prevent you from
24  giving your best testimony today?
25    A.  No.

13

1    Q.  Okay.  What did you do to prepare for your
2  deposition today?
3    A.  Well, I reviewed my report; I reviewed the
4  patent; I reviewed some of the art that I had cited in
5  my report; I met yesterday, I think it was, with
6  attorneys.
7    Q.  Who did you meet with?
8    A.  Well, I met with the three attorneys here in
9  this room with us today.
10    Q.  Ms. Roberts, Mr. White and Mr. Cannon?
11    A.  Yes.
12    Q.  Okay.  Did you meet with anyone else in
13  preparation for your deposition?
14    A.  No.
15    Q.  Where did you meet yesterday?
16    A.  We met here in these law offices.
17    Q.  Okay.  And how long did you meet yesterday?
18    A.  Took pretty much of the day.  I don't remember
19  exact times.
20    Q.  Approximately how many hours did you meet
21  yesterday?
22    A.  It probably was six or seven.
23    Q.  Did you have any other meetings or do anything
24  else to prepare for your deposition, other than what
25  you've just described?

4 (Pages 10 to 13)

Witness: Paul Stanley Peters, Jr.

1    A.  No.
2    Q.  Did you review any other documents other than
3  your report, the patent and some art in preparation for
4  your deposition?
5    A.  Oh, well, I did review, for example, the
6  rebuttal report, I think it's called, of Dr. Rhyne.
7    Q.  Anything else?
8    A.  Not that I can remember at this time.
9    Q.  What prior art did you review in preparation
10  for your deposition today?
11    A.  Well, I looked back at some of the Salton books
12  that I had cited.  I looked back at a couple of the
13  patents that are mentioned in my report.
14    Q.  Do you recall which ones?
15    A.  I looked at Culliss; I looked at Herz, as I
16  recall.
17    Q.  Any other art that you reviewed?
18    A.  Not to the best of my recollection at this
19  point.
20    Q.  Okay.  When were you retained on this case?
21    A.  About a year ago.  Maybe a little more.
22    Q.  Can you be any more specific?
23    A.  Well, as I recall, it was late 2008.
24    Q.  And who were you contacted by?
25    A.  I think I was contacted by Mr. Cannon.

1    Q.  And what did he tell you about the case?  What
2  did he tell you when he first contacted you?
3    A.  Well, he told me that he was working on a case
4  and that he thought that I might be able to help him
5  understand some of the issues and that he would like to
6  talk about it.
7    Q.  What happened next?
8    A.  Well, we met --
9    MS. PALLIOS ROBERTS:  Objection.  Form.
10    MR. FENSTER:  Go ahead.
11    THE WITNESS:  We met and he showed me the
12  patent, as I recall, and I read it and gave him my
13  initial impressions of, you know, what the field was,
14  what the patent was about.
15    MR. FENSTER:  Q.  Did he tell you that he was
16  looking for an opinion regarding invalidity?
17    MS. PALLIOS ROBERTS:  I'm going to object.  I
18  think we're getting close to the areas that the
19  protective order says are not discoverable, namely
20  communications between counsel and the experts, other
21  than anything the expert may have relied upon in forming
22  their opinions.
23    MR. FENSTER:  Q.  Before you rendered your
24  initial impressions, were you aware that Mr. Cannon
25  represented the defendant in the case?

1    A.  Well, I know he told me there was a lawsuit.  I
2  don't recall him telling me who the defendant was,
3  although he might have.  And -- no, I don't actually
4  remember if he told me which side he was representing.
5    But since he didn't really -- he was asking me
6  for information about the patent.  It wasn't much of an
7  inference for me to guess that he was not representing
8  the plaintiff.
9    Q.  You understood before you gave your initial
10  impressions that Mr. Cannon represented the defendant in
11  the case; is that correct?
12    MS. PALLIOS ROBERTS:  Objection.  Form.
13    THE WITNESS:  When I talked to Mr. Cannon, I
14  talked to him about the substance of the patent.  We're
15  talking about the initial conversation now, right?
16    MR. FENSTER:  Mm-hm.
17    THE WITNESS:  I just talked to him about the
18  substance of the patent.  I really wasn't much
19  interested in which party he was representing.  I was
20  happy to try and shed some light on what the patent was
21  about.
22    MR. FENSTER:  Q.  Dr. Peters, can you answer my
23  question, please.  My question is, when you first
24  talked -- strike that.
25    My question is you understood, before you gave

1  your initial impressions, that Mr. Cannon represented
2  the defendant in this case; is that correct?
3    MS. PALLIOS ROBERTS:  Objection.  Form.
4    THE WITNESS:  I don't know that it is.  I don't
5  know at what point I came to the conjecture that he
6  represented the defendant.
7    MR. FENSTER:  Q.  Did you run a conflict check
8  before you gave him your initial impressions?
9    A.  Probably.  I don't -- you know, we're talking
10  about more than a year ago.  Probably, but I really
11  don't remember.
12    Q.  Have you talked -- who else have you talked
13  with about this case, other than the three attorneys you
14  mentioned?
15    A.  One other attorney here at Quinn Emanuel.
16    Q.  Who's that?
17    A.  Cheryl Galvin.
18    Q.  Have you talked with anyone else other than
19  those four attorneys about this case?
20    A.  Well, let's see.  I've talked to attorneys from
21  Quinn Emanuel and from Howrey.  Principal contacts have
22  been the people we've already talked about, as far as I
23  can recall.  Have I talked with other attorneys in those
24  firms?  Possibly.
25    Q.  Okay.  Have you talked with anyone other than

18

1  attorneys inside either Quinn or Howrey about this case?
2      A.  Well, let's see.  I think there was -- there --
3  so who was present at every meeting; that's what you're
4  asking me, I guess.
5      Q.  My question, Mr. Peters, is have you talked
6  with anyone else other than attorneys from Quinn or
7  Howrey regarding this case?
8      A.  Well, if I had, it would have been an attorney
9  for one of the defendants who was attending a meeting.
10  That's the only other person.
11      Q.  Okay.  What did you understand the scope of
12  what you were asked to do?
13      A.  Well, initially I was simply asked to try to
14  shed light on the field of the patent, which I did.
15          Eventually, more recently, this past fall, I
16  was contacted again by Quinn Emanuel and I was asked to
17  render an opinion about validity of the claims that are
18  at issue.
19      Q.  And specifically you were asked to render an
20  opinion that the claims of the patent were invalid,
21  correct?
22      MS. PALLIOS ROBERTS:  Objection.  Form.
23      THE WITNESS:  That's not correct.  I was asked
24  for my honest opinion on validity.
25      MR. FENSTER:  Q.  And when did that -- when

19

1  were you asked to do this?
2      A.  Oh, the first meetings were October or
3  thereabouts of 2009.
4      Q.  And what were you asked to consider regarding
5  validity?
6      MS. PALLIOS ROBERTS:  I'm going to object
7  again.  This is not discoverable information under the
8  terms of the protective order.
9      MR. FENSTER:  Are you instructing him not to
10  answer what he was asked -- the scope of what he was
11  asked to do?
12      MS. PALLIOS ROBERTS:  I am instructing him not
13  to answer the content of communications with counsel,
14  which is specifically not discoverable --
15      MR. FENSTER:  Okay.  Are you --
16      MS. PALLIOS ROBERTS:  -- under the protective
17  order unless it's information that he relied upon in
18  forming his opinions.
19      MR. FENSTER:  Okay.  Are you instructing him
20  not to answer this question?
21      MS. PALLIOS ROBERTS:  I've just stated the
22  basis for the instruction.
23      MR. FENSTER:  Are you instructing him not to
24  answer this question?
25      MS. PALLIOS ROBERTS:  I just answered your

20

1  question.
2      MR. FENSTER:  What you did is you stated a
3  basis.  I'll ask the question again.  You can either
4  instruct or not, I guess.
5      MR. CANNON:  Brian, that is a different
6  question (inaudible) --
7      THE REPORTER:  I can't hear you, sorry.
8      THE VIDEOGRAPHER:  I'm sorry ...
9      MR. FENSTER:  Q.  What aspects of validity were
10  you asked to render opinions on?
11      MS. PALLIOS ROBERTS:  Object again on the same
12  basis.  You're asking him for what he was asked by
13  counsel.
14      MR. FENSTER:  I don't care if you instruct or
15  not.  But you've stated an objection; you haven't stated
16  an instruction.  Are you instructing him not to answer?
17      MS. PALLIOS ROBERTS:  I will instruct him not
18  to answer on that basis.  If you can ask your question
19  in some other way, you're welcome to try.
20      MR. FENSTER:  Thank you very much.
21      Q.  And you'll follow your counsel's instruction?
22      A.  Yes.
23      Q.  What did you -- what aspects of validity did
24  you understand were within the purview of your task?
25      A.  My understanding was that for the specific

21

1  claims that are at issue, any aspect of validity was
2  potentially rel -- at issue.
3      Q.  Okay.  And it's your testimony that you were
4  asked to give -- to render an honest opinion regarding
5  every aspect of validity regarding those asserted
6  claims; is that correct?
7      A.  I --
8      MS. PALLIOS ROBERTS:  Objection.  Form.  And
9  again, you're asking about what -- about the
10  communications with counsel.
11      THE WITNESS:  Well, let me --
12      MS. PALLIOS ROBERTS:  So I'll instruct him not
13  to answer on that basis.
14      THE WITNESS:  Okay, well, if I'm instructed not
15  to answer, then I won't answer.
16      MR. FENSTER:  Q.  Is it your testimony that it
17  was your understanding that you were to -- that you were
18  tasked to render an honest opinion as to every aspect of
19  validity of the asserted claims?
20      A.  Well, first of all, I absolutely took it as my
21  job to render an honest opinion on these claims.
22          And secondly, yes, there was never the
23  slightest suggestion from any of the attorneys that I've
24  been dealing with that I should do anything other than
25  that, if that's what you're trying to get at.

22

1    Q. My question is was it your understanding that
2    you were to render an opinion regarding every aspect of
3    validity that you could consider regarding the asserted
4    claims?
5    A. I thought your question was -- had to do with
6    the honesty of my opinion. I --
7    Q. It's both.
8    A. Well, I was asked to render an opinion -- an
9    honest opinion about any aspect of validity that I
10   thought was potentially relevant.
11       Q. Okay. And what aspects of validity did you
12   consider?
13       A. Well, I considered the ones I knew about.
14   Those would be anticipation. The claims construction
15   had already occurred, so those were defined. I thought
16   about obviousness. I thought about being -- having it
17   described carefully -- written description, I guess it's
18   called -- being described carefully enough that you
19   could actually follow it. And I thought about
20   usefulness, utility.
21       Q. Anything else?
22       A. Those are the ones that I can think of at the
23   moment.
24       Q. Did you consider enablement?
25       A. Yes, I see. Isn't written description an

23

1    aspect of enablement?
2        Q. Tell me your understanding.
3        A. Well, that was my understanding. If you want
4    to be able to practice a patent, it has to be
5    described -- you know, the invention has to be described
6    clearly enough to allow you to do that.
7        Q. Okay.
8        A. I'm not a lawyer, you understand, and so ...
9    but that's my understanding.
10       Q. And did you render any opinions -- strike that.
11       Did you reach any conclusions regarding the
12   anticipation -- the validity, based on anticipation, of
13   the asserted claims?
14       MS. PALLIOS ROBERTS: Objection. Form.
15       THE WITNESS: I -- did I reach any conclusions.
16   I certainly didn't report that I think it was
17   anticipated.
18       MR. FENSTER: Q. Is it fair to say that you
19   concluded that the patent was not invalid for
20   anticipation?
21       A. No, that wouldn't be fair to say. I mean, I
22   did not find another patent that encompassed all of the
23   claim -- the limitations on any -- the claims.
24       Q. Okay. You did not find any prior art reference
25   that would render any of the asserted claims invalid for

24

1    anticipation; is that correct?
2        A. I think that's right.
3        Q. Did you state that in your report?
4        A. No.
5        Q. Why not?
6        A. It wasn't relevant to my report.
7        Q. In your report you include a list of materials
8    that you reviewed; is that correct?
9        A. Yes.
10       Q. And in that list of materials, you -- actually,
11   let me back up.
12       I'll place before you what's been marked as
13   Peters Exhibit 1. Do you recognize that document?
14       A. It looks like my report -- or part of
15   thereof -- part of it.
16       (Plaintiff's Exhibit 1
17       marked for identification.)
18       MR. FENSTER: And I'll hand you Exhibit 2,
19   which was Exhibit B to your report.
20       (Plaintiff's Exhibit 2
21       marked for identification.)
22       MR. FENSTER: Q. Do you recognize that?
23       A. Yes, that's a list of materials that I did
24   review.
25       Q. Okay. And is this list of materials that we've

25

1    marked as Exhibit 2 -- is this a complete list of all
2    the materials that you reviewed in preparation of your
3    report?
4        MS. PALLIOS ROBERTS: Objection. Form.
5        THE WITNESS: It includes all the materials
6    that I used. I made thorough searches of the Internet
7    and looked at a lot of things.
8        MR. FENSTER: Q. Did you do your own search
9    for prior art?
10       A. I did.
11       Q. Can you describe that search.
12       A. Well, I used Internet search engines to search
13   for aspects of the patent -- aspects of the -- the
14   invention to see how they related to prior art.
15       I used tools to search for patents that were
16   potentially relevant in the same field.
17       I also read books that I had available on the
18   subject, so ... the usual means of scholarly search.
19       Q. Okay. Did you -- would you characterize your
20   search as thorough?
21       MS. PALLIOS ROBERTS: Objection. Form.
22       THE WITNESS: I did do quite a thorough search.
23       MR. FENSTER: Q. How much time did you spend
24   searching for prior art for the Geller patent?
25       A. Well, I -- I spent over a hundred hours

**26**

1  preparing the report. I don't know how much of that
2  time was spent searching and how much was in preparing
3  the report and so on. But quite a lot of time.
4      Q. Did you find prior art references that were not
5  previously provided to you by the attorneys?
6      A. Yes, I did.
7      Q. Did you list those on your list of references
8  considered?
9      A. The ones that I felt it was useful to quote in
10  the report are all listed there.
11      Q. Do you know which of the references cited were
12  ones that were not previously provided to
13  you by the attorneys?
14      MS. PALLIOS ROBERTS: Objection. Form.
15      THE WITNESS: Do I know? Yes.
16      MR. FENSTER: Q. Can you identify them for me,
17  please.
18      A. Well, there's a number of articles on here.
19  The Salton books, I had identified. Those, I think,
20  were also subsequently presented by attorneys, not
21  surprisingly, those being classics in the field. These
22  articles by McKeown, Menczer, Belkin, Church, Robertson,
23  a number of those are articles that I found on my own.
24      Q. Can you identify which of these references you
25  found that were not previously provided to you by the

**27**

1  attorneys?
2      A. Well, I --
3      MS. PALLIOS ROBERTS: Objection. Form.
4      THE WITNESS: -- thought I just gave you a
5  extensive list of them.
6      MR. FENSTER: Q. Okay. Is that an exhaustive
7  list?
8      A. Probably not. No. For example, this Myaeng
9  reference, I also found.
10      Q. Dr. Peters, let me be clear. I'm not asking
11  for isolated examples. I'm asking if you can identify
12  which of these references you found that were not
13  previously provided by the attorneys.
14      A. Well, no, I don't -- if you're asking me to say
15  exactly which ones I found and which ones I didn't find
16  on my own, I probably can't tell you exactly right here
17  on the spot.
18      Q. Okay. Fair enough. Are there any materials
19  that you considered that are not listed on Exhibit B?
20      MS. PALLIOS ROBERTS: Objection. Form.
21      THE WITNESS: Well, I don't know what you mean
22  by "considered." As I say, I looked around extensively.
23  In the course of doing so, you find all sorts of things
24  that search engines throw up which might be relevant and
25  turn out not to be. Did I consider those? I'm not sure

**28**

1  what you mean.
2      MR. FENSTER: Q. Okay. Anything that you
3  considered and relied on is listed in this -- in this
4  Exhibit 2, correct?
5      A. What I --
6      MS. PALLIOS ROBERTS: Objection. Form.
7      THE WITNESS: What I based my report on is
8  listed in this exhibit.
9      MR. FENSTER: Q. Is there anything that you
10  relied on in forming your opinions that is not listed in
11  Exhibit B?
12      A. Well, I'm trying to answer your question, but I
13  guess I don't quite understand what you mean by "rely
14  on." Is it a legal term or ... you know, I'm -- I've
15  just answered it in a couple of different ways, and I'm
16  clearly not understanding something about it.
17      Q. What was your intention in compiling this list
18  of materials?
19      A. To disclose the things that form the basis of
20  my opinion as I presented it in my written report.
21      Q. Okay. So it was not -- Exhibit B was not
22  intended to include all the materials that you reviewed
23  in forming your opinion; is that correct?
24      MS. PALLIOS ROBERTS: Objection. Form.
25      THE WITNESS: Again, I don't know how to answer

**29**

1  the question. It's -- I stand by my report and am
2  prepared to back it up based on the materials in Exhibit
3  B.
4      MR. FENSTER: Q. On page 1 of Exhibit B, the
5  third item listed is invalidity contentions dated
6  November 14, 2008. Do you see that?
7      A. Yes, I do.
8      Q. Okay. And did you review invalidity
9  contentions dated November 14, 2008?
10      A. So I think when I was -- you know, last fall,
11  2009, when I started this, I believe that was given to
12  me. I skimmed through that and found it most difficult
13  to understand. So if I reviewed it, it certainly didn't
14  have much of an impact on my subsequent thinking.
15      Q. Did you have an understanding that the
16  invalidity contentions dated November 14, 2008 were
17  drafted by attorneys for the defendants?
18      A. I didn't know who drafted them, but they sure
19  read like attorneys' documents.
20      Q. Did you understand, based on your review of
21  that document, that the attorneys for the defendants
22  were asserting that several references, prior art
23  references, rendered the asserted claims of the Geller
24  patent invalid for anticipation?
25      A. Oh, for anticipation. Well, I don't recall

30

1　whether that -- it didn't make a big impression on me if
2　I did actually realize that some of the references were
3　being cited as anticipatory.
4　　Q.　To the extent the attorneys for the defendants
5　asserted that any prior art references did anticipate
6　the asserted claims of the Geller patent, is it fair to
7　say that you did not reach the same conclusion?
8　　MS. PALLIOS ROBERTS: Objection. Form.
9　　THE WITNESS: I don't know which ones they
10　thought anticipated, off the top of my head. But as
11　I -- as I answered earlier, I didn't find references
12　that, in my view, anticipated. And that's why I didn't
13　put in my report that I thought the patent -- that
14　claims were anticipated.
15　　MR. FENSTER: Q. Were you given any other
16　invalidity contentions, other than those dated
17　November 14, in this case?
18　　A.　Not as far as I remember. I only faintly
19　remember those, to be honest.
20　　Q.　Okay. You don't recall seeing any amended
21　invalidity contentions in or around November of 2009?
22　　A.　I don't remember seeing them. If I was given
23　those -- well, I don't think I was given them. I
24　certainly don't remember seeing them.
25　　I have to admit, you know, lawyerese really

31

1　didn't help me in thinking about the questions I was
2　trying to think about.
3　　Q.　Referring to Exhibit 1, your report, how was --
4　how did this come to be prepared?
5　　MS. PALLIOS ROBERTS: Objection. Form.
6　　THE WITNESS: How did it come to be prepared.
7　Well, I studied the materials we've been talking about,
8　including the patent and prior art, and I wrote down
9　preliminary drafts of my views on things. I asked the
10　attorneys about the law and -- you know, as -- for
11　clarification of legal points -- and made a draft.
12　　MR. FENSTER: Q. Who actually wrote this
13　report?
14　　A.　Well, I wrote it.
15　　Q.　Did you?
16　　A.　Yes.
17　　Q.　All aspects of it?
18　　A.　All aspects of it. You mean did I type it?
19　　Q.　Yes.
20　　A.　I typed multiple drafts of it. Did somebody
21　else type this draft? It was probably prepared by a
22　stenographer.
23　　Q.　Do you dictate?
24　　A.　No, I write longhand and on computer.
25　　Q.　Okay. There are a number of charts that were

32

1　attached to your report.
2　　A.　They're part of the report.
3　　Q.　Okay. Who did the -- who prepared the charts?
4　　A.　They were prepared at my direction. These were
5　things that I had found, and I directed the -- the
6　charts be prepared showing the art by limitations of
7　those claims.
8　　Q.　Okay. What do you mean they were prepared at
9　your direction?
10　　A.　I said which portions of the art pertain to
11　which claim -- to which limitation.
12　　Q.　Okay.
13　　A.　And the -- as I say, I don't know -- presumably
14　some stenographer actually produced the documents that
15　we both have in our possession.
16　　Q.　But it's your testimony that you identified
17　each portion that appears in the right-hand column of
18　the charts that are part of your report; is that
19　correct?
20　　A.　They are -- they all are part of my report,
21　yes.
22　　Q.　My question isn't whether they're part of your
23　report. I understand that the charts are part of your
24　report. My question is, is it your testimony that you
25　personally identified each portion of each prior art

33

1　reference that --
2　　A.　There --
3　　Q.　Excuse me. You need -- for us to get a clear
4　record, we can't talk over each other. And so I need to
5　wait for you to finish and you need to wait for me to
6　finish.
7　　A.　Very good.
8　　Q.　Thank you. Is it your testimony, Dr. Peters,
9　that you personally identified each portion of each
10　prior art reference that appears in the right-hand
11　columns of the charts that are part of your report?
12　　A.　That's absolutely my belief. The charts are
13　hundreds of pages long, but I identified all those
14　things. I did my best to check that they are as I
15　directed them to be.
16　　Q.　And it's your testimony that it was your
17　original work product, that you personally are the one
18　that identified which portions to put in those charts;
19　is that correct?
20　　A.　I did --
21　　MS. PALLIOS ROBERTS: Objection. Form.
22　　MR. FENSTER: Q. Is that correct?
23　　A.　I did identify them, yes.
24　　Q.　Okay.
25　　A.　Can I just -- I'm not quite sure the force of

9 (Pages 30 to 33)

34

1 the objections here. So can I just get some
2 clarification about ...
3 MS. PALLIOS ROBERTS: Unless I instruct you not
4 to answer, you can answer the question.
5 THE WITNESS: Okay. Okay. Thank you.
6 MR. FENSTER: Q. Is your report a complete
7 statement of your opinions -- of the opinions that you
8 have reached in this case regarding the validity of the
9 Geller patent?
10 MS. PALLIOS ROBERTS: Objection. Form.
11 THE WITNESS: Yes. I mean, I did the work; I
12 came to opinions, and I wrote them in the report, and
13 it -- it states them.
14 MR. FENSTER: Q. Are there any opinions that
15 you reached that are not included in the report?
16 A. Well, the report reserves the right to add to
17 it under certain circumstances. Those circumstances
18 haven't arisen. I don't add to it at this -- I don't
19 wish to add to it at this point.
20 Q. Okay. So as you sit here today, this report is
21 a complete statement of the opinions you formed in this
22 case, correct?
23 A. I believe that's the case.
24 Q. Okay. And is it -- does it have a -- strike
25 that.

35

1 Does it contain all the bases for those
2 opinions?
3 MS. PALLIOS ROBERTS: Objection. Form.
4 THE WITNESS: Again, I'm -- so the report tries
5 to present reasoning in support of conclusions and
6 opinions. And yes, it contains that reasoning.
7 MR. FENSTER: Q. And does it include all the
8 analysis that you have to offer, as you sit here today,
9 in support of your opinions?
10 A. Well, I guess we'll find out. I'll do my best
11 to provide analysis and we'll see whether it's exactly
12 as written. But it -- you're deposing me on the report.
13 I will -- I'll give you my analysis.
14 Q. My question is does your report contain all of
15 the analysis that you have done in support of your
16 opinions as you sit here today?
17 MS. PALLIOS ROBERTS: Objection. Form.
18 THE WITNESS: Again, I guess I'm just -- this
19 question sounds sort of formalistic. I wrote the
20 report. I printed my analysis. It's there. It's
21 complete as a report.
22 You're now asking me questions about it. I
23 will answer your questions. Are all the answers to the
24 questions in the report? If so, I don't know why -- why
25 you're here asking me questions. So that's what's

36

1 puzzling me about your question.
2 MR. FENSTER: Q. Dr. Peters, can you answer my
3 question, please. I understand you have lots to say.
4 The purpose of a deposition, I get to ask questions and
5 you are to give -- to answer those questions as
6 precisely as you're able to.
7 A. Okay. Well, the only answer I can give you is
8 I don't know.
9 Q. Was it your intention to set forth in your
10 report all the analysis that's necessary to support
11 your opinions?
12 A. That was my intention.
13 Q. And as you sit here today, are you aware of any
14 analysis that you forgot to include or did not include
15 in your report?
16 A. Not aware of it.
17 Q. Dr. Peters, there were two sets of exhibits to
18 your report. There were some ACC exhibits, which were
19 invalidity charts.
20 A. Yes.
21 Q. And I have 13 of those. Does that sound right?
22 A. That sounds right.
23 Q. Okay. And I also had some AR exhibits, and I
24 found 24 of those. Does that sound right?
25 A. That sounds right too.

37

1 Q. Okay. What are the AR exhibits?
2 A. Well, those are prior art. Those are the --
3 those are patents and articles.
4 Q. Okay. What caused you to attach these 24 out
5 of the list of references that you considered in Exhibit
6 B?
7 A. Well, at the time I wrote the report, it seemed
8 to me that those were, taken together, sufficient, along
9 with the analysis, to justify the opinions that I
10 offered in the ...
11 Q. Is it fair to say that the 24 references that
12 you attached as exhibits to your report as the AR
13 exhibits are the references that you intend to rely on
14 in support of your opinions?
15 MS. PALLIOS ROBERTS: Objection. Form.
16 THE WITNESS: Well, they're certainly the ones
17 that I did rely on in the written report, yes.
18 MR. FENSTER: Q. So to the extent that there
19 were prior art references listed in Exhibit B to your
20 report that are not included in the AR exhibits, is it
21 fair to say that you did not intend to rely on them or
22 that you did not rely on them to support your opinions
23 in your report?
24 A. In the written report, I did not find those
25 other references were required as a part of the

38

1 analysis.
2    Q. Dr. Peters, the ACC exhibits that you attached
3 to your report, can you give me an overview of what the
4 13 exhibits are.
5    MS. PALLIOS ROBERTS: Objection. Form.
6    THE WITNESS: Well, each of those charts is
7 directed to one of the claims, claim 1 or claim 45,
8 showing on a limitation-by-limitation basis prior art
9 that is relevant to the -- that particular limitation.
10    So the different charts are different
11 combinations -- you know, call out there as -- as two
12 principal sources, different combinations of prior art.
13 And then in the right-hand column, they contain
14 additional citations from other prior art.
15    MR. FENSTER: Q. So I'm trying to understand
16 the combinations that are being asserted. So, for
17 example, chart 1, ACC1, is entitled "Invalidity Chart,
18 Salton '89 In View Of Culliss And Additional Prior Art
19 References." You're familiar with that chart?
20    A. Yes.
21    Q. Okay. And you have what you've described as
22 two primary references, Salton '89 and Culliss,
23 described in the charts, correct?
24    A. Yes.
25    Q. Okay. And in the right-hand column, you have

39

1 additional prior art references, correct?
2    A. That's correct.
3    Q. Okay. So -- and those include a relatively
4 long list of references, Salton '68, Braden, Herz, Ahn,
5 A-H-N, Brookes, Dasan, Dedrick, Krishnan, Kupiec?
6    A. Yes. Other patents that are in that other
7 volume that you were just showing me.
8    Q. Okay. So what is the significance of the prior
9 art references in the right-hand column? Are those part
10 of the combinations or not?
11    A. They supplement. They would strengthen the
12 combination in the first two columns. So --
13    Q. So, for example, with the Braden reference, is
14 it -- are you meaning to assert that claim 1 is invalid
15 in light of the combination of Salton '89 in view of
16 Culliss and Braden?
17    MS. PALLIOS ROBERTS: Objection. Form.
18    Do you have a copy of the charts for the
19 witness?
20    MR. FENSTER: Go ahead.
21    THE WITNESS: Well, it would help to see a copy
22 of the charts. But what I mean to assert is that the
23 first two columns following the limitation that's quoted
24 themselves prefigure that limitation. And then they are
25 buttressed or even further reinforced by the citations

40

1 in the right-hand column.
2    MR. FENSTER: Okay.
3    THE WITNESS: And you'll notice that many of
4 the citations that occur in the right-hand column also
5 occur as members of other combinations; that is,
6 there'll be another chart that uses those things in
7 combination with some other element as the two principal
8 items anticipating.
9    MR. FENSTER: Q. Right. So are you intending
10 that the prior art references in the right-hand column,
11 the additional prior art references that you include --
12 are those part of the combinations or not?
13    A. If you like, they're two combinations signaled
14 by every chart. There's the combination of simply the
15 two principal ones and then there's a combination of
16 those plus the right-hand column.
17    Q. So is it your intention [sic] that ACC1 sets
18 forth a combination -- sets forth two combinations to
19 invalidate claim 1? The first combination is Salton '89
20 plus Culliss -- in view of Culliss by themselves; is
21 that correct?
22    A. Yes.
23    Q. Okay. And it's your further opinion that claim
24 1 is invalid in light of the combination of Salton in
25 view of Culliss and all of the additional prior art

41

1 references?
2    A. Listed for that, yes, that's correct.
3    Q. Okay. Is it your opinion that the combination
4 of Salton plus Culliss plus each individual reference by
5 itself invalidates claim 1?
6    A. I suppose it would be. I mean, I don't think
7 the references in the right-hand column take away
8 anything from Salton plus Culliss. So if -- so each of
9 them individually adds, and all of them taken together
10 add still more. That's -- that's my view.
11    Q. So should I understand from your report that
12 you're intending to assert that claim 1 is invalid under
13 the combination of Salton '89 plus Culliss plus Salton
14 '68 --
15    MS. PALLIOS ROBERTS: Objection. Form.
16    MR. FENSTER: Q. -- as one combination?
17    A. Well, yes, I -- I think that those -- that
18 combination makes claim 1 -- claim 1 obvious.
19    Q. Okay. And it's further -- and you further
20 intend to -- strike that.
21    And it's also your opinion that the combination
22 of Salton '89 plus Culliss plus Braden renders claim 1
23 invalid, correct?
24    A. Yes.
25    Q. And does your -- so am I to understand that

**42**

1 each possible combination of the prior art references in
2 each chart render that claim invalid?
3 MS. PALLIOS ROBERTS: Objection. Form.
4 THE WITNESS: Well, as I say, there are two
5 principal ones. So those -- those are meant, as far as
6 these charts go, always to be included in the
7 combination. And then the addition of zero or one or
8 more of the additional references listed in the
9 right-hand column is also sufficient.
10 MR. FENSTER: Q. Does your report say anywhere
11 that claim 1 is invalid in view of Salton '89 in view of
12 Culliss by themselves and without any additional prior
13 art references?
14 A. Well, I think that's -- that's the meaning of
15 my report.
16 Q. Can you point to anywhere in your report where
17 you say that claim 1 is invalid in light of the
18 combination of Salton '89 in view of Culliss by
19 themselves?
20 A. Well, let's take a look at the report.
21 MS. PALLIOS ROBERTS: I think when you provided
22 him with Peters Exhibit 1, you noted that it was a
23 portion of the report. Do you have the rest of the
24 report for him?
25 You're not going to answer?

**43**

1 MR. FENSTER: Well, I didn't bring extra
2 copies. So I can give the witness this copy of the
3 report if he needs to look at it.
4 THE WITNESS: So in -- so let me just describe,
5 in answer to your question, how the report is organized,
6 if that -- if I may do that.
7 MR. FENSTER: Q. Can you answer my question
8 first?
9 A. Is there -- can I point you to a sentence that
10 says that combination of two patents renders claim 1
11 invalid for obviousness?
12 Q. Yes.
13 A. Probably not. I certainly don't remember well
14 enough to find that sentence right now. But I can tell
15 you how I think it says that, how the report says that.
16 Q. So it's your opinion -- it was your intention
17 to disclose all of the possible combinations of Salton
18 plus Culliss in combination with zero, one or more of
19 all of the prior art references listed in the right-hand
20 column for each chart; is that correct?
21 MS. PALLIOS ROBERTS: Objection. Form.
22 THE WITNESS: I don't know. What my intention
23 was, let me tell you and we'll see whether it's what you
24 just said, was -- I believe that claim 1 and claim 45
25 are both rendered obvious in virtue of many combinations

**44**

1 of prior art.
2 It was my intention in the report to point out
3 how that is the case. The report includes both the
4 discursive prose section and those charts that identify
5 prior art by claim limitation for those two claims.
6 So as I say, I think there are many
7 combinations of prior art that are sufficient. And what
8 I intended to do in the report is to give you a number
9 of such examples -- not necessarily an exhaustive list
10 of the examples, but a number of such examples -- of
11 combinations of prior art that suffice.
12 MR. FENSTER: Q. And what are the examples of
13 the combinations that you intended to disclose in your
14 report?
15 MS. PALLIOS ROBERTS: Objection. Form.
16 THE WITNESS: Well, again, I didn't have an
17 intention to make an exhaustive list, but among them are
18 Salton and Culliss, the one you -- the one that you were
19 just talking about.
20 MR. FENSTER: Q. I'm handing you, Dr. Peters,
21 my copy of ACC1, which is the first chart, okay.
22 A. Yes.
23 Q. Can you tell me all the combinations that you
24 intended to disclose as invalidating claim 1 by that
25 chart.

**45**

1 A. All right. So Salton '89 and Culliss is one
2 such combination. As you say, Salton '89 and Culliss
3 and Salton '68 would be another. Salton '89, Culliss
4 and Braden. Salton '89, Culliss and Herz, and so forth.
5 What I'm doing, as you did, is simply going
6 down the --
7 Q. I'd like you to go through and list all the
8 combinations that are disclosed there. I don't want
9 "and so on." Please go ahead and list them.
10 A. All right. Well, so also Salton '89, Culliss,
11 Salton '68 and Braden. Salton '89, Culliss, Braden and
12 Herz. Salton '89, Culliss, Salton and Herz.
13 And now we need to move on. Salton '89,
14 Culliss, and Ahn. Salton '89, Culliss, Salton '68 and
15 Ahn. Salton '89, Culliss, Braden and Ahn. Salton '89,
16 Culliss, Salton -- sorry -- Herz and Ahn. Salton '89,
17 Culliss and Brookes. Salton '89, Culliss, Salton '68
18 and Brookes. Salton '89, Culliss, Braden and Brookes.
19 Salton '89, Culliss, Herz and Brookes. Salton '89,
20 Culliss, Ahn and Brookes. Salton '89, Culliss and
21 Dasan. Salton '89, Culliss, Salton '68 and Dasan.
22 Salton '89, Culliss, Braden and Dasan. Salton '89,
23 Culliss, Herz and Dasan. Salton '89, Ahn and Dasan.
24 Did I omit Culliss there inadvertently? I
25 meant to say Salton '89, Culliss, Ahn and Dasan. Salton

**46**

1 '89, Culliss, Brookes and Dasan. Salton '89, Culliss
2 and Dedrick. Salton '89, Culliss, Salton '68 and
3 Dedrick. Salton '89, Culliss, Braden and Dedrick.
4 Salton '89, Culliss, Herz and Dedrick. Salton '89,
5 Culliss, Ahn and Dedrick. Salton '89, Brookes and
6 Dedrick. Salton '89, Dasan and Dedrick. Salton '89,
7 Culliss and Krishnan. Salton '89, Culliss, Salton '68
8 and Krishnan. Salton '89, Culliss, Braden and Krishnan.
9 Salton '89, Culliss, Herz and Krishnan.
10     I mean, we --
11     Q. Keep going.
12     A. We could spend most of the day doing this
13 because this is an exponential number of combinations.
14 I'm happy to keep going as long as you like, but ...
15     Q. Okay. Let me --
16     A. Is Herz involved in that one?
17     Q. Let me -- would you mind handing that back.
18     A. Here you are.
19         MS. PALLIOS ROBERTS: Counsel, we've been going
20 for a little over an hour. Can we take a break?
21         MR. FENSTER: We can, but we're going to
22 keep -- request that we keep breaks short since we
23 started late at your request.
24         THE VIDEOGRAPHER: We are now off the record at
25 11:14.

**47**

1     (Recess taken.)
2     (Mr. Cannon left the deposition.)
3         THE VIDEOGRAPHER: We are now on the record at
4 11:27.
5         MR. FENSTER: Q. Dr. Peters, during the break
6 did you talk with anybody about your testimony?
7     A. Yes, I talked with the attorneys. I was in the
8 room here, just said "How am I doing?"
9     Q. What did they say?
10         MS. PALLIOS ROBERTS: Objection. Protective
11 order makes communications with counsel not
12 discoverable.
13         MR. FENSTER: I disagree.
14         MS. PALLIOS ROBERTS: I'll instruct you not to
15 answer.
16         MR. FENSTER: You're going to instruct him not
17 to answer about communications regarding his testimony
18 in the middle of a deposition?
19         MS. PALLIOS ROBERTS: I believe the protective
20 order says unless communications are used to form the
21 basis of his opinions, they're not discoverable.
22         MR. FENSTER: Okay. We'll reserve the right to
23 go to court on that.
24     Q. Dr. Peters, did you find that claim 1 was
25 invalid for obviousness based on any reference by

**48**

1 itself, any single reference by itself?
2         MS. PALLIOS ROBERTS: Objection. Form.
3         THE WITNESS: Well, in my report I assert that
4 it's invalid for obviousness on the basis of
5 combinations of references, not on the basis of a single
6 reference.
7         MR. FENSTER: Q. Okay. So it's fair to say
8 that in your report, you didn't state any conclusion
9 that claim 1 was invalid based on any single reference
10 either for anticipation or obviousness, correct?
11     A. That's true.
12         MS. PALLIOS ROBERTS: Objection. Form.
13         MR. FENSTER: Q. And the same is true with
14 respect to every other claim, correct?
15         MS. PALLIOS ROBERTS: Objection. Form.
16         THE WITNESS: The ones at issue, yes.
17         MR. FENSTER: Q. Okay. The only way you were
18 able to find obviousness was by combining -- by
19 combining references?
20     A. That's correct.
21     Q. So is it -- let me -- let me hand you back
22 ACC1.
23     A. All right.
24     Q. So is it fair to say that Salton '89 by itself
25 fails to disclose one or more elements of claim 1?

**49**

1     A. My feeling was that -- and my -- my analysis, I
2 wanted -- I believe that the combination of elements in
3 claim 1 is obvious, but I did not feel I could get a
4 clear enough statement for every single one of those
5 limitations from Salton '89 alone to make me comfortable
6 asserting that.
7     Q. So is it fair to say that Salton '89 by itself
8 fails to disclose one or more elements of claim 1?
9     A. Well, I guess -- no, it's not fair to say that.
10 I mean, that's -- I'm not -- I'm not contending that it
11 does disclose all of them. But I think that's an
12 arguable point, you know. Another person -- another
13 expert in the field might wish to actually claim that it
14 does.
15     Q. Okay. You didn't find --
16     A. I didn't. I'm not claiming that.
17     Q. So you felt -- you reached the opinion that
18 Salton '89 by itself was insufficient in describing at
19 least one or more elements of claim 1 to render that
20 claim invalid by itself; is that fair?
21         MS. PALLIOS ROBERTS: Objection. Form.
22         THE WITNESS: Salton '89 by itself did not
23 meet -- did not rise to my standards for clarity as
24 antecedent -- you know, as prefiguring all of the
25 limitations so that I was -- I felt comfortable saying

50

1 on the basis of Salton '89 alone that the claim was
2 obvious.
3 MR. FENSTER: Q. Okay. And that's true of all
4 of the prior art references cited in your report,
5 correct?
6 MS. PALLIOS ROBERTS: Objection. Form.
7 THE WITNESS: That is true for each -- yes,
8 each single one of the references.
9 MR. FENSTER: Q. Now, in ACC1, you assert
10 various combinations that we started to go through, one
11 of which is the combination of Salton '89 with Culliss,
12 correct?
13 A. Yes. In fact, that's the principal one.
14 Q. Okay. And do you anywhere in your report
15 disclose any particular motivation to combine Salton '89
16 with Culliss?
17 A. Yes.
18 Q. Okay. Where is that?
19 A. Well, there's a discussion in the --
20 Q. I'm sorry. I'll let you get there. Pardon --
21 pardon me.
22 Is there any disclosure in the chart ACC1 of
23 the motivation to combine Salton '89 with Culliss?
24 A. ACC1, the chart itself, does not contain the
25 analysis that would motivate someone to do that.

51

1 Q. Okay. And is that true of all the charts, that
2 none of the charts contain any analysis or disclosure
3 regarding the motivation to combine the various
4 references disclosed in those charts?
5 A. The charts do not contain that. They were not
6 intended to. They are -- they present information that
7 is both so detailed and so voluminous that it would have
8 interfered with intelligibility of the report if they'd
9 been contained in the prose section, and that's why they
10 were attached as separate charts.
11 Q. Okay. So I'm sorry I interrupted you before,
12 but I would like you to point out where in your report
13 you believe you disclosed the motivation to combine
14 Salton '89 with Culliss.
15 A. All right. Yeah. So -- and it's not
16 particular to Salton '89 and Culliss. It applies to
17 numerous of these combinations.
18 So the report itself includes background on the
19 state of the field -- yes, by all means, take that
20 back -- on the state of the field at the time when this
21 patent was filed. And then it includes a discussion of
22 the elements that are found in the claims that are at
23 issue in the patent. And then it points to prior art
24 for those patents -- for those claims.
25 And it's the combination -- then it's

52

1 backed up by these detailed charts that cite prior art
2 by limitation in the independent claims. And it's the
3 combination of these things that actually explains the
4 motivation. So as --
5 Q. I'm sorry, when you say "the combination" --
6 "it is the combination of these things that explains the
7 motivation," to combine Salton '89 with Culliss?
8 A. Yes.
9 Q. And what --
10 A. The background -- these things are the
11 background -- the analysis of the principal ideas in the
12 patent, and the detailed references cited in the claim
13 chart.
14 Q. Okay. And that is as specific as you can be
15 regarding pointing -- in terms of pointing me to
16 disclosure of particular motivation to combine Salton
17 '89 with Culliss; is that right?
18 A. No. No, I think that the report, for example,
19 in the background section talks quite clearly about how
20 the rise of the World Wide Web led to a completely
21 different kind of information search than had earlier
22 been the case in information retrieval and produced the
23 need for personalized information search.
24 And the report also talks about the activity in
25 the field that was bringing in techniques such as

53

1 natural language processing for information retrieval
2 and indeed for personalization.
3 And so the motivation comes from a combination
4 of the need and the strands of research that were going
5 on in a very lively way at that time.
6 Q. Okay. Is there -- does your report contain any
7 specific motivation to combine Salton '89 specifically
8 with Culliss --
9 A. Well, in the --
10 Q. -- to achieve the claimed invention?
11 A. So in the section where -- the section starting
12 on page 24 with paragraph 91, the claims of the '067
13 patent existed in the prior art. My report calls out
14 how -- what the precursors are in prior art for each of
15 the motivating strands, each of the things that was
16 trying to be achieved by this new patent, brought
17 together to achieve the goal of this new patent.
18 And it does then cite specific examples. It
19 cites examples from Salton '89, from Culliss, from
20 Kurtzman, from numerous other precursors, any -- any
21 subset of which provides sufficient prior art for
22 combining. The motivation was that the ideas were
23 there.
24 Q. Okay. Is it fair to say that your report
25 discusses motivation to combine in general but doesn't

54

1  do a separate analysis of the motivation to combine any
2  particular combination of references?
3      MS. PALLIOS ROBERTS: Objection. Form.
4      THE WITNESS: Well, for -- for -- take, for
5  example, the particular combination Salton '89 and
6  Culliss. The report shows that there was this general
7  motivation to combine and shows that that particular
8  combination was sufficient.
9      So I believe it does actually provide
10  motivation for that specific combination.
11      MR. FENSTER: Q. Where in your report does it
12  disclose -- and so -- my question is the same for each
13  of these combinations, okay. So, for example, in ACC2,
14  the principal references are Braden in view of Herz.
15      A. Mm-hm.
16      Q. Do you have -- does your report disclose a
17  particular motivation to combine Braden and Herz
18  specifically?
19      A. So as I say, the report starts off by saying in
20  each section what the problem was. So then -- it
21  discusses several different sources of art for solving
22  that problem and then it says, as explained in detail in
23  the attached charts, these claims are not novel by
24  virtue of whatever specific feature they're talking
25  about because the prior art, as called out in these

55

1  attached claim charts, suffices to -- as -- to make that
2  obvious.
3      Q. Where does your report say -- disclose the
4  motivation to combine Braden with Herz?
5      MS. PALLIOS ROBERTS: Objection. Form.
6      MR. FENSTER: Q. Or does it?
7      A. Well, it does. And as I say, the motivation is
8  that --
9      Q. No, I'm not asking for what the motivation is;
10  I'm asking for what your report discloses, okay.
11      A. Yes.
12      Q. So show me page and line where in your report
13  you say "The motivation to combine Braden and Herz is
14  X."
15      MR. WHITE: Marc, I'd appreciate it if you'd
16  let him finish his answers and not interrupt, please.
17      THE WITNESS: Okay, so you're asking me to
18  point you to a sentence that says "Here is the
19  motivation for combining Braden and Herz"?
20      MR. FENSTER: Yes.
21      THE WITNESS: Okay. To the best of my
22  recollection, there isn't a sentence in the report that
23  says that.
24      MR. FENSTER: Q. Okay. Do you disclose the
25  particular motivation to combine Salton '89 and Culliss

56

1  anywhere in your report?
2      MS. PALLIOS ROBERTS: Objection. Form.
3      THE WITNESS: I believe I do, as I've
4  explained.
5      MR. FENSTER: Q. Can you point me to where
6  that is.
7      MS. PALLIOS ROBERTS: Objection. Form.
8      THE WITNESS: I've pointed you to the
9  combination of elements that do that.
10      MR. FENSTER: Q. Okay. Is it your -- strike
11  that.
12      Does your report disclose any particular
13  motivation to combine Braden in view of Culliss?
14      MS. PALLIOS ROBERTS: Objection. Form.
15      THE WITNESS: Well -- so I understand you to be
16  asking me the same question about a different
17  combination.
18      MR. FENSTER: That's correct.
19      THE WITNESS: The answer is the same. I
20  believe -- so I don't -- I don't recall there being a
21  specific sentence for each of these combinations, no.
22      What there is in here is a discussion of the
23  fact that there were numerous combinations that would
24  suffice, and that if anything, this simply adds to the
25  obviousness.

57

1      MR. FENSTER: Q. Okay. Is it fair to say that
2  you don't disclose anywhere in your report any express
3  teaching from Salton '89 that would -- that would
4  suggest a combination with Culliss or the other
5  references that you disclose?
6      MS. PALLIOS ROBERTS: Objection. Form.
7      THE WITNESS: No, I didn't say -- well, Salton
8  '89 was -- preceded Culliss, so -- but I didn't say
9  that, no, Salton '89 teaches that you should combine
10  some part of that with Culliss.
11      MR. FENSTER: Q. Okay. And you didn't
12  disclose in your report any express teaching in any of
13  the references that would suggest combination with any
14  of the others, correct?
15      MS. PALLIOS ROBERTS: Objection. Form.
16      THE WITNESS: No, I didn't.
17      MR. FENSTER: Q. Can you turn to paragraph 85
18  of your report.
19      A. Okay. Yes.
20      Q. You state at paragraph 85 that in determining
21  whether a claimed invention is obvious, you have been
22  informed that one should consider the scope and content
23  of the prior art, the level of ordinary skill in the
24  relevant art, the differences between the claimed
25  invention and the prior art, and whether the claimed

15 (Pages 54 to 57)

58

1 invention would have been obvious to one skilled in the
2 art in light of those differences, correct?
3    A.  That's correct.
4    Q.  Okay.  So one of the things that you needed to
5 evaluate was the differences between the claimed
6 invention and the prior art; is that fair?
7    A.  That is correct.
8    Q.  Okay.  Does your report set forth the
9 differences between any of the asserted claims and the
10 prior art?
11    A.  Well, there are very few differences, to be
12 honest.  The only one that I found that -- was the use
13 of part-of-speech tagging in linguistically profiling
14 users and stored data files and queries for these
15 purposes, for the purposes of personalized information
16 retrieval.  And the report does actually specifically
17 address that difference.
18    Q.  Where do you identify the differences between
19 the claimed inventions and the prior art?
20    A.  Oh, you mean is -- again, you're asking me is
21 there a sentence that says "For each of these claims,
22 these are the differences"?
23    Q.  Yes.
24    A.  I don't -- I don't call out the differences
25 explicitly except in the case of this one affirmative

59

1 difference that -- where I do talk about it being
2 obvious to use that particular form of natural language
3 processing and personalization.
4    Q.  So you didn't endeavor to explicitly list the
5 differences between the prior art in each of these
6 asserted claims in your report; is that correct?
7    A.  In the report --
8    MS. PALLIOS ROBERTS: Objection.  Form.
9    THE WITNESS:  So I -- I examined them all
10 carefully.  I was looking to see what they were.
11    MR. FENSTER:  Q.  Can you answer my question?
12    A.  But did I list them in the report?  I did not.
13    Q.  Okay.
14    A.  Not all of them exhaustively.
15    Q.  Did you anywhere explicitly list any of the
16 differences between the asserted claims and the prior
17 art?
18    MS. PALLIOS ROBERTS: Objection.  Form.
19    THE WITNESS:  You mean did I say "This piece of
20 prior art doesn't use part-of-speech tagging, but the
21 patent does," that sort of thing?
22    MR. FENSTER:  Q.  I'm asking, yes, did you
23 compare the individual reference -- did you compare the
24 prior art references to the asserted claims and say
25 "These are the differences"?

60

1    MS. PALLIOS ROBERTS: Objection.  Form.
2    THE WITNESS:  I did compare them.  I did not
3 write in the report exactly what the differences were
4 for every -- every piece of prior art.
5    MR. FENSTER:  I see.
6    Q.  Now, at paragraph 86, you state -- you
7 reference a statement from the Supreme Court that,
8 quote,
9      "When there is a design need or market
10    pressure to solve a problem and there are a
11    finite number of identified predictable
12    solutions," comma, "a person of ordinary
13    skill has good reason to pursue the known
14    options within his or her technical grasp,"
15    and the quote goes on.
16    Do you see that?
17    A.  Yes, I do.
18    Q.  Okay.  And you considered -- you relied on this
19 statement from the Supreme Court to -- in reaching your
20 conclusion that the claims were obvious?
21    MS. PALLIOS ROBERTS: Objection.  Form.
22    THE WITNESS:  Well, so I -- I was guided by
23 this, yes.  I mean, I do believe this is a case in
24 point, that they -- that the patent at issue is a case
25 in point of what's described in that sentence.

61

1    MR. FENSTER:  Q.  Okay.  In other words, you
2 found that this -- the patent was addressing a problem
3 for which there were a finite number of identified
4 predictable solutions; is that correct?
5    MS. PALLIOS ROBERTS: Objection.  Form.
6    THE WITNESS:  Yes.
7    MR. FENSTER:  Q.  Okay.  Do you anywhere in
8 your report identify what those -- what that finite
9 number of identified predictable solutions are?
10    MS. PALLIOS ROBERTS: Objection.  Form.
11    THE WITNESS:  Do I list them all out?  No.
12    MR. FENSTER:  Q.  Do you ever state -- do you
13 ever state that -- how many there are?
14    MS. PALLIOS ROBERTS: Objection.  Form.
15    THE WITNESS:  No, I don't think I stated how
16 many there are.  I mean, the one particular one that
17 Geller adopted is the one that I spend the most time
18 discussing.
19    MR. FENSTER:  Q.  Okay.  Did you mention any
20 other identified predictable solutions to the same
21 problem in your report?
22    MS. PALLIOS ROBERTS: Objection.  Form.
23    THE WITNESS:  I didn't mention them as that.
24 So some of the prior art presents other approaches.  For
25 example, having users construct their own profile is

16 (Pages 58 to 61)

62

1  something -- is another -- one of the finite possible --
2  set of possible solutions. And some of the prior art
3  actually uses that.
4        MR. FENSTER: Q. Okay. Can --
5     A. But I didn't enumerate that as another --
6  explicitly as another possible solution.
7     Q. Okay. So in your report, you didn't try to
8  list or identify the finite number of predictable
9  solutions that you think exists; is that right?
10        MS. PALLIOS ROBERTS: Objection. Form.
11        THE WITNESS: Well, I -- insofar as I think
12  you're just repeating what I said, I agree.
13        MR. FENSTER: Q. Okay. As you sit here today,
14  now, what is -- is it your opinion that there are a
15  finite number of identified predictable solutions to the
16  problems addressed by the Geller patent?
17     A. That there are, or there were in 1990?
18     Q. Excellent clarification. That there were as of
19  the date of the invention.
20     A. As of the date of the invention, I believe
21  that's the case, yes.
22     Q. Okay. And what were the finite number of
23  identified predictable solutions as of the date of the
24  invention?
25     A. Well, there were two basic approaches to user

63

1  profiling. One had to -- one was to employ the user's
2  history and do some automatic computation on that to
3  calculate a profile which could then be used in
4  personalizing retrieval results.
5        And the other is -- approach is to have the
6  user construct the profile himself, usually with the aid
7  of some software that's provided. Some kind of a
8  graphical user interface would often be provided, and
9  the user would make selections under that.
10        So those are the two general approaches to
11  solutions. And within each approach, there was just a
12  finite number of different variants as to what things
13  would go into the profile.
14        So some of the ones where the user constructed
15  his own profile would simply ask the user to mark items
16  that they had encountered as things they liked or things
17  they weren't interested in. Others would ask them to
18  explicitly list out their interest areas.
19        Within the approaches that -- the family of
20  approaches that did automatic computation on some amount
21  of -- you know, some collection of documents or some
22  amount of user history, some of those approaches used
23  natural language processing of documents that were
24  obtained, for example, from the user himself or
25  documents that the user had visited; others used

64

1  statistical means, which you can think of as a form of
2  natural language processing, but it's a bit different
3  from the kind that Geller employed.
4        So that basically is the space of
5  possibilities. And what Geller did fell into one of
6  those.
7     Q. Okay. So it's your testimony that there were
8  only two possible identified solutions, one being
9  natural language processing and the other being
10  statistical for the automatic computation family; is
11  that right?
12        MS. PALLIOS ROBERTS: Objection. Form.
13        THE WITNESS: Those were the two I just named
14  right now. I think they principally cover the
15  possibilities.
16        MR. FENSTER: Q. Is it your testimony that
17  natural language processing -- that there's one way to
18  do natural language processing, that it wouldn't have
19  multiple variants?
20     A. No. No, that's not what I'm saying.
21     Q. How many variants are there if one of ordinary
22  skill in the art sat down to do natural language
23  processing in 1999?
24     A. Well, natural language processing is the
25  computational analysis of language to extract structure

65

1  and, through that, information from text usually; I mean
2  as opposed to speech. And that structure exists at
3  numerous levels.
4        There's the morphological structure of words.
5  This word is the plural of that, or this is -- this
6  adjective is formed from that noun by adding a suffix,
7  or so forth.
8        One very low level of processing involves
9  finding these -- doing stemming, finding these -- these
10  roots.
11        Other levels of processing find structure at
12  higher levels, finding, for example, the so-called
13  part-of-speech, the grammatical category of -- that
14  distinguishes noun from verbs and adjectives from
15  prepositions that determine what combinations of these
16  words can occur in well-formed sentences of the
17  language.
18        Still higher levels of structural processing
19  would include taking a string of text words and finding
20  that syntactic structure, which implies finding the
21  parts of speech, finding the basic categories, finding
22  the -- not only that, but the phrases and combinations.
23        Still deeper levels of processing include
24  finding aspects of the meaning of the sentence, because
25  different words can mean the same thing; different

17 (Pages 62 to 65)

66

1  orders of the same words can mean the same thing;
2  different combinations of words can mean the same thing.
3  So getting at the meaning is also a part of natural
4  language processing.
5        And so some -- different ones of the prior art
6  that are cited here actually go to different levels of
7  depth, as it were, in the kind of processing -- natural
8  language processing. And they do employ different
9  methods for discovering, for example, syntactic
10  structure as well.
11      Q.  Isn't it true that there's lots of different
12  methods and lots of different levels and ways to conduct
13  computational analysis within the broad confines of
14  natural language processing?
15        MS. PALLIOS ROBERTS: Objection --
16        THE WITNESS: Well, there's --
17        MS. PALLIOS ROBERTS: -- form.
18        THE WITNESS: There are lots of them today,
19  including numerous ones that were not widely available
20  in the '90s. But even then, there were -- there were a
21  number of ways, that's true.
22        And there were many good textbooks on the
23  subject. I mean, it was an area that someone with --
24  who wanted to make use of natural language processing
25  had good resources for finding out about.

67

1        MR. FENSTER: Q. A lot of options?
2        MS. PALLIOS ROBERTS: Objection. Form.
3        MR. FENSTER: Q. One of skill in the art would
4  have lots of options, lots of -- based on the resources
5  available to him or her in 1999 about how to go about
6  doing natural language processing; is that true?
7        MS. PALLIOS ROBERTS: Objection. Form.
8        THE WITNESS: Yeah. So, for example, if they
9  were -- if the person wanted to do part-of-speech
10  tagging, there were several different part-of-speech
11  tagging algorithms available which the person could
12  choose among.
13        MR. FENSTER: Q. Can you turn to paragraph 160
14  of your report.
15      A.  Yes.
16      Q.  So in the middle of paragraph 160, you state,
17        "Numerous pieces of prior art can be
18  combined in order to demonstrate the
19  obviousness of the invention. For example,"
20  and then you call out four of the charts.
21      A.  Oh, yes, so I did.
22      Q.  Do you see that?
23      A.  Yes.
24      Q.  Okay. My question is why these four and why
25  didn't you reference any of the other charts in your

68

1  report?
2        MS. PALLIOS ROBERTS: Objection. Form.
3        THE WITNESS: Well, these four are not any
4  better than any of the other ones. The example -- or
5  the sentence says, for example,
6        "Claim 1 is obvious in light of Salton
7  '89 in combination with Culliss."
8        So the purpose was simply to bolster the
9  general statement that numerous pieces of prior art can
10  be combined. The 13 charts actually give you specific
11  combinations.
12        MR. FENSTER: Q. If you can turn to page 17 of
13  your report.
14      A.  Mm-hm.
15      Q.  So at 17 you have a series of paragraphs,
16  starting with 67, that describe the various prior art
17  references.
18      A.  Yes.
19      Q.  Okay. Do you anywhere in your report analyze
20  the differences between Braden-Harder and the asserted
21  claims?
22        MS. PALLIOS ROBERTS: Objection. Form.
23        THE WITNESS: Does the report lay out
24  explicitly in text those differences? Not that I -- I
25  don't recall doing that, no. I certainly didn't do it

69

1  systematically.
2        MR. FENSTER: Q. Does your report disclose the
3  differences or analyze the differences between Brookes
4  prior art reference and the asserted claims?
5        MS. PALLIOS ROBERTS: Objection. Form.
6        THE WITNESS: No, it does not.
7        MR. FENSTER: Q. Does the report disclose
8  or -- any analysis regarding the differences between
9  Chislenko and any of the asserted claims?
10      A.  No.
11        MS. PALLIOS ROBERTS: Objection. Form.
12        MR. FENSTER: Q. Does your report disclose any
13  analysis regarding the differences between Culliss and
14  any of the asserted claims?
15        MS. PALLIOS ROBERTS: Objection. Form.
16        THE WITNESS: Not -- no, not systematically.
17        MR. FENSTER: Q. And does it disclose any
18  analysis regarding the differences between any of the
19  prior art references and any of the asserted claims?
20        MS. PALLIOS ROBERTS: Objection. Form.
21        THE WITNESS: Again, not systematically.
22        MR. FENSTER: Q. If you can turn to paragraph
23  91 on page 24.
24      A.  Yes.
25      Q.  So you state at paragraph 91, "I

18 (Pages 66 to 69)

70

1 believe that claim 1 of the '067 patent
2 consists of six different general concepts,
3 while claim 45 consists of three additional
4 general concepts," each of which you discuss
5 in that section; is that right?
6 A. Yes.
7 Q. And your analysis of obviousness was based on
8 finding disclosures of those general concepts in the
9 prior art; is that how you went about it?
10 MS. PALLIOS ROBERTS: Objection. Form.
11 THE WITNESS: No. The analysis was based on
12 finding prior art for the elements in each of the
13 limitations. The concepts are here for purposes of
14 explanation and analysis.
15 For example, there are certain elements -- if
16 you will, concepts -- that cut across multiple
17 limitations in a single patent -- claim. And it seemed
18 informative and useful to discuss them together in one
19 place -- discuss that element in one place, even though
20 it appears in multiple claims, rather than just to
21 repeat the discussion many times.
22 MR. FENSTER: Q. In the body of the report,
23 isn't it true that you compared the general concepts or
24 you showed disclosure of the general concepts in the
25 prior art references as opposed to going through,

71

1 element by element, using the actual claim language?
2 MS. PALLIOS ROBERTS: Objection. Form.
3 THE WITNESS: No, not -- not in general.
4 That's not true. So for -- for claim 1 and claim 45,
5 which have many, many elements, many limitations, I
6 appended the claim charts which did show element by
7 element in the claims what their antecedents were, as I
8 said earlier, to avoid putting that huge volume of
9 material in the report and making it completely
10 unintelligible.
11 So it's incorporated by reference as part of
12 the report, but it doesn't consist of the flow -- part
13 of the flow of prose here.
14 MR. FENSTER: Okay.
15 THE WITNESS: On the other hand, for the
16 dependent claims, which are -- each add one single
17 discrete bit to the independent claims on which they
18 depend, you do find analysis right here in this section
19 of the prior art.
20 MR. FENSTER: Q. Okay. Excluding the ACC
21 charts -- I want to distinguish between what's in the
22 ACC charts and what's in the body of the report. I
23 understand that they're incorporated by reference, but I
24 just need a way to talk about the body of the -- of your
25 report separate from the charts.

72

1 Okay. So if I talk about the body of the
2 report, excluding the charts, will you understand that
3 I'm talking about the 57 pages that constitute the body
4 of your report?
5 A. Well, I don't -- I don't think of that as the
6 body of my report. I think of the claim charts as an
7 inherent part of it. But I do understand what you mean
8 by 57 pages. So let's talk about pages 1 through 57.
9 That's just as good.
10 Q. All right. Is it fair to say that in the prose
11 section of your report on pages 1 through 57, you don't
12 analyze the prior art with reference to individual
13 elements, but instead you analyze it with respect to the
14 general concepts that you describe in paragraphs 91, et
15 cetera?
16 A. I think it would be --
17 MS. PALLIOS ROBERTS: Objection. Form.
18 THE WITNESS: I think it would be more -- more
19 accurate to say I analyze it -- I don't analyze it in
20 each case with respect to individual claim limitations,
21 that I do analyze it with respect to elements of those
22 claim limitations. That's what the concepts are;
23 they're elements that cut, in some cases, across
24 multiple limitations.
25 So the analysis is -- and the discussion is

73

1 there. And when you read it in light of the claim
2 charts, it's also very clear on a
3 limitation-by-limitation basis what the prior art is.
4 MR. FENSTER: Q. Did anyone tell you that
5 analyzing claims in terms of breaking them down into
6 general concepts as a means of analyzing the validity of
7 the claims was a valid approach to validity analysis?
8 MS. PALLIOS ROBERTS: I'm going to object, to
9 the extent this calls for communications with counsel,
10 and instruct you not to answer on --
11 THE WITNESS: Okay.
12 MS. PALLIOS ROBERTS: -- that basis.
13 MR. FENSTER: Q. How did you conclude that
14 breaking claims down into general concepts was the
15 proper test for validity?
16 MS. PALLIOS ROBERTS: Objection. Form.
17 THE WITNESS: I -- I didn't think it was the
18 proper test for validity. I thought it was a way of
19 explaining the analysis about -- of clearly explaining
20 the analysis of what made each of the claims obvious.
21 You could either go through a long and
22 unilluminating recitation for each limitation of the
23 prior art and then the discussion of the obviousness of
24 combining those and so forth, or you could give a
25 general overarching discussion that drew out

19 (Pages 70 to 73)

74

1 similarities across cases and give the explanation that
2 way.
3 And it was my feeling that the latter was more
4 illuminating.
5 MR. FENSTER: All right. I think we're going
6 to have to go off the record to change the tape.
7 THE WITNESS: Oh, okay.
8 THE VIDEOGRAPHER: This is the end of video
9 number 1. We are now off the record at 12:14.
10 (Discussion off the record.)
11 (Lunch recess from 12:19 to 1:05.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

75

1 AFTERNOON SESSION                    1:02 P.M.
2 THE VIDEOGRAPHER: We are now on the record at
3 1:02. This is the beginning of video number 2.
4 EXAMINATION RESUMED BY
5 MR. FENSTER: Q. Dr. Peters, if you could turn
6 to page 24 of your report, paragraph 92.
7 A. 24, 92. Yes.
8 Q. So here you identify one general concept as the
9 use of natural language processing to rank for
10 personalized interest. And you identify that as
11 corresponding to elements 1(a), 1(b), 1(d) and 1(i); is
12 that correct?
13 MS. PALLIOS ROBERTS: Objection. Form.
14 THE WITNESS: I do identify natural language
15 processing for ranking documents. And it is used for
16 that and those elements that you named.
17 MR. FENSTER: Q. Okay. And what do you mean
18 by "natural language processing"? What do you mean by
19 the con -- what are you using as the general concept of
20 the use of natural language processing to rank for
21 personalized interest here?
22 MS. PALLIOS ROBERTS: Objection. Form.
23 THE WITNESS: Well, there -- there are two
24 concepts: natural language processing, which is using
25 computers to process natural language in the ways we

76

1 talked about earlier; and the other one is ranking
2 documents based on personalized interests. So that
3 latter concept belongs more particularly to information
4 retrieval.
5 And documents can be ranked for personalized
6 interest in a variety of ways. But one of those ways is
7 by using the product of natural language processing.
8 MR. FENSTER: Q. Earlier you described several
9 different methodologies or hierarchies of analysis that
10 all fell within the broad category of natural language
11 processing. Do you recall that?
12 MS. PALLIOS ROBERTS: Objection. Form.
13 THE WITNESS: I did describe several different
14 levels of structure that natural language processing can
15 produce, yes. I did. That's correct.
16 MR. FENSTER: Q. And you agree that there are
17 different ways to conduct natural -- strike that.
18 You agree that there were different ways to
19 conduct natural language processing as of 1999, correct?
20 MS. PALLIOS ROBERTS: Objection. Form.
21 THE WITNESS: Yes. There were.
22 MR. FENSTER: Q. Did all forms of natural
23 language processing that were available in 1999 extract
24 linguistic patterns, as that term has been defined by
25 the court in this case?

77

1 MS. PALLIOS ROBERTS: Objection. Form.
2 THE WITNESS: So the court defined linguistic
3 pattern as -- well, I don't have the construction in
4 front of me, but it's basically a combination of parts
5 of speech, is the operative part of it, as I recall it.
6 And not all types of natural language
7 processing do extract parts of speech. Some, as I
8 mentioned earlier, for example, simply stem words. They
9 remove suffixes to try to find the root of a word,
10 without necessarily identifying the part of speech. In
11 fact, they may reduce different words of different parts
12 of speech to the same stems.
13 MR. FENSTER: Q. Okay. So would you agree
14 that the specific steps set forth in claim 1 in the
15 elements 1(a), 1(b), 1(d) and 1(i) reflect a particular
16 method or a particular aspect of natural language
17 processing?
18 MS. PALLIOS ROBERTS: Objection. Form.
19 MR. FENSTER: Q. Natural language processing.
20 A. So employing a part-of-speech tagger and a
21 dictionary, as this patent does, to identify linguistic
22 patterns is a -- is a particular form of natural
23 language processing. Is that -- did that answer your
24 question?
25 Q. I believe so. It's correct that not all forms

78

1 of natural language processing involve the particular
2 steps outlined in claim 1, correct?
3 MS. PALLIOS ROBERTS: Objection. Form.
4 THE WITNESS: Well, could can we take a look at
5 claim 1?
6 MR. FENSTER: Certainly. It's set forth in
7 your report, but --
8 THE WITNESS: Yes. I don't have it in front of
9 me. That's why I was --
10 MR. FENSTER: It is in -- it is in your report,
11 but I'll hand you the patent marked as Exhibit 3.
12 (Plaintiff's Exhibit 3
13 marked for identification.)
14 THE WITNESS: Thank you. Right. I mean, as
15 you -- as you know, I have only a part of my report in
16 front of me.
17 So let's see. Claim 1.
18 MS. PALLIOS ROBERTS: Is there a question
19 pending?
20 MR. FENSTER: Yes. Question is, is it correct
21 that not all forms of natural language processing
22 involve the particular steps outlined in claim 1?
23 MS. PALLIOS ROBERTS: Objection. Form.
24 THE WITNESS: Well, that's very definitely
25 correct because the steps outlined in claim 1, of which

79

1 there are nine, I guess, A through I, include many
2 things, of which a certain form of natural language
3 processing is only one.
4 MR. FENSTER: Q. So you agree that natural
5 language processing is broader than -- it's more
6 encompassing than the particular form of language
7 processing that's specified in the elements of claim 1,
8 correct?
9 MS. PALLIOS ROBERTS: Objection. Form.
10 THE WITNESS: Well, I think -- I'm trying to
11 think how to answer your question because as you've --
12 as you've posed it, it doesn't make technical sense to
13 me, but ... let me try --
14 MR. FENSTER: Let me -- let me see if I can
15 clarify the question.
16 THE WITNESS: All right.
17 MR. FENSTER: Q. Would you agree that natural
18 language processing, as you've used the term in your
19 report, refers to a class of methodologies of which only
20 one is used in the actual claim 1, that the particular
21 methodology of claim 1 is one methodology that belongs
22 to the class of methodologies that you describe as
23 natural language processing?
24 A. So the class I included -- I -- so yes, I
25 outlined the class of methods for extracting structure

80

1 at several levels. And I do believe that claim 1 makes
2 reference to a particular subset of those methods.
3 Q. Okay. So what I'm a little bit -- what I'm
4 trying to get at, and I'm a little confused by, is the
5 way I understand your report to be structured, you seem
6 to be using these general concepts, of which the first
7 is the use of natural language processing to rank for
8 personalized interest -- you seem to be using those
9 concepts as a way to explain how the prior art teaches
10 the claims -- or the elements of the claims, correct?
11 A. That --
12 MS. PALLIOS ROBERTS: Objection. Form.
13 THE WITNESS: I did introduce it to try to
14 explain that, yes.
15 MR. FENSTER: Q. And instead of using the
16 particular method of natural language processing that's
17 actually called out in the claims, you used the general
18 concept that includes the whole class of natural
19 language processing, correct?
20 MS. PALLIOS ROBERTS: Objection. Form.
21 THE WITNESS: So I did -- I made reference to
22 the whole class and I did talk some about the more
23 specific species within it, yes. I mean, I did do that.
24 MR. FENSTER: Q. And so when you go through
25 and you did your analysis finding that this first

81

1 general concept that corresponds, according to you, to
2 elements 1(a), (b), (d) and (i), as described in the
3 prior art, you base that conclusion on disclosures
4 relating to the general class of natural language
5 processing; is that correct?
6 MS. PALLIOS ROBERTS: Objection. Form.
7 THE WITNESS: So there are -- in that section,
8 there are a number of different pieces of prior art
9 cited that made use of natural language processing. And
10 different ones made, in some cases, slightly different
11 use of natural language processing -- of -- inside the
12 general class. That's -- that is true.
13 Some of those prior art -- for example, in
14 paragraph 91 it points out here -- sorry, I beg your
15 pardon -- paragraph 95, it points out that
16 Braden-Harder, the Braden patent, uses natural language
17 processing that involved a multiplicity of steps, one of
18 which was assigning parts of speech.
19 MR. FENSTER: Okay.
20 THE WITNESS: And similarly in 96, paragraph
21 96, it points out that Kupiec teaches the analysis --
22 language -- natural language processing, including
23 assigning parts of speech.
24 MR. FENSTER: Q. So in paragraphs 92 through
25 97, do you describe how the prior art discloses

21 (Pages 78 to 81)

82

1 extracting the user profile from the linguistic data
2 previously provided by the user?
3     A.   No.  Paragraphs 92 to 97 are about the use of
4 natural language processing for ranking according to a
5 user profile.  It's other paragraphs that describe what
6 you're asking about.
7     Q.   Okay.  In paragraphs 92 through 97, do you
8 describe how the prior art discloses constructing a
9 plurality of data item profiles, as required by claim
10 1(b)?
11     A.   No, I don't.
12     MS. PALLIOS ROBERTS:  Objection.  Form.
13     MR. FENSTER:  Q.  In paragraphs 92 through 97,
14 did you describe how the prior art discloses extracting
15 a search request profile, as required by 1(d)?
16     A.   No, that's not the organization of my
17 explanation.
18     Q.   And in paragraphs 92 through 97 do you explain
19 how the prior art discloses retrieving data that has
20 linguistic characteristics that substantially correspond
21 to linguistic characteristics of the linguistic data
22 generated by the user, as required by 1(i)?
23     A.   Retrieving data that has -- well, the data that
24 are ranked are being ranked according to the linguistic
25 characteristics of the user profile.

83

1     So the method described in paragraphs 92
2 through 97 are -- the approaches described there are
3 talking about how those retrieved data are ranked, yes.
4     Q.   Okay.  So where do you disclose that the prior
5 art discloses the elements specifically of claim 1(i)?
6     MS. PALLIOS ROBERTS:  Objection.  Form.
7     THE WITNESS:  All right.  So claim -- if you
8 look at -- so that's not in that section of the
9 paragraph -- of the report.
10     Claim 1(i) by itself is simply retrieving a
11 data item that you've already selected by some other
12 method and presenting it to the user.
13     And then there's just the bald assertion that
14 the method described in the patent actually does make it
15 correspond to the user's social, cultural and economic
16 background and psychological profile.
17     MR. FENSTER:  Q.  Do you anywhere in paragraphs
18 92 through 134 explain how the prior art discloses the
19 particular elements of claim 1(i)?
20     A.   Of claim 1(i).
21     MS. PALLIOS ROBERTS:  Objection.  Form.
22     THE WITNESS:  Through paragraphs -- I'm sorry,
23 what was the final one again?
24     MR. FENSTER:  134.
25     THE WITNESS:  134.  Well, so claim 1(i) is

84

1 simply the step of retrieving a document that was
2 selected by claim 1(h) and presenting it to the user.
3 And to the extent that the document presented --
4 retrieved and presented is the one that's selected by
5 claim 1(h), it is actually paragraphs 92 through 97 that
6 are relevant.  That is, claim 1(h) is all about ranking
7 documents according to a personalized interest profile.
8     There's nothing novel about claim 1(h).
9 Retrieving the documents and presenting it is well-known
10 art.  And the citations in the claim charts actually
11 demonstrate this.
12     MR. FENSTER:  Q.  Dr. Peters, I really want to
13 ask you to constrain your comments to response to my
14 questions.  My question is, where in your report do you
15 disclose how the prior art discloses the particular
16 elements of claim 1(i)?
17     MS. PALLIOS ROBERTS:  Objection.  Form.
18     THE WITNESS:  In the claim charts.
19     MR. FENSTER:  Q.  Okay.  And there's nothing in
20 the body of your report; is that right?
21     MS. PALLIOS ROBERTS:  Objection --
22     MR. FENSTER:  Q.  Meaning pages 1 through 57.
23     A.   So --
24     MS. PALLIOS ROBERTS:  Objection.  Form.
25     THE WITNESS:  Paragraph 97.

85

1     MR. FENSTER:  Q.  Okay.  Anything else?
2     A.   Which refers you to the claim --
3     MS. PALLIOS ROBERTS:  Objection.  Form.
4     THE WITNESS:  -- charts.
5     Not as far as I can recall right now.
6     MR. FENSTER:  Q.  Now, in the claim charts, as
7 far as I could tell, on -- the structure of the charts
8 has the claim language on the left, and then you have
9 three columns from the prior art references, correct?
10     A.   Yes.
11     Q.   And as far as I could tell, the evidence in the
12 three columns relating to the prior art references were
13 either excerpts from the prior art references or
14 citations to the prior art references.  Is that right?
15     A.   For the most part, that is what's there.
16     Q.   It doesn't include any analysis on your part in
17 terms of showing how, for example, the portions cited
18 correspond to or relate to the language of the claim; is
19 that right?
20     MS. PALLIOS ROBERTS:  Objection.  Form.
21     THE WITNESS:  That analysis is implied by the
22 discussion in the section that we've just been talking
23 about.
24     MR. FENSTER:  Q.  Okay.  But the chart itself
25 does not contain any analysis by you showing how the

22 (Pages 82 to 85)

86

1  cited portions of the prior art correspond or relate to
2  the language of the claims, correct?
3        MS. PALLIOS ROBERTS: Objection. Form.
4        THE WITNESS: Not above and beyond what's in
5  the rest of the report. So, for example, it's pretty --
6  well, yes. Let's leave it there.
7        MR. FENSTER: Q. The chart itself -- the
8  charts themselves do not contain any analysis by you
9  showing how any of the cited portions of the prior art
10 correspond to or disclose any of the claim elements,
11 correct?
12       MS. PALLIOS ROBERTS: Objection. Form.
13       THE WITNESS: That's not where that analysis
14 is. It's not in the claim charts.
15       MR. FENSTER: Q. And is that true for all 13
16 of the claim charts?
17       MS. PALLIOS ROBERTS: Objection. Form.
18       THE WITNESS: Probably. The claim charts don't
19 stand by themselves. The claim charts are a part of a
20 report. The report is a whole entity.
21       MR. FENSTER: Q. Okay. But the claim charts
22 themselves don't contain any analysis by you showing how
23 the cited portions of the prior art references disclose
24 the particular elements of the claims, correct?
25       MS. PALLIOS ROBERTS: Objection. Form.

87

1        THE WITNESS: Well, these things disclose
2  that -- that particular claim limitation. Do I say it's
3  these specific words in this part that correspond to
4  those specific words? That's not in the claim chart.
5        MR. FENSTER: Q. Is there any analysis, any
6  original work product by you, other than the mere
7  citation of the portions of the prior art references
8  themselves, showing how those prior art references
9  correspond to or disclose the particular claim elements
10 in the charts?
11    A. It's included --
12       MS. PALLIOS ROBERTS: Objection. Form.
13       THE WITNESS: -- in the discourse that we've
14 just been discussing.
15       MR. FENSTER: Q. Is there any analysis by you
16 in the charts, ACC1 through ACC13, showing how any
17 portion of the prior art corresponds and discloses the
18 actual claim elements?
19       MS. PALLIOS ROBERTS: Objection. Form.
20       THE WITNESS: Well, I don't have all the charts
21 in front of me. But to the best of my recollection,
22 that's not in the charts. I can look through all of
23 them here if you like, but ...
24       MR. FENSTER: If you need to to answer the
25 question. You're the one who prepared the charts.

88

1        THE WITNESS: Yep, yep. They are voluminous.
2  That's why I'm saying I don't remember them all. But
3  as -- you know, there -- there are -- there may be
4  specific bits of explanation, for example, where there
5  are terminological difference between one of -- of the
6  citations of prior art and the terminology that's used
7  in the claim elements.
8        There are, as I recall, some explanations like
9  that that are in the chart itself that show what the
10 correspondence is.
11       But the principal work of explaining how the
12 elements of the claims relate to what's called out in
13 the -- what's cited in the claim charts is done in the
14 explanatory sections, not in the charts.
15       MR. FENSTER: Q. And the charts themselves
16 don't reflect any analysis by you -- don't -- strike
17 that.
18       The charts themselves don't include any
19 analysis by you showing how the prior art references
20 disclose the claims as construed by the court, correct?
21       MS. PALLIOS ROBERTS: Objection. Form.
22       THE WITNESS: Well, it's the claims as
23 construed by the court that I was looking for prior art
24 for. So that's -- the citations are there because they
25 relate to the claim as construed by the court, the claim

89

1  language as construed by the court.
2        That language is not recited in the chart. If
3  you're asking me is it recited in the chart, it's not.
4        MR. FENSTER: Q. Dr. Peters, for example,
5  with -- let's -- let's just look at 1(a) for example,
6  which is at page 5 of -- starts at page 5 of ACC1.
7        And on the left-hand column, you've got the
8  claim language from claim 1(a), correct?
9     A. Yes.
10    Q. And then in the next column you have some
11 excerpts from Salton '89, correct?
12    A. Yes.
13    Q. And you have Salton '89, and you cite a page,
14 and then you have quotes -- quoted language there,
15 correct?
16    A. That's correct. And there's several of those,
17 as you say.
18    Q. Right. And that's true for all of the prior
19 art references; you just have quoted portions from the
20 text and citations set forth in these columns, correct?
21       MS. PALLIOS ROBERTS: Objection. Form.
22       THE WITNESS: That is what's there, yes.
23       MR. FENSTER: Q. Okay. And in the chart, do
24 you provide any explanation as to how the quoted portion
25 matches up with or discloses the claim language in the

23 (Pages 86 to 89)

90

1  left column?
2      A.  No.  The chart does not say, you know, "These
3  words in column 2 map to those words in column 1."
4      Q.  It's left as an exercise for the reader?
5          MS. PALLIOS ROBERTS:  Objection.  Form.
6          THE WITNESS:  It was explained earlier in
7  the -- the correspondence was explained in the section
8  we were discussing earlier.
9          MR. FENSTER:  I see.
10         THE WITNESS:  Would you like this back?
11         MR. FENSTER:  Sure.  Thanks.
12     Q.  So if you could turn to page 36 of your report.
13     A.  Yes.
14     Q.  Okay.  Now, you cite three general concepts for
15  claim 45; is that correct?
16         MS. PALLIOS ROBERTS:  Objection.  Form.
17         THE WITNESS:  Yes.  In connection with claim
18  45, I lump together the elements that appear across its
19  limitations in three major groups, yes.
20         MR. FENSTER:  Q.  Okay.  And the first major
21  group, as you call it, is creation of user profile from
22  text items, correct?
23     A.  That's correct.
24     Q.  And it's your opinion that that major category
25  corresponds to six of the elements from claim 45; is

91

1  that right?
2          MS. PALLIOS ROBERTS:  Objection.  Form.
3          THE WITNESS:  Yes.  And if I may consult the
4  patent here for a second and look at claim 45.
5          It's my opinion that six of those limitations
6  are involved in creating a user profile from text items
7  in one way or another.
8          MR. FENSTER:  Q.  Is it your opinion that if a
9  reference discloses creating a user profile from text
10  items, that that reference will necessarily disclose
11  each of the six elements you've identified as
12  corresponding?
13         MS. PALLIOS ROBERTS:  Objection.  Form.
14         THE WITNESS:  No, not -- it's not.  As I -- as
15  I've said, there are -- well, let's see.  In claim 45
16  here, we have even more.  Eight, nine, ten, 11 -- 11
17  steps, 11 limitations called out in the claim.  So I
18  believe that -- my understanding is that for the patent
19  to be obvious, each of those steps has to have an
20  antecedent.
21         MR. FENSTER:  That's not my question.
22         THE WITNESS:  Okay.
23         MR. FENSTER:  Q.  Okay.  At page 36 of your
24  report, you, in paragraph -- well, it's listed as
25  indented 1.  The first major category you have listed is

92

1  creation of a user profile from text items.  Do you see
2  that?
3      A.  Yes.
4      Q.  And in parentheses you have claims 45(a), (b),
5  (c), (d), (e), (f), (g) and (k), along with two
6  dependent claims.  Do you see that?
7      A.  That's correct.
8      Q.  Okay.  And what did you mean by putting those
9  claim elements in parentheses after reciting that major
10  category?
11     A.  I mean that those are the steps in claim 45.
12  Those are the elements in claim 45 that are involved in
13  creating the user profile from text items in the way
14  that claim 45 claims.
15     Q.  Okay.  Is it your opinion that any prior art
16  reference which creates a user profile from text items
17  will necessarily disclose each of claim elements 45(a),
18  (b), (c), (f), (g) and (k)?
19     A.  No, it is not.
20     Q.  Do you, in paragraphs 135 through 139, show how
21  Salton discloses the particular elements of claim 45(a)?
22         MS. PALLIOS ROBERTS:  Objection.  Form.
23         THE WITNESS:  Not in those paragraphs taken by
24  themselves.  It's in the combination of those paragraphs
25  and the claim charts that support these.

93

1          MR. FENSTER:  Q.  Okay.  So there isn't
2  anything in the disclosure of paragraphs 135 through 139
3  by themselves that would show a mapping of the
4  disclosure from Salton '68 to the particular claim
5  elements of claim 1(a); is that right?
6          MS. PALLIOS ROBERTS:  Objection.  Form.
7          THE WITNESS:  No, it doesn't say, you know,
8  "This part of Salton 1968 is about retrieving user
9  linguistic data comprising at least one text item," et
10  cetera.
11         MR. FENSTER:  Q.  Is there anything in
12  paragraphs 135 through 139 showing how Culliss teaches
13  the particular elements of claim 1(a)?
14         MS. PALLIOS ROBERTS:  Objection.  Form.
15         THE WITNESS:  No, in the same way; it's not
16  there alone.
17         MR. FENSTER:  Q.  Is there anything in
18  paragraphs 135 through 139 showing how Culliss teaches
19  any of the particular -- of the particular six elements
20  that you identified as corresponding to this general
21  category of creating a user profile from text items?
22         MS. PALLIOS ROBERTS:  Objection.  Form.
23         THE WITNESS:  In that part of the report alone,
24  no.  It's the combination of that part, plus the claim
25  charts, that show -- that provide that.

94

1    MR. FENSTER: Q. Is there anything in
2  paragraphs 135 through 139 that discloses how Herz
3  teaches each of the six elements that you identify as
4  corresponding to this general category?
5    MS. PALLIOS ROBERTS: Objection. Form.
6    THE WITNESS: Well, so it's not about
7  retrieving. Herz does talk about using copies of the
8  target objects that the user indicates are
9  representative of his or her interest, so ... you could
10 say that even in this particular prose, there's some
11 indication there.
12   MR. FENSTER: Q. Tell me which of these
13 elements -- which of the six elements of 45(a), (b),
14 (c), (f), (g) and (k) you think are specifically
15 disclosed by Herz, as disclosed in paragraphs 135
16 through 139 of your report.
17   MS. PALLIOS ROBERTS: Objection. Form.
18   THE WITNESS: Okay. So Herz talks about -- the
19 citation from Herz here is about initially
20 determining -- it's about determining a user profile
21 using copies of the profiles of target objects that the
22 user represents -- indicates are representative of his
23 or her interest. That's related to retrieving user
24 linguistic data provided by the user.
25   MR. FENSTER: Q. Does your report say that?

95

1    A. No.
2    MS. PALLIOS ROBERTS: Objection. Form.
3    THE WITNESS: I take that to be something that
4  you could easily figure out.
5    MR. FENSTER: Q. You're referring to paragraph
6  138 of your report; is that correct?
7    A. That's correct.
8    Q. Okay. And 138 says "Herz teaches" and then has
9  a quote from Herz, correct?
10   A. That's correct.
11   Q. The sum total of your analysis regarding Herz
12 in those paragraphs is "Herz teaches," correct?
13   MS. PALLIOS ROBERTS: Objection. Form.
14   THE WITNESS: No. No, that's not the sum
15 total. Again, the paragraphs -- this paragraph is one
16 of a series of paragraphs that culminates by bringing in
17 the attached claim chart --
18   MR. FENSTER: Okay.
19   THE WITNESS: -- where Herz is one of the
20 examples.
21   MR. FENSTER: Q. I'm having trouble finding
22 your analysis in the -- in your report. You keep
23 telling me that it's here in the report, it's not in the
24 charts, and that it's the sum total.
25   Let's go through -- let's just take Herz as an

96

1  example.
2    A. Okay.
3    Q. Okay. And Herz is disclosed in ACC2, for
4  example.
5    A. Well, that one's about claim 1. If we want to
6  talk about claim 45, we should --
7    Q. You're right. So let's go to ACC11. Okay.
8    Now -- so what I want is your analysis -- what
9  I want to point out is where in your report do you
10 show your own analysis and explanation as to how Herz
11 discloses each of the elements of claim 45, okay.
12   So let's start -- let's start with 45(a) and go
13 all the way through (k). And for each one, I want you
14 to go through and point out everywhere in your report
15 where you think you provide your own analysis and
16 explanation as to how Herz teaches each element.
17   A. Okay. But remember, I -- I -- what this --
18 what I've asserted here is that Salton plus Herz teach
19 each element of claim 45, not that Herz alone teaches
20 every element of claim 45.
21   Q. Okay.
22   A. So we'll go through the ones which I think Herz
23 does teach.
24   All right. So let's see. For claim 45(a),
25 which is retrieving user linguistic data comprising at

97

1  least one text item, and so on -- so Herz in -- let's
2  see. I got mixed up here about pages here.
3    In column 56, 20 through 28 says,
4    "As in any application involving search
5  profiles" -- I'll show it to you here --
6    "they can be initially determined" --
7    Q. Okay.
8    A. -- "or explicitly altered by a number
9  of procedures, including the following
10 preferred methods."
11   And one of those methods is using copies of the
12 profiles of target objects or target clusters the user
13 indicates are representative --
14   Q. Dr. Peters, let me interrupt.
15   MS. PALLIOS ROBERTS: Don't interrupt his
16 answer.
17   MR. FENSTER: Q. -- 'cause you're not actually
18 answering my question. What you were reading from was a
19 quoted portion from Herz that you have at page 3 of
20 ACC11, correct?
21   A. Mm-hm.
22   Q. Okay. What I'm asking you for is not what --
23 I'm not asking for your analysis now, okay. I'm not
24 asking you to now provide an analysis and explanation as
25 to how Herz -- how the quoted portions of Herz disclose

25 (Pages 94 to 97)

1  45(a).

2    A.  Mm-hm.

3    Q.  What I want you to do is point to the -- any
4  explanation that you already provided in your report, if
5  there is any.

6    A.  Mm-hm.  Okay.  Well, the explanation is the
7  combination of that citation and the discussion in these
8  paragraphs 135 through 139 as it applies to claim 45(a)
9  specifically -- not as it applies to the other claims of
10  45, 'cause this discussion is intended to summarize
11  across claims -- but as it applies to claim 45(a), this
12  discussion, together with the citations from Herz here.

13    Q.  Okay.  So what you've identified for me is
14  paragraphs 135 through 139 in your report and the quoted
15  portions from Herz in the chart, correct?

16    A.  Mm-hm.

17    MS. PALLIOS ROBERTS:  Objection.  Form.

18    MR. FENSTER:  Q.  Okay.  And is it correct that
19  the chart doesn't include any explanation by you; it's
20  just quoted portions regarding Herz?

21    MS. PALLIOS ROBERTS:  Objection.  Form.

22    THE WITNESS:  That's correct in this case, yes.

23    MR. FENSTER:  Q.  Okay.  Now, does 135 -- does
24  paragraph 135 of your report provide any explanation by
25  you as to how Herz discloses element 45(a)?

1    A.  Well, I believe it does, yes.

2    Q.  Okay.  Show me where.

3    A.  Well, in paragraph 138 in particular.

4    Q.  I was asking about 135.

5    A.  Oh, I'm sorry.  130 -- does 135?  135 speaks
6  about Salton.

7    Q.  It doesn't include any explanation by you about
8  how Herz discloses paragraph 45(a), correct?

9    A.  No.

10    Q.  Okay.  And paragraph 136 of your report
11  likewise does not include any explanation by you as to
12  how Herz discloses 45(a), correct?

13    A.  Not by itself.  What each of these paragraphs
14  does is to talk about how elements of other patents or
15  textbooks map onto elements of claim 45(a).

16    So the only one that specifically is about Herz
17  is 138.  It needs to be --

18    Q.  Okay.

19    A.  -- interpreted in the context of the whole
20  section.

21    Q.  Okay.  And so paragraph 138 is the only
22  paragraph in your entire report that contains any
23  explanation by you as to how Herz discloses element
24  45(a), correct?

25    A.  That's not what I said.

1    MS. PALLIOS ROBERTS:  Objection.  Form.

2    THE WITNESS:  I said it had to be read in the
3  context of the rest of the explanation.

4    (Brief interruption.)

5    MR. FENSTER:  Q.  The only words that are yours
6  in paragraph 148 -- 138 are "Herz teaches," correct?

7    A.  In 138, that is -- "Herz teaches," and then
8  there's a quotation.

9    Q.  And you can't point to any other portion of
10  your report where you provide explanation as to how Herz
11  teaches element 1(a), correct?

12    MS. PALLIOS ROBERTS:  Objection.  Form.

13    THE WITNESS:  The rest of this section plus the
14  charts that involve Herz.

15    MR. FENSTER:  Q.  Okay.  Let's do the same
16  exercise for 45(b).

17    A.  All right.

18    Q.  You contend that Herz discloses element 45(b),
19  correct?

20    A.  That's right.  Generating, in this case, an
21  empty user data profile.  That's the first step in
22  entering -- in generating data profiles generally.

23    Q.  Do you provide any explanation in your
24  report -- any explanation by you -- as to how Herz
25  teaches element 45(b)?

1    A.  Yes.  The answer is the same as before.  It's
2  the combination of these paragraphs 135 through 139,
3  which make -- which include particular mention of Herz,
4  plus the quoted portions of Herz here in the claim
5  chart.

6    Q.  Okay.  And the only words in all of that that
7  you've quoted regarding Herz that are yours "Herz
8  teaches," correct --

9    MS. PALLIOS ROBERTS:  Objection --

10    MR. FENSTER:  Q.  -- in paragraph 138?

11    MS. PALLIOS ROBERTS:  Objection.  Form.

12    THE WITNESS:  No.  The -- that's the only
13  mention of Herz in my words.  The section as a whole is
14  intended to show how prior art, including Herz's art,
15  maps onto a collection of steps -- anticipates, if you
16  like -- that's not the right technical term because I'm
17  not saying it anticipates the claim -- but it's prior
18  art for these steps in those limitations of claim 45.

19    MR. FENSTER:  Q.  I'm eager for your words.  If
20  you can point me to any words -- you're a teacher.  You
21  explain.  If you can point me to any words of yours in
22  your report where you explain how -- tell me how Herz
23  discloses element 45(b), please do so.

24    MS. PALLIOS ROBERTS:  Objection.  Form.

25    THE WITNESS:  Well, the report explains the

102

1   context in which this patent occurred; it explains what
2   combination of elements occur there; it talks about
3   where each of the parts that goes into the combination
4   can be found.
5       MR. FENSTER: Q. Can you --
6       MS. PALLIOS ROBERTS: Let him finish.
7       MR. FENSTER: Q. Can you answer my specific
8   question. Can you point me to any words of yours where
9   you explain how Herz in particular discloses element
10  45(b) in particular?
11      MS. PALLIOS ROBERTS: Objection. Form.
12      THE WITNESS: I guess I don't know what you're
13  looking for if I -- what I've given you isn't an answer
14  to the question.
15      MR. FENSTER: Q. I'm asking where you discuss
16  Herz in particular, if you do, in your report and where
17  you explain in your own words and provide your analysis
18  as to how Herz in particular discloses the particular
19  element of 45(b).
20      MS. PALLIOS ROBERTS: Objection. Form.
21      THE WITNESS: So my -- the report is not a
22  report about Herz; it's a report about the Geller
23  patent, what is -- what combination of elements it
24  involves, how other people were looking at those
25  elements, and even for a similar combination at the

103

1   time, and a discussion of who those people were and what
2   they actually presented.
3       MR. FENSTER: Q. If it's not there, that's a
4   fine answer. If it is there, I want you to show me
5   where it is. That's all.
6       So if you contend that you did explain where
7   Herz discloses 45(b) and how, then show me. And if you
8   didn't explain it, just say so.
9    A.  I am --
10      MS. PALLIOS ROBERTS: Objection. Form.
11      THE WITNESS: -- going to say again that the
12  report is not about Herz. I don't give a section on
13  what Herz teaches about this particular patent in, you
14  know, minute detail.
15      MR. FENSTER: Q. Okay. So is it fair to say
16  that your report wasn't intended to and doesn't explain
17  how Herz teaches the particular elements of claim 45?
18      MS. PALLIOS ROBERTS: Objection. Form.
19      THE WITNESS: No, I don't think that's fair.
20      MR. FENSTER: Q. Okay. So let me ask it this
21  way: Does your report explain how Herz discloses claim
22  45(b)?
23      MS. PALLIOS ROBERTS: Objection. Form.
24      THE WITNESS: In my opinion, it does.
25      MR. FENSTER: Q. And can you point me to any

104

1   sentences in your report where that explanation is
2   provided?
3       MS. PALLIOS ROBERTS: Objection. Form.
4       THE WITNESS: The sentences of the section
5   we're discussing about paragraphs 135 through 139, plus
6   the portion of the claim chart that we're looking at
7   here.
8       MR. FENSTER: Q. Okay. Can you point me to --
9   does your report explain in your words how Herz
10  discloses claim element 45(c)?
11   A.  Let's look at 45(c), retrieving a text item
12  from user linguistic data. So Herz actually -- yes,
13  Herz does teach that the -- in creating a profile, you
14  can take text and you can break it into segments here
15  that correspond to these text items.
16   Q.  Dr. Peters, please focus on my question. Does
17  your report explain in your own words how Herz discloses
18  claim element 45(c)?
19      MS. PALLIOS ROBERTS: Objection --
20      MR. FENSTER: Q. Yes or no?
21      MS. PALLIOS ROBERTS: Objection. Form.
22      THE WITNESS: I guess you're saying that you
23  find it hard to make the connection between those two
24  things. I do not explain so -- apparently so that you
25  could see the connection, what that connection was.

105

1       MR. FENSTER: No, I --
2       THE WITNESS: You don't seem to be seeing the
3   connection.
4       MR. FENSTER: Q. I'm slow, so, you know --
5   I -- I'm not asking -- can you answer my question yes or
6   no; does your report explain in your own words how Herz
7   discloses element 45(b)?
8       MS. PALLIOS ROBERTS: Objection. Form.
9       THE WITNESS: I've answered yes.
10      MR. FENSTER: Q. Can you point me to where?
11   A.  It --
12      MS. PALLIOS ROBERTS: Objection. Form.
13      THE WITNESS: It is the section that discusses
14  claims here, including 45(b), these paragraphs 135
15  through 139, and the portion of the claim charts that
16  appear -- that corresponds to -- that matches Herz up
17  with claim 45(b).
18      MR. FENSTER: Q. Does your report explain in
19  your own words how Herz teaches claim 45(c)?
20      MS. PALLIOS ROBERTS: Objection. Form.
21      MR. FENSTER: Q. Yes or no?
22   A.  Yes, it does.
23   Q.  Okay. Where?
24      MS. PALLIOS ROBERTS: Objection. Form.
25      THE WITNESS: Same portion of these pages 36

27 (Pages 102 to 105)

**106**

1  and 37 and the part of the claim chart that maps Herz --
2  quotations from Herz to claim 45(c).
3      MR. FENSTER: Q. Does your report explain in
4  your own words how Herz discloses claim element 45(f)?
5      MS. PALLIOS ROBERTS: Objection. Form.
6      THE WITNESS: Yes, it does.
7      MR. FENSTER: Q. Where?
8    A. Paragraphs 135 --
9      MS. PALLIOS ROBERTS: Objection. Form.
10     THE WITNESS: -- to 139 and the portion of the
11  claim chart that maps citations from Herz to claim
12  45(f).
13     MR. FENSTER: Q. Okay. Does your report
14  explain in your own words how Herz teaches claim 45(g)?
15     MS. PALLIOS ROBERTS: Objection. Form.
16     THE WITNESS: Yes, it does.
17     MR. FENSTER: Q. Where?
18   A. Paragraphs 135 through 139 and the portion of
19  the claim chart that map Herz to claim 45(g).
20   Q. Okay. Does your report explain in your own
21  words how Herz teaches or discloses the element 45(k)?
22     MS. PALLIOS ROBERTS: Objection. Form.
23     THE WITNESS: Yes.
24     MR. FENSTER: Q. Where?
25   A. Yes, it does.

**107**

1      MS. PALLIOS ROBERTS: Objection. Form.
2      THE WITNESS: Paragraphs 135 through 139 and
3  the portion of the claim chart that maps, in this case,
4  multiple citations from Herz to claim 45(k).
5      MR. FENSTER: Q. And do you agree with me that
6  the only words of your own that you provide in
7  paragraphs 135 through 139 and the chart ACC11 regarding
8  Herz are the introductory phrase "Herz teaches"?
9      MS. PALLIOS ROBERTS: Objection. Form.
10     THE WITNESS: No, I don't agree with that at
11  all. The section is about a collection of concepts
12  explained in light of a background which I expanded on
13  in considerable detail. And the citations from the
14  patents as well as the Geller patent are things which I
15  believe are understandable in light of that explanation.
16     And I think that it's a clear -- taken
17  together, it amounts to a clear explanation of how Herz
18  maps onto it.
19     And so the words "Herz teaches" are not the sum
20  total of what I have to say about what it is that Herz
21  teaches.
22     MR. FENSTER: Q. Do you say --
23   A. You have to read it in the context of all that
24  surrounds it.
25   Q. Okay. Are there any other paragraphs where you

**108**

1  discuss Herz in particular?
2      MS. PALLIOS ROBERTS: Objection. Form.
3      THE WITNESS: Well, there may well be. I don't
4  recall offhand. It did come up other times, so surely
5  there are. In claim -- discussed in claim 1, for
6  example.
7      MR. FENSTER: Q. Is paragraph 138 the only
8  place where you discuss Herz in connection with claims
9  45(a), (b), (c), (d), (e), (f), (g) and (k)?
10     MS. PALLIOS ROBERTS: Objection. Form.
11     THE WITNESS: No. It's paragraphs 135 through
12  139, taken with the claim charts.
13     MR. FENSTER: Q. Do you mention Herz in
14  paragraph 135?
15   A. No.
16   Q. Do you mention Herz in paragraph 136?
17   A. I don't mention him, no. I'm talking --
18   Q. Do you mention -- do you mention Herz in
19  paragraph 137?
20   A. No.
21   Q. And do you mention Herz in paragraph 139?
22   A. No. These are a series of connected paragraphs
23  of which the paragraph about Herz is one. And it
24  relates, in the context, to all the other discussion.
25   Q. Does your report contain any explanation by you

**109**

1  as to how Salton '68 teaches element 45(a)?
2      MS. PALLIOS ROBERTS: Objection. Form.
3      THE WITNESS: Yes, it does.
4      MR. FENSTER: Q. Where?
5    A. It's in paragraph 135 through 139 and the
6  charts about Salton '68, which this -- this is the chart
7  which combines Salton with Herz.
8    Q. And you're referring to ACC11, correct?
9    A. I am, yes.
10   Q. Does your report disclose any explanation by
11  you in your own words as to how Salton '68 teaches
12  element 45(b)?
13     MS. PALLIOS ROBERTS: Objection. Form.
14     THE WITNESS: The same paragraphs, 135 through
15  139, and the part of this chart that lines up Salton
16  specifically here are reference to the figure and
17  paragraph -- limitation (b) of claim 45.
18     MR. FENSTER: Q. Does your report contain any
19  explanation by you as to how Salton '68 teaches element
20  45(c)?
21     MS. PALLIOS ROBERTS: Objection. Form.
22     THE WITNESS: Paragraphs 135 through 139 --
23     MR. FENSTER: Q. Can you answer my question
24  yes or no?
25   A. Oh, I'm sorry.

28 (Pages 106 to 109)

110

1  MS. PALLIOS ROBERTS: Let him finish his
2  answer.
3  THE WITNESS: Well, yes. I'll start with yes.
4  Same paragraphs and the part of the claim chart that
5  lines up Salton with 45(c).
6  MR. FENSTER: Q. Does your report contain any
7  analysis or explanation by you as to how Salton '68
8  teaches element 45(f)?
9  MS. PALLIOS ROBERTS: Objection. Form.
10  THE WITNESS: Yes.
11  MR. FENSTER: Q. And where is that found?
12  THE WITNESS: It's in the paragraph about
13  Salton, 135, plus the remainder of that section, 139,
14  and the portion of the claim chart that line up Salton
15  '68 with claim 45(f).
16  MR. FENSTER: Q. Okay. Does the chart ACC11
17  include any explanation by you or just quotations or
18  citations to Salton '68?
19  A. In the chart, there are citations and
20  quotations.
21  Q. The chart itself doesn't -- does the chart
22  itself include any explanation by you regarding Salton
23  '68?
24  A. The chart taken alone does not seem to include
25  any explanation about Salton. It's the combination that

111

1  does.
2  Q. And does your report contain any explanation by
3  you as to how Salton '68 discloses claim element 45(f)?
4  MS. PALLIOS ROBERTS: Objection. Form.
5  THE WITNESS: Yes.
6  MR. FENSTER: Q. And where is that found?
7  A. Okay, I -- it's right here in front of me. So
8  I thought that might be the one I just answered, but
9  maybe I turned to it in looking through the chart.
10  It's in paragraphs 135 through 139 plus the
11  section of the chart that has some citations of Salton
12  lined up with claim 45(f).
13  Q. Okay. And does your report contain any
14  explanation or analysis by you as to how Salton '68
15  teaches element 45(g)?
16  MS. PALLIOS ROBERTS: Objection. Form.
17  THE WITNESS: Yes, it's paragraphs 135 through
18  139 and the portion of the chart that aligns citations
19  of Salton with claim limitation 45(g).
20  MR. FENSTER: Q. And is your answer the same
21  with respect to Salton -- your analysis of -- or your
22  explanation of how Salton '68 teaches 45(k)?
23  MS. PALLIOS ROBERTS: Objection. Form.
24  THE WITNESS: It -- yes, it is. Those
25  paragraphs plus the part that lines up citations of

112

1  Salton with claim 45(k).
2  MS. PALLIOS ROBERTS: Counsel, we've been going
3  for about an hour. If this is a natural stopping point,
4  could we take a break.
5  MR. FENSTER: Sure.
6  THE VIDEOGRAPHER: We are now off the record at
7  2:07.
8  (Recess taken.)
9  THE VIDEOGRAPHER: We are now on the record at
10  2:24.
11  MR. FENSTER: Q. Dr. Peters, you assert in
12  ACC12 that chart -- that claim 45 is invalid in light of
13  several references, the principal ones of which are
14  Braden and Kurtzman; is that correct?
15  A. I believe that's correct. If I could just see
16  it for one second.
17  Yes, that -- that is correct.
18  Q. Does your report disclose anywhere any analysis
19  or explanation in your own words -- strike that.
20  Does your report contain any explanation in
21  your own words as to how Braden teaches element 45(a)?
22  MS. PALLIOS ROBERTS: Objection. Form.
23  THE WITNESS: Well, yes, it does. I discuss
24  Braden in -- when it's introduced as prior art; I
25  discuss it in some other places; and I discuss it in

113

1  particular in paragraphs -- the ones we were just
2  talking about -- and I have to find them again here --
3  paragraphs 135 through 139 with -- together with that
4  portion of the claim chart that you just mentioned,
5  ACC12, that pertains to claim 45(a).
6  MR. FENSTER: Q. It's your testimony that your
7  report contains an explanation in your own words
8  regarding how Braden -- explaining how Braden discloses
9  claim 45(a) in paragraphs 135 through 139 together with
10  the chart; is that correct?
11  MS. PALLIOS ROBERTS: Objection. Form.
12  THE WITNESS: I -- I do think that it does.
13  What I said was that it's discussed in the places where
14  Braden itself is introduced and those paragraphs and the
15  chart.
16  Let's see. Paragraph 67, for example, Braden
17  is discussed, along with being relevant to the -- those
18  paragraphs 135 through 139. And, of course, it's also
19  in that chart.
20  MR. FENSTER: Q. Okay. So you're telling me
21  that the places where I can find -- that your report
22  explains in your own words how Braden teaches 45(a) in
23  particular at paragraph 67 of your report, paragraphs
24  135 through 139 of your report, together with the chart;
25  is that correct?

114

1     MS. PALLIOS ROBERTS:  Objection.  Form.
2     THE WITNESS:  Let's say -- I can look through
3  the report and see if there are any other places that
4  are pertinent.  45(a) we're talking about?
5     MR. FENSTER:  Yep.
6     THE WITNESS:  Well, that's part of the creation
7  of a user profile and so ... there's also relevant
8  discussion of creating user profiles in paragraphs 98
9  through 111.  And indeed in the section under Graham
10  factors on the scope and content of the prior art,
11  there's again reference to Braden.
12     MR. FENSTER:  Q.  What paragraph are you at?
13     A.  In paragraph 171 and paragraphs 178, 175.
14     So they've -- you know, it's not that the
15  contribution of Braden to understanding how to create
16  user profiles is not discussed in the report; I believe
17  it is.
18     Q.  What did you understand my last question to be?
19     MS. PALLIOS ROBERTS:  Objection.  Form.
20     THE WITNESS:  Well, I think --
21     MS. PALLIOS ROBERTS:  Counsel, he answered your
22  question.  Can you move on.
23     MR. FENSTER:  No.
24     Q.  What did you understand my last question to be?
25     A.  Well, your very last question was did I agree

115

1  that only -- you named -- I forget exactly which
2  paragraphs, but a specific set of paragraphs plus the
3  claim charts were the analysis of how Braden teaches
4  this.
5     And I was saying no, no, what I had answered
6  the previous question as saying was that those
7  paragraphs, the claim charts and other discussion in
8  these 53 pages, or whatever the number is -- 57 pages --
9  were all a part of the account of how Braden teaches the
10  construction of things relevant to the construction of
11  user profiles.
12     MR. FENSTER:  Q.  Do you believe that your
13  report sets forth an explanation in your own words as to
14  how specifically Braden specifically discloses element
15  45(b)?
16     MS. PALLIOS ROBERTS:  Objection.  Form.
17     THE WITNESS:  Yes, I do believe that.
18     MR. FENSTER:  Q.  Okay.  Can you show me where
19  in your report you explain in your own words
20  specifically how Braden specifically discloses the
21  elements of 45(b).
22     MS. PALLIOS ROBERTS:  Objection.  Form.
23     THE WITNESS:  Yes.  You put the words -- put
24  together the words about Braden in the sections that
25  I've cited earlier, the prior art paragraph 67, the

116

1  discussion of Braden in connection with user profiling
2  in paragraphs 98 through 111, and the discussion of
3  claim -- creation of a user profile from text items,
4  paragraphs 135 through 139, and the citations in the
5  claim charts for claim 45(b).
6     Q.  Does paragraph 67 mention element 45(b) at all?
7     A.  Let me look.
8     No, paragraph 67 does not mention claim 45(b).
9     Q.  Does claim [sic] 98 mention either Braden or
10  element 45(b)?
11     MS. PALLIOS ROBERTS:  Objection.  Form.
12     THE WITNESS:  Does paragraph 98 ...
13     MR. FENSTER:  Q.  Mention either Braden or
14  paragraph 45(b) -- element 45(b).
15     A.  Paragraph 98.
16     No, it does not mention either one.
17     Q.  Does paragraph 99 mention either Braden or
18  element 45(b)?
19     A.  No, it does not.
20     Q.  How about paragraph 100?
21     A.  No.
22     Q.  How about 101?
23     MS. PALLIOS ROBERTS:  Objection.  Form.
24     THE WITNESS:  Paragraph 101 doesn't mention
25  either Braden or 45(b).

117

1     MR. FENSTER:  Q.  Does 102 mention either
2  Braden or paragraph [sic] 45(b)?
3     A.  Paragraph 102 does not mention either Braden or
4  paragraph 45 -- or claim limitation 45(b).
5     Q.  Do any of the paragraphs 98 through 111 mention
6  either Braden or paragraph 45(b)?
7     MS. PALLIOS ROBERTS:  Objection.  Form.
8     THE WITNESS:  No, they don't mention it.
9     MR. FENSTER:  Q.  Do any of paragraphs 135
10  through 139 mention Braden?
11     MS. PALLIOS ROBERTS:  Objection.  Form.
12     THE WITNESS:  No, they do not mention Braden.
13     MR. FENSTER:  Q.  So I don't understand, Dr.
14  Peters, how if paragraphs 98 through 111 don't mention
15  either Braden or claim 45(b) you could answer a question
16  that asks specifically for your explanation of your
17  words explaining how Braden teaches 45(b) -- you would
18  respond citing, in part, paragraphs 98 through 111.
19     MS. PALLIOS ROBERTS:  Is there a question?
20     MR. FENSTER:  Q.  Please explain that to me.
21     A.  When -- I'm trying to think of an analogy here
22  that might be helpful to you.
23     So when someone explains that a group of
24  writings by various people are precursors to some other
25  particular point -- you know, let's say a group of

30 (Pages 114 to 117)

| | |
|---|---|
| **118** | **120** |

**118**

1 historical writings talk about some element of American
2 Revolution or something like that -- and they explain
3 that in detail, giving examples but not exhaustive
4 lists, and then they give in detail a list of authors,
5 maybe including some that weren't mentioned, called out
6 explicitly as examples in that earlier -- the earlier
7 general discussion, and show, you know, the
8 correspondence between their words and whatever aspect
9 of, say, the American Revolution it was they were [sic]
10 about, it seems to me reasonable to say "Look, they
11 explained the connection between that writing and that
12 element of the revolution."
13      They talked about it in general terms. They
14 gave some specific examples. They called out this
15 particular case separately.
16      Q. Okay.
17      A. They didn't repeat their words about that case.
18 They didn't mention it as an example.
19      Q. Okay. But my question to you is, using your
20 analogy, show me where, if anywhere, you discuss a
21 particular author in connection with disclosing a
22 particular thing.
23      I'm not asking you the general question why do
24 you think the patent's obvious, okay. I understand your
25 whole report lays that out. What I'm asking you is for

**119**

1 a very specific disclosure, if it's there.
2      It's not there, and yet you won't tell me.
3      MS. PALLIOS ROBERTS: Counsel, are you going to
4 get to a question?
5      MR. FENSTER: You know --
6      MS. PALLIOS ROBERTS: I mean, I appreciate that
7 you're arguing with him.
8      MR. FENSTER: -- you can object to form, and
9 that's all you can do.
10      MS. PALLIOS ROBERTS: Well, you need to -- you
11 need to ask a question.
12      MR. FENSTER: Q. Dr. Peters, I'm asking you
13 whether your report specifically discusses a specific
14 reference in connection with element 45(b), for example.
15 And I'm asking you very specific questions. I'm asking
16 discrete questions. And I'd appreciate an answer to
17 those discrete questions. Will you try to do that for
18 me?
19      A. I am trying to do that for you. I'm trying to
20 answer questions accurately here. So --
21      Q. Does your report contain any explanation where
22 you discuss Braden specifically, and only Braden, and
23 how it discloses element 45(b)?
24      MS. PALLIOS ROBERTS: Objection. Form.
25      THE WITNESS: That's the function of the claim

**120**

1 chart. Yes, it does; that's the function of the claim
2 chart.
3      MR. FENSTER: Q. Is that the only place where
4 you provide any explanation discussing Braden
5 specifically, and only Braden, and how it discloses
6 element 45(b)?
7      MS. PALLIOS ROBERTS: Objection. Form.
8      THE WITNESS: The discussion in the prose part,
9 the pages 1 through 57, is not unique to Braden. It
10 doesn't -- it does not mention Braden and claim 45(b) in
11 the same sentence, as far as I recall.
12      So if you're asking me did I mention the two in
13 the same sentence somewhere else, I did not.
14      MR. FENSTER: Q. Okay. Did you mention -- did
15 you provide any explanation regarding Braden
16 specifically and any particular element of claim 45?
17      A. Yes, I believe I --
18      MS. PALLIOS ROBERTS: Objection. Form.
19      THE WITNESS: I did. I believe that is exactly
20 what these -- this section -- these paragraphs, combined
21 with the claims chart, do.
22      MR. FENSTER: Q. All right. Let's keep going
23 one by one, then.
24      Do you provide any explanation discussing
25 Braden in particular in connection with element 45(c)?

**121**

1      MS. PALLIOS ROBERTS: Objection. Form.
2      THE WITNESS: Let's see. 45(c) ... it would be
3 in the claims chart, including, for example, ACC12,
4 where -- in the portion where claim 45(c) is paired up
5 with citations to Braden.
6      MR. FENSTER: Q. Okay. And do you include any
7 analysis other than citations to Braden in the ACC12?
8      MS. PALLIOS ROBERTS: Objection. Form.
9      THE WITNESS: Yes. It's in the paragraphs that
10 should be read in understanding the force of these --
11 this claim chart, paragraphs 135 through 139.
12      MR. FENSTER: Q. Let me ask a more specific
13 question. Other than citations and quotations from
14 Braden that you include in your chart, do you include
15 any explanation or analysis that specifically addresses
16 Braden in connection with element 45(c)?
17      MS. PALLIOS ROBERTS: Objection. Form.
18      THE WITNESS: Well, specifically addresses
19 Braden, I don't know what you mean. As I've explained,
20 I think it clearly encompasses Braden. You say it's not
21 specific. I think it clearly encompasses Braden. I say
22 yes.
23      MR. FENSTER: Q. Even though Braden's not
24 mentioned anywhere in the paragraphs that you cited in
25 connection with --

31 (Pages 118 to 121)

122

1  A. No, that's right.
2  Q. -- 45(c)?
3  MS. PALLIOS ROBERTS: Objection. Form.
4  THE WITNESS: The claim charts are referenced
5  for incorporation. That's exactly the purpose of
6  saying -- you know, paragraph 139 says "as explained in
7  detail."
8  MR. FENSTER: Q. And that detailed explanation
9  you think is in the charts?
10  MS. PALLIOS ROBERTS: Objection. Form.
11  THE WITNESS: The details are in the charts.
12  The general explanation is relevant for interpreting the
13  charts. And yes, I think together there's a
14  sufficiently detailed explanation.
15  MR. FENSTER: Q. Can you point to anywhere in
16  your report where you explain in your own words how
17  Braden specifically discloses the elements of claim
18  45(f).
19  MS. PALLIOS ROBERTS: Objection. Form.
20  THE WITNESS: So the -- once again, the
21  paragraphs 135 through 139, which make reference to the
22  attached charts, refer -- apply in interpreting the
23  references in ACC12 where reference to Braden is
24  connected to claim 45(f).
25  MR. FENSTER: Q. Okay. But you acknowledge

123

1  that Braden's not mentioned anywhere in paragraphs 135
2  through 139, correct?
3  MS. PALLIOS ROBERTS: Objection. Form.
4  THE WITNESS: There's not a -- there's not an
5  explicit mention of Braden in those paragraphs.
6  MR. FENSTER: Let me have that back.
7  THE WITNESS: Sure.
8  MR. FENSTER: Q. Can you show me where in the
9  body of your report, separate from the chart -- do you
10  have any -- strike that.
11  Do you have any discussion in the body of your
12  report that is specific to Kurtzman, II?
13  A. To Kurtzman, II?
14  Q. Yes.
15  MS. PALLIOS ROBERTS: Objection. Form.
16  MR. FENSTER: In connection with elements
17  45(a), (b), (c), (f), (g) or (k).
18  MS. PALLIOS ROBERTS: Objection. Form.
19  THE WITNESS: So again, the Kurtzman patent is
20  introduced in the prior art section in paragraph 77,
21  which talks about disclosing the use of natural language
22  processing to select advertisements related to a user
23  based on the user's profile.
24  And then the section I referred you to earlier,
25  paragraphs 98 through 111, about creation of a user

124

1  profile are relevant. As far as I can see here, they do
2  not explicitly reference Kurtzman.
3  Again, the paragraphs 135 through 139 are
4  particularly relevant. And I don't see specific
5  reference to Kurtzman in them.
6  There is a reference -- there are references in
7  paragraphs 171 and 179 to Kurtzman.
8  So those are explicit reference. And then, of
9  course, in a claim chart such as ACC12, there's a good
10  deal of detailed information about Kurtzman in relation
11  to claim limitations of claim 45, including -- and I'm
12  sorry, I've now forgotten which limitation you were
13  asking about.
14  Q. 45(c).
15  A. (C). Yes, so here, for example, are citations
16  to Kurtzman in connection with 45(c).
17  Q. It was actually all of the elements, 45(a),
18  (b), (c), (f), (g) or (k).
19  A. Oh, all right. Well, I can check and see.
20  Yes, there are Kurtzman reference for (a), for
21  (b), (c), (f) and (j) [sic].
22  Q. And in the chart ACC12 where you say that there
23  was a good bit of detailed information, did any of that
24  include any analysis by you other than mere quotes from
25  Kurtzman?

125

1  MS. PALLIOS ROBERTS: Objection. Form.
2  THE WITNESS: Well, let me see what -- what's
3  said here in those sections on Kurtzman.
4  Right. So those sections on Kurtzman in this
5  chart do consist of quotes. The analysis is simply the
6  combination of especially paragraphs 135 through 139
7  with the chart. It's not found in the chart itself
8  by -- taken by itself.
9  MR. FENSTER: Q. Okay. Does your report
10  contain any explanation in your own words addressing
11  Culliss specifically in connection with elements 45(a),
12  (b), (c), (f), (g) or (k)?
13  MS. PALLIOS ROBERTS: Objection. Form.
14  THE WITNESS: Well, so Culliss is referenced in
15  paragraph 137, among those 135 through 139 that I
16  referred you to earlier for a discussion of the
17  interpretation of these particular claim charts.
18  I don't have all of the claim charts in front
19  of me. But looking through this chart, for example,
20  there are -- against 45(a) -- there are citations to
21  Culliss. Same for 45(b), (c), (f), (g) and (k).
22  MR. FENSTER: Q. Is it true that the
23  information in the chart consists only of quotations
24  from Culliss, with respect to those elements, and none
25  of your own analysis?

32 (Pages 122 to 125)

126

1      MS. PALLIOS ROBERTS: Objection. Form.
2      THE WITNESS: The -- in the chart, against
3 those -- those claim limitations, there are quotations
4 from Culliss. The analysis is -- results from the full
5 report, including the discussion in the prose,
6 combination of the charts.
7      MR. FENSTER: Q. Referring to ACC11, you opine
8 that claim 45 is invalid in view of principal references
9 Salton '68 and Herz, in addition to other prior art
10 references, correct?
11      MS. PALLIOS ROBERTS: Objection. Form.
12      THE WITNESS: Well, my report as a whole, yes,
13 contains that opinion. And this chart ACC11 is support
14 for that.
15      MR. FENSTER: Q. What elements of claim 45 are
16 missing from claim Salton -- from the reference Salton
17 '68 that you relied on Herz for?
18      A. Well, at a glance through the chart, I seem to
19 have a reference to Salton connected with each element
20 of the claim.
21      And so my reliance on Herz really is to
22 strengthen the case that -- you know, in some cases, the
23 references are not a point citation in Salton, but
24 they're -- for example, say Salton teaches receiving --
25 sorry -- retrieving, locating, multiple text items, and

127

1 there's a reference to a section of his 1968 book, which
2 I thought really would be more convincing if backed up
3 by a more specific detail that -- for which I cited Herz
4 and other -- and the -- you know, the right-hand column
5 additional --
6      Q. So let me understand.
7      A. -- items.
8      Q. You've got a citation to Salton '68 for every
9 element, correct?
10      A. Yes, I have.
11      Q. Okay.
12      A. So it appears.
13      Q. And yet you don't find that Salton '68
14 anticipates claim 45; is that correct?
15      MS. PALLIOS ROBERTS: Objection. Form.
16      THE WITNESS: No, I haven't -- you know, I
17 haven't asserted that it anticipates it.
18      MR. FENSTER: Q. So there are some
19 references -- some citations that you have there that
20 are not sufficient to find the element fully disclosed
21 sufficient for anticipation; is that fair?
22      MS. PALLIOS ROBERTS: Objection. Form.
23      THE WITNESS: Yes. I wouldn't -- I would not
24 try to make the case that the Salton 1968 book
25 anticipates the claim 45 in this case.

128

1      MR. FENSTER: Q. What aspects of Herz are you
2 relying on to combine with Salton to achieve the claimed
3 invention in claim 45?
4      A. Well, especially elements that have to do with
5 how user profiles are created from a collection of text.
6      Q. And what does your report say about the
7 specific motivation to combine the Herz teaching
8 regarding the user profiles created from texts with
9 Salton '68?
10      MS. PALLIOS ROBERTS: Objection. Form.
11      THE WITNESS: Well, what it says in paragraphs
12 159 and 160 is that the creation of the Internet led to
13 this need for personalized search engines -- that's
14 something that didn't exist, by the way, at the time
15 of -- neither the Internet nor highly individualized
16 search existed at the time of Salton 1968 -- and that
17 this design need, this market pressure to improve the
18 performance and accuracy, which incidentally the Geller
19 patent cites as a motivation, produced a pressure to
20 solve that problem.
21      And among the numerous pieces of prior art that
22 could be combined, Salton '68 and the Herz patent are an
23 example.
24      MR. FENSTER: Q. You don't point to anything
25 specific in terms of a motivation to combine Herz

129

1 specifically with Salton '68, correct?
2      MS. PALLIOS ROBERTS: Objection. Form.
3      THE WITNESS: Well, I mean, there's -- as I
4 say, there's nothing special about Herz. There are a
5 number of combinations that are possible. Herz, and
6 Braden-Harder is another one that's actually called out
7 here. But that's for claim 1. So ...
8      I didn't say and I wouldn't say that, you know,
9 Salton published a paper that said "Please combine me
10 with Herz."
11      MR. FENSTER: Q. Claim 45(h) requires
12 generating at least one user segment group by grouping
13 together identical segments. Do you see that?
14      A. Yes.
15      Q. Does your report address that specific element,
16 and if so, where?
17      MS. PALLIOS ROBERTS: Objection. Form.
18      THE WITNESS: Let me just read that, if I may,
19 in the context here of the sequence of steps so that I
20 can figure out where I did talk about that.
21      So I have a hard time finding it here without
22 looking through the entire thing in detail. The user
23 segment groups are sequences of parts of speech,
24 according to the claims construction, if I remember
25 correctly.

33 (Pages 126 to 129)

130

1     Perhaps, actually, if you could let me see a
2  copy of the claims construction order, that would help
3  me to be more precise.
4     (Plaintiff's Exhibit 4
5     marked for identification.)
6     MR. FENSTER: Q. Hand you what's been marked
7  as Exhibit 4, which was Exhibit D to your expert report.
8  It's a copy of the claims construction order.
9     A. Thank you. Segment, page 22.
10     Right, so the court construed segment to mean
11  one or more parts of speech arranged in an order.
12  That's more or less the way I was recalling it.
13     Q. So my question is does your report specifically
14  discuss where the prior art discloses that specific
15  element in 45(h), and if so, where?
16     MS. PALLIOS ROBERTS: Objection. Form.
17     THE WITNESS: Well, I know I considered it. I
18  think I put it in my report. Let me just look through
19  here and see if I can figure out where.
20     So the segments are the elements -- if you
21  like, the numbers -- of the profiles. And in the user
22  document profiles, they're combined with frequency
23  counts.
24     And so I'm not finding it right offhand where I
25  talk about segments in connection -- you know, as a part

131

1  of profile. But that's what they are.
2     MR. FENSTER: Q. You can't point to anyplace
3  in your report where you specifically address element
4  45(h); is that correct?
5     MS. PALLIOS ROBERTS: Objection. Form.
6     THE WITNESS: I can read the whole thing as we
7  sit here and try, but I can't find it off the top of my
8  head. The point is that elements -- as constituents of
9  profiles, the counterpart of -- counterparts of segment
10  and prior art are the corresponding elements of profiles
11  that other inventors, other scientists, use.
12     MR. FENSTER: Q. Let's talk a little bit about
13  your definition of a person with ordinary skill in the
14  art.
15     A. All right.
16     Q. How did you -- what's your understanding of the
17  level of a person of ordinary skill in the art?
18     A. This would be an ordinary person who is
19  sufficiently skilled to practice the art to which the
20  invention belongs, or the nearest neighboring art, in
21  this case -- in this case, there is an art of
22  information retrieval, Web search, including
23  personalized search.
24     So it would be a person who had sufficient
25  skill to practice that art.

132

1     Q. I don't understand your answer. What do you
2  mean sufficient skill to practice?
3     A. Well, so what I suggested constituted ordinary
4  skill in the art was a bachelor's degree in computing,
5  because computing is the mechanism by which this
6  happens, together with either some advanced study or
7  work experience, at least couple years of that, in
8  natural language processing and personalization as being
9  the other ingredients here.
10     I think I called out information retrieval as
11  also being relevant. Let me look and see exactly what I
12  did say. Trying to find the paragraph here.
13     Well, I've already gotten to the overview of
14  the patent, so I must have skipped over it.
15     Q. Are you looking for paragraph 64?
16     A. I'm sure I defined it earlier than that, but
17  you're right, I probably reiterated it. Oh, no. Thank
18  you. 64. Right. Right.
19     So what I did say here was an undergraduate
20  degree in computer science or its equivalent and either
21  additional graduate education or one to two years of
22  work experience in natural language processing, use of
23  computers to process human language for some useful
24  purpose, and information retrieval.
25     Okay. So NLP, information retrieval and

133

1  computer science were the three ingredients.
2     Q. Okay. Would you consider yourself a person of
3  skill -- of ordinary skill in the art in 1999?
4     A. In 1999, no, I would not have been.
5     Q. Why not?
6     A. Well, I was doing research in information
7  retrieval at that time, and I think my skill was greater
8  than ordinary skill.
9     Q. So you had an extraordinary level of skill in
10  the art at the time --
11     A. Well --
12     Q. -- in 1999?
13     A. -- I'm --
14     MS. PALLIOS ROBERTS: Objection. Form.
15     THE WITNESS: -- too modest to say so, but I'll
16  accept your characterization.
17     MR. FENSTER: Q. Okay. And were you working
18  in the field of personalized search at the time?
19     A. I do have a paper in personalized search at
20  about that time, yes.
21     Q. Is that your paper in 1998?
22     A. Yes, the one in SIGIR, mm-hm.
23     Q. And did your paper describe the inventions
24  claimed in the Geller patent?
25     A. No, it didn't.

34 (Pages 130 to 133)

---

134

1    Q.  Have you found -- are you -- have you found any
2  references after 1999 that describe all the elements of
3  claim 1 of the Geller patent?
4        MS. PALLIOS ROBERTS:  Objection.  Form.
5        THE WITNESS:  Have I found references after '99
6  that describe all the elements of claim 1.  I don't
7  think I have, no.
8        MR. FENSTER:  Q.  Have you found any references
9  after 1999 that describe all the elements of claim 45 of
10  the Geller patent?
11        MS. PALLIOS ROBERTS:  Objection.  Form.
12        THE WITNESS:  I don't think I have found any
13  reference since then.
14        MR. FENSTER:  Q.  Have you found any references
15  since '99 that describe all of the elements of any of
16  the asserted claims of the Geller patent?
17        MS. PALLIOS ROBERTS:  Objection.  Form.
18        THE WITNESS:  Well, let's see.  The others are
19  dependent claims.  So that would include the elements of
20  1 and 45, as well as the additions.  No.
21        MR. FENSTER:  Okay.  We have to go off the
22  record to change the tape.
23        THE WITNESS:  Okay.
24        THE VIDEOGRAPHER:  This is the end of video
25  number 2.  We are now off the record at 3:17.

---

135

1        (Recess taken.)
2        THE VIDEOGRAPHER:  We are now on the record at
3  3:32.  This is the beginning of video number 3.
4        MR. FENSTER:  Q.  Dr. Peters, in addition to
5  invalidity, were you asked to render an opinion
6  regarding materiality of several prior -- several
7  references?
8        MS. PALLIOS ROBERTS:  Objection.  Form.
9        THE WITNESS:  Yes, I was asked to render an
10  opinion on materiality.
11        MR. FENSTER:  Q.  Do you have an understanding
12  as to what materiality relates to, why were you asked
13  to -- or why were you asked to render such an opinion?
14        MS. PALLIOS ROBERTS:  Objection.  Form.
15        THE WITNESS:  Yes.
16        MR. FENSTER:  Go ahead.
17        MS. PALLIOS ROBERTS:  Is there a question?
18        MR. FENSTER:  Q.  Why were you asked -- what
19  does materiality relate to?
20        A.  Well, materiality relates to the question of
21  whether a patent examiner would wish to see a particular
22  reference -- a particular piece of prior art at the time
23  he's examining a patent application.
24        Q.  What is your understanding as to the -- as the
25  standard for materiality?

---

136

1        MS. PALLIOS ROBERTS:  Objection.  Form.
2        THE WITNESS:  Well, I mean, my understanding is
3  pretty much what's -- I wrote in the report here.  So
4  let me try to refresh myself and you on that.
5        So the standard is the reasonable examiner
6  would consider the piece of art important in deciding
7  whether to allow the application to issue as a patent.
8        MR. FENSTER:  Q.  That's the full statement of
9  your understanding as to materiality?
10        A.  Well, that's what it is -- that's what
11  materiality is.  So there's a -- you know, a reference
12  is not material if it's merely cumulative to or is less
13  relevant than information that has already been
14  considered by the examiner.
15        Q.  Okay.  And is this the standard that you
16  applied in reaching your conclusions as to whether
17  several references were material?
18        A.  Yes, it is.
19        Q.  Okay.  And you were asked specifically to
20  determine whether three patents, Ahn, Dasan and ...
21  "Syfert"?
22        A.  Yes, I'm not sure of the pronunciation either.
23  I called it "Seefert."
24        Q.  Okay.  You were asked to determine whether
25  those three patents are material art; is that correct?

---

137

1        A.  Yes, I was.
2        Q.  Okay.  And did you reach any conclusions with
3  respect to those three references?
4        A.  Yes.  I looked at those in light of the art
5  that the examiner hadn't listed on the face of the
6  Geller patent, and I came to the conclusion that both
7  the Dasan and -- "Seefert" is what I've been saying --
8  patents were material.
9        Q.  Okay.  And what about the Ahn reference?
10        MS. PALLIOS ROBERTS:  Objection.  Form.
11        MR. FENSTER:  Q.  Did you reach any conclusions
12  regarding the materiality of Ahn?
13        A.  I did not conclude that it was material.
14        Q.  Why not?
15        A.  Well, I thought that in the case of Ahn, it was
16  merely cumulative.
17        Q.  Now, did you find that the Dasan reference
18  anticipates any of the asserted claims?
19        A.  No, I didn't find that the Dasan reference
20  anticipates claims.
21        Q.  Did you find that the Siefert reference
22  anticipates any of the asserted claims?
23        A.  No, I didn't find a Siefert reference to that
24  either.
25        Q.  Did you conclude that Dasan, in combination

---

35 (Pages 134 to 137)

138

1  with other references, would render any of the asserted
2  claims invalid?
3      A.  I thought that Dasan was a reference that
4  the -- a reasonable examiner would have wanted to have
5  in front of him in considering whether the claims of the
6  Geller patent met the standard of being new, useful and
7  not obvious.
8      Q.  Did you reach a conclusion that Dasan, in
9  combination with any other patents or prior art,
10 rendered any of the asserted claims invalid for
11 obviousness?
12     A.  Oh, I feel that it does, yes, of course.
13     Q.  Okay.  What combinations did you find in your
14 report, that include Dasan, render any of the asserted
15 claims invalid for obviousness?
16         MS. PALLIOS ROBERTS:  Objection.  Form.
17         THE WITNESS:  Well, in each case where Dasan is
18 cited in one of these claim charts, I felt that Dasan,
19 in combination with the other patents -- the other art
20 that was cited for that -- for that claim limitation,
21 made it -- you know, predated it.  It was prior art and
22 would therefore be part of the combination that would
23 render the claim, the entire collection of limitations,
24 invalid for obviousness.
25         MR. FENSTER:  Q.  Do you anywhere set forth any

139

1  combinations that include Dasan for any of the asserted
2  claims?
3          MS. PALLIOS ROBERTS:  Objection.  Form.
4          THE WITNESS:  Well, let's look.  I certainly
5  included Dasan at certain places in the charts, so that
6  it does figure in combination with other art in that
7  way.
8          MR. FENSTER:  Q.  Do you rely on Dasan as any
9  of the principal references in any of the 13 charts?
10         MS. PALLIOS ROBERTS:  Objection.  Form.
11         THE WITNESS:  I don't -- could I -- could I see
12 the -- let's look at the charts.  I don't think that I
13 did, but let's look at the charts and just make sure
14 that I'm going to be able to -- I'm going to give you
15 the correct answer here.
16         Thank you.
17         So the first one, the principal ones are Salton
18 and Culliss -- Salton '89 and Culliss, Braden and Herz,
19 Braden and Culliss, Culliss and Herz, Salton '68 and
20 Braden, Salton '68 and Herz, Salton '89 and Salton '68,
21 Salton '89 and Braden, Salton '68 and Herz, Braden and
22 Kurtzman, II, Salton '68 and Culliss.
23         So the answer is no, not as the principal.
24         MR. FENSTER:  Q.  Okay.  If you could refer to
25 paragraph 198 of your report.

140

1      A.  Yes.
2      Q.  There you make the assertion, "The
3  prior art patents cited by the '067 patent
4  in combination with the Dasan and Siefert
5  patents render the '067 patent obvious."
6          Do you see that?
7      A.  Yes.
8      Q.  Okay.  Do you state anywhere in your report
9  what combinations of Dasan and Siefert and the cited
10 prior art references would render any claim obvious?
11         MS. PALLIOS ROBERTS:  Objection.  Form.
12         THE WITNESS:  I don't know where that would be
13 in the reports.  Not in the claim charts.  Those are not
14 the art that was cited by the '067 patent.  And I
15 certainly don't here in this paragraph 198, so I think
16 that's probably -- you know, so it's not called out --
17 if you're saying here do I call out -- again, as we've
18 been talking about limitation by limitation for a given
19 claim for each of the claims in issue -- each of the
20 claims that's in issue, do I have a place in the report
21 where I call that out, I do not seem to do that.
22         MR. FENSTER:  Q.  Okay.  And you don't in your
23 report anywhere identify any particular combinations of
24 any of the cited prior art of either Dasan and/or
25 Siefert that would render any of the asserted claims

141

1  obvious; is that correct?
2          MS. PALLIOS ROBERTS:  Objection.  Form.
3          THE WITNESS:  So the reason that I felt that
4  Dasan and Siefert were not cumulative is that they each
5  disclose elements that were not disclosed in the cited
6  art, this art in the patent application, or -- neither
7  the application, nor that was, you know, listed by the
8  examiner.
9          And so I do call out in paragraph 196 that the
10 Dasan patent discloses utilization of user profiles and
11 the Siefert patent, I call out in 197, discloses display
12 of documents through a user profile and a learning
13 profile.
14         And my belief was that if the examiner had had
15 these bits of art in front of him, along with the art
16 that he did consider, that he might well have come to a
17 different conclusion.
18         So that's his -- that's as close as I come in
19 the report to giving combinations that would make the
20 claims obvious.
21         MR. FENSTER:  Q.  Do you identify any
22 particular combinations of any of the cited prior art
23 with either Dasan and/or Siefert that would render any
24 of the asserted claims obvious in your report?
25         MS. PALLIOS ROBERTS:  Objection.  Form.

36 (Pages 138 to 141)

142

1      THE WITNESS:  I think I've just answered the
2   question.
3      MR. FENSTER:  Q.  The answer's no, isn't it?
4      MS. PALLIOS ROBERTS:  Objection.  Form.
5      THE WITNESS:  The answer is I explained what
6   was in Dasan and Siefert that wasn't in the other art
7   that could have rendered it obvious.
8      MR. FENSTER:  Q.  Do you identify any
9   particular combinations that include Dasan and Siefert
10  with the cited prior art that would render any of the
11  asserted claims invalid for obviousness?
12     MS. PALLIOS ROBERTS:  Objection.  Form.
13     THE WITNESS:  All of the prior art that was
14  considered -- that was listed by the examiner at the
15  time it was considered can be combined with either of
16  these two.  And I do believe that if they were combined,
17  there's a good chance the examiner could have found the
18  invention was obvious.
19     I can -- I suppose that's identification.
20  You're asking -- if you're asking do I have a sentence
21  that says "The claims 1 and 45 are obvious when you
22  combine Dasan with," and then I give a list of all of
23  the art that was considered by the examiner, there is no
24  such sentence there.
25     MR. FENSTER:  Q.  Okay.  Do you identify any

143

1   particular combinations --
2      A.  There is --
3      MS. PALLIOS ROBERTS:  Objection.  Form.
4      MR. FENSTER:  Let me finish the question.
5      Q.  Do you identify in your report any particular
6   combinations that include Dasan and/or Siefert and the
7   cited prior art that would render any asserted claim
8   invalid?
9      MS. PALLIOS ROBERTS:  Objection.  Form.
10     THE WITNESS:  To the extent that I've just been
11  explaining, yes.  Do I have a sentence that names any
12  subsets of the cited prior art along with Dasan and/or
13  Siefert?  There is no such sentence.
14     MR. FENSTER:  Q.  Okay.  Then tell me which
15  particular combinations you think you disclose in your
16  report that would render any of the asserted claims
17  invalid for obviousness that include Dasan and/or
18  Siefert.
19     A.  Well, I think the combination --
20     MS. PALLIOS ROBERTS:  Objection.  Form.
21     THE WITNESS:  -- of all prior art with Dasan or
22  with Siefert could well have led the examiner to the
23  conclusion that the invention was obvious.
24     MR. FENSTER:  Q.  Okay.  And just so I
25  understand your question -- or your answer, on the front

144

1   page of the Geller patent and continuing on to the
2   second page, there is a list of references cited.  Do
3   you see that?
4      A.  Yes.
5      Q.  Okay.  And that includes the prior art cited,
6   correct?
7      A.  That's correct.  So we're looking at three
8   patents and three other publications on the front page
9   and then an additional seven patents on the second page.
10     Q.  Okay.  So we've got a total of ten patents,
11  correct?
12     A.  Correct.
13     Q.  Okay.  And three articles?
14     A.  Yes.
15     Q.  Okay.  And is it your opinion that the asserted
16  claims are invalid in light of all 13 references
17  together plus Dasan or any one of the 13 references plus
18  Dasan?
19     MS. PALLIOS ROBERTS:  Objection.  Form.
20     THE WITNESS:  So I haven't asserted that all of
21  them together plus Dasan make the invention obvious.  I
22  asserted that Dasan was material, that it was not
23  cumulative.  I think Dasan in combination with some
24  other prior art does make the claims obvious.
25     And the other prior art is not the cited art;

145

1   it's the art that I put in my report.
2      MR. FENSTER:  Q.  Okay.  So you have not
3   concluded -- strike that.
4      Your report doesn't set forth any affirmative
5   opinion that any of the asserted claims are invalid for
6   obviousness in light of Dasan in combination with any of
7   the cited prior art; is that correct?
8      MS. PALLIOS ROBERTS:  Objection.  Form.
9      THE WITNESS:  That's correct.
10     MR. FENSTER:  Okay.
11     THE WITNESS:  It doesn't set forth any such
12  opinion.
13     MR. FENSTER:  Got it.
14     Q.  Now, if I could ask you to take a look at
15  paragraph 194 of your report.
16     A.  Okay.
17     Q.  In paragraph 194 you state, quote,
18  "In my opinion, the Dasan and Siefert
19  patents each disclose elements of the '067
20  patent that were not disclosed by the prior
21  art that was submitted to the United States
22  Patent & Trademark Office for the '067
23  patent," comma, "and are therefore
24  material."
25     Do you see that?

146

1    A.  Yes.
2    Q.  Okay.  Is that an accurate statement of your
3  opinion?
4        MS. PALLIOS ROBERTS:  Objection.  Form.
5        THE WITNESS:  It is my opinion, yes.
6        MR. FENSTER:  Q.  Okay.  You -- is it a
7  necessary inference that something is material -- that
8  Dasan and Siefert are material because they each
9  disclose elements of the patents that were not disclosed
10  by the prior art that was submitted to the Patent
11  Office?
12       MS. PALLIOS ROBERTS:  Objection.  Form.
13       THE WITNESS:  I see; so you're focusing on the
14  word "therefore."  So as I -- as we've discussed, to be
15  material I think it needs to be something the examine --
16  the examiner would want to consider -- that he would
17  consider important and that isn't cumulative.
18       And so they do disclose elements that were not
19  disclosed by the prior art that I believe the examiner
20  would have wanted to consider.  And so I think they are
21  therefore material.
22       But you're correct, I think -- you know, my
23  opinion's based on both of those.
24       MR. FENSTER:  I see.
25    Q.  In paragraph 194, the same paragraph --

147

1    A.  Mm-hm.
2    Q.  -- you state that Dasan and Siefert disclose
3  elements that were not disclosed by the prior art that
4  was submitted to the United States Patent Office.
5       Are you aware that examiners can do their own
6  searches and that examiners may be aware of other prior
7  art that wasn't submitted to them?
8    A.  I am, yes.
9    Q.  Okay.  And did you mean to make that
10  distinction in this sentence?
11    A.  I do not, actually.  In fact, you know, I see,
12  now that we're discussing it, that this sentence is not
13  all that well worded because I really meant to say the
14  prior art that was considered by the Patent Office, not
15  that was submitted to.
16    Q.  Got it.  Do either Dasan or Siefert disclose
17  retrieving search results that reflect a user's social,
18  cultural, educational and economic background or
19  psychological profile?
20    A.  To be honest with you, I'd have to look back at
21  the patents in order to -- to tell you.  I know that
22  both of them relate to personal relevance.  You know,
23  whether that relevance has to do with those specific
24  items, I would have to take another look at the
25  patents --

148

1    Q.  Does your report --
2    A.  -- to tell you.
3    Q.  -- disclose any analysis as to whether Dasan or
4  Siefert disclosed that limitation?
5       MS. PALLIOS ROBERTS:  Objection.  Form.
6       THE WITNESS:  No, it doesn't.  Sorry.  I'm
7  sorry.  The Siefert -- it does disclose that the Siefert
8  patent contemplates finding documents that correspond to
9  a user's learning history or educational background.  It
10  does disclose that.
11       MR. FENSTER:  Q.  I'm sorry, where are you
12  reading?
13    A.  Paragraph 197.
14    Q.  Okay.
15    A.  The second sentence.
16    Q.  Can you tell me -- actually, did you draft this
17  section on materiality?
18    A.  Yes, I got -- so I don't know the law.  I asked
19  the lawyers to explain the law to me.  The draft of this
20  section about what the law states was created by them,
21  and then I put -- you know, put it in my words.
22       But the analysis of what's in the patents and
23  the conclusions that I came to were drafted entirely by
24  me.
25    Q.  Okay.  Regarding obviousness, what is your

149

1  understanding of the standard for obviousness?
2       MS. PALLIOS ROBERTS:  Objection.  Form.
3       THE WITNESS:  Well, it's as I set it out here,
4  that a person of ordinary skill in the art would have
5  been able to make the combination of prior art that is a
6  claim to the claim.
7       Let's see here.  We were looking at that
8  paragraph earlier.  I think you may be getting tired.  I
9  know I am.  But -- oh, here we are.
10       We have to consider the scope and content of
11  the prior art, level of ordinary skill in the relevant
12  art, differences between the claimed invention and the
13  prior art, whether the claimed invention would have been
14  obvious to one of ordinary skill in the art in light of
15  those differences.
16       So that's basically it.  Someone of ordinary
17  skill in the art would have been able to bridge the
18  difference between the prior art and the claimed art by
19  gaining these elements of prior art.
20       MR. FENSTER:  Q.  Is it your understanding that
21  the test is as applied -- that the test for obviousness
22  is applied element by element or to the invention as a
23  whole?
24       MS. PALLIOS ROBERTS:  Objection.  Form.
25       THE WITNESS:  Well, my understanding is that

150

1  what's obvious is a claim, if that's what you're asking,
2  as opposed to an entire patent.
3       MR. FENSTER: Q. Okay. And now I'm asking
4  actually --
5       A. About a claim. Okay.
6       Q. -- within the claim, is it your understanding
7  that the test for obviousness is applied on an
8  element-by-element basis within the claim or to the
9  claim as a whole?
10      A. No, my understanding is it's applied to the
11  claim as a whole.
12      Q. So, for example, you go through and talk about
13  the various elements in paragraph 92 through 97. For
14  example, at paragraph 97 you concluded that elements
15  1(a), 1(b), 1(d) and 1(i) are not novel.
16      Do you see that?
17      A. Yes.
18      Q. And then paragraph 111, you find that paragraph
19  1(a) doesn't contain anything that's not obvious from
20  the prior art.
21      A. Yes.
22      Q. So what's the relevance of that statement with
23  respect to an individual element?
24      A. Well --
25      MS. PALLIOS ROBERTS: Objection. Form.

151

1       THE WITNESS: The -- for the claim to be
2  nonobvious -- well, sorry. Let me put it differently.
3       The claim is obvious if one of ordinary skill
4  in the art could have combined the elements from prior
5  art, all the elements that make up the claim, in the
6  manner that the claim itself does combine them, bridging
7  whatever differences there might have been from, you
8  know, their appearance in other related art to the form
9  they take in this combination.
10      So this analysis is part of the analysis that
11  says "Well, look, all of those elements were there.
12  They're in the ethos of Web search in the 1990s. They
13  were available for any inventor, anyone of ordinary or
14  extraordinary skill in the art, to combine. And so
15  their combination could be obvious."
16      MR. FENSTER: Q. Do you -- so we've discussed
17  the parts of your report where you've provided a general
18  discussion of the motivation to combine.
19      Is there any general reference that you point
20  to that provides a road map of how to combine all these
21  various elements that were out there in the ethos -- is
22  there a reference that you look to that provides a road
23  map of how to combine these various elements to get to
24  this combination that was claimed in the '067 patent?
25      MS. PALLIOS ROBERTS: Objection. Form.

152

1       THE WITNESS: I didn't find any such road map.
2  I found lots of examples of combining various things
3  that were models, if you like, but I didn't find a road
4  map.
5       MR. FENSTER: Q. Can you show me where in your
6  report you have analysis that claim 1 as a whole --
7  strike that.
8       You told me that your understanding is that the
9  test for obviousness is applied to the claim as a whole,
10  correct?
11      A. That's correct.
12      Q. Okay. Can you show me where in your report you
13  discuss claim 1 being obvious as a whole -- that claim 1
14  as a whole would have been obvious to one of skill in
15  the art in 1999.
16      A. Do you mean --
17      MS. PALLIOS ROBERTS: Objection. Form.
18      THE WITNESS: So following on this discussion
19  of the elements were out there in the ethos, can I point
20  you to a place where I say, okay, so claim 1 itself is
21  obvious?
22      MR. FENSTER: Q. Yeah, so you've got an
23  individual -- a discussion of the various individual
24  elements and you discuss how you believe they're not --
25  the individual elements are novel or obvious.

153

1       But can you show me where the discussion is
2  regarding the claim as a whole not being obvious -- or
3  being obvious, rather.
4       A. Yeah, being obvious.
5       MS. PALLIOS ROBERTS: Objection. Form.
6       THE WITNESS: Well, again, that's basically the
7  analysis where I talk about why one skilled in the art
8  would have been motivated to pursue the combination, how
9  the combinations themselves are predictable, don't yield
10  unpredictable results, and that when you analyze these
11  claims in terms of the Graham factors, the scope and
12  content of the prior art, the differences between prior
13  art and claims and the level of skill in the art, they
14  all point to the conclusion that claim 1 and claim 45,
15  and so forth, are obvious.
16      MR. FENSTER: Q. So let's talk a little bit
17  about your understanding -- or your opinions regarding
18  section 112, which start at page 53 of your report.
19      A. Okay.
20      Q. So as I understand it, you have reached
21  conclusions regarding both written -- invalidity for
22  failure to meet the written description requirement, and
23  separately, invalidity for failure to meet the
24  enablement requirement. Is that correct?
25      A. Yes, I guess that's correct.

39 (Pages 150 to 153)

|     | 154 |
| --- | --- |

1    Q.   What is your understanding of the standard for
2  validity under section -- under the written description
3  requirement of section 112?
4        MS. PALLIOS ROBERTS:  Objection.  Form.
5        THE WITNESS:  Well, the written -- roughly, I
6  think the requirement is that a person of ordinary skill
7  must be able, by reading the patent, to make and use the
8  invention for the purpose that's claimed, or, I guess,
9  you know, in the technical sense, that the -- it's that
10  the invention really was in possession of the inventor.
11        MR. FENSTER:  Q.  Do you have -- what is your
12  understanding as to the relationship between the written
13  description requirement and the enablement requirement
14  under section 112?
15        MS. PALLIOS ROBERTS:  Objection.  Form.
16        THE WITNESS:  Well, I think that both
17  conditions have to be met, both written description and
18  enablement, for the patent to be -- to issue.
19        MR. FENSTER:  Q.  What is your understanding as
20  to the standard for validity under written description?
21        MS. PALLIOS ROBERTS:  Objection.  Form.
22        THE WITNESS:  Well, I mean, I think I said it.
23  It says -- let me just read in what it says here.
24        "The description written in the patent
25        itself has to be sufficiently clear, concise

|     | 155 |
| --- | --- |

1        and exact, that any person skilled in the
2        art to which it pertains or with which it's
3        most nearly connected could make and use the
4        same," the invention.
5        And it also has to set forth this preferred
6  embodiment, the best mode contemplated by the invention.
7        MR. FENSTER:  Q.  Okay.  Are you reading from
8  paragraph 199?
9        A.  Yes, I am.
10        Q.  And what is your understanding as to the
11  standard for validity -- or the standard to meet the
12  enablement requirement of section 112?
13        MS. PALLIOS ROBERTS:  Objection.  Form.
14        THE WITNESS:  Well, the part that I've focused
15  on is that the person of ordinary skill should be able
16  to follow the description as it's described in the
17  patent.  They have to be able to make it and use it
18  without undue experimentation.
19        MR. FENSTER:  Q.  And can you state your
20  opinion regarding the validity of each of the -- strike
21  that.
22        And did you reach any conclusions regarding the
23  validity of any of the asserted claims in connection
24  with the enablement standard?
25        MS. PALLIOS ROBERTS:  Objection.  Form.

|     | 156 |
| --- | --- |

1        THE WITNESS:  The enablement.  Yes.
2        MR. FENSTER:  Q.  Can you state those
3  conclusions?
4        A.  Well, yes.  I think that the -- that it's --
5  does not -- does not meet the enablement standard.  I
6  think it would require undue experimentation, at the
7  very least.
8        Q.  Okay.  And does that conclusion apply to all
9  asserted claims?
10        MS. PALLIOS ROBERTS:  Objection.  Form.
11        THE WITNESS:  Well, the purpose of the
12  invention is to provide the user of the method or system
13  with documents that are relevant to their queries and
14  match their background and psychological profile.
15        I think to -- at the very least, enormous
16  quantities of experimentation, certainly undue
17  experimentation, would be required by anyone following
18  the descriptions given in the patent itself --
19        MR. FENSTER:  Q.  Why?
20        A.  -- to accomplish that.
21        Q.  Why?
22        A.  Well, there are a number of reasons for that.
23        So, I mean, one is that the patent just doesn't
24  even really give any working examples of how to follow
25  the prescription that it lays out for the invention so

|     | 157 |
| --- | --- |

1  that the results will match the user's background.
2        It asserts that they will, but it doesn't --
3  when you -- when you actually look through the working
4  examples, those are -- those don't actually show how it
5  would.
6        A second is that it's actually well known in
7  information retrieval that when you start following the
8  kinds of procedures that the patent itself describes,
9  such as counting the number of occurrences of identified
10  segments in text and so forth, that the raw counts of
11  these don't even provide very good results, just for
12  simple relevance to queries, for a host of reasons.
13        For example, larger documents tend to have
14  higher counts of the segment -- of given segments in
15  them than smaller ones do.  But they may not be, by any
16  means, the most relevant to a query.
17        So in information retrieval, what one does is
18  to normalize counts by length of documents, to apply
19  other techniques, such as TFIDF, to distinguish between
20  frequent terms that are not very good discriminators
21  between documents and terms that are pretty frequent and
22  are good discriminators between documents and therefore
23  helpful in determining the relevance of a document to a
24  query.
25        There is -- there is lots of kinds of

158

1 operations of this kind that are needed in order to make
2 information retrieval systems work well, none of which
3 are described in the patent. So I think that a person
4 of ordinary skill reading the patent would be obliged to
5 do an enormous amount of experimentation to try to make
6 the thing work at all, let alone for its intended
7 purpose.
8     Q. Did you apply the same standard for a person of
9 ordinary skill in the art when you did your obviousness
10 analysis as when you did your written description and
11 enablement analysis?
12     MS. PALLIOS ROBERTS: Objection. Form.
13     THE WITNESS: I did.
14     MR. FENSTER: Q. So it's the same person of
15 skill in the art that we're talking about that would
16 find it impossible to make and use the claimed invention
17 without undue experimentation that would also find the
18 same invention obvious in light of the prior art; is
19 that correct?
20     A. Yes, that's -- that's right. Someone with a --
21 you know, the bachelor's degree we talked about and a
22 couple of years of graduate study or experience.
23     Q. And you taught lots of these -- lots of
24 students that you think qualify as people of ordinary
25 skill in the art back in 1999, correct?

159

1     MS. PALLIOS ROBERTS: Objection. Form.
2     THE WITNESS: I was teaching students like that
3 then, yes, that's right.
4     MR. FENSTER: Q. Okay. And so you had -- so
5 one of your students who was a person of ordinary skill
6 in the art would have been able to make and use the
7 claimed invention from the prior art -- it would have
8 been obvious for him or her to do so; is that your
9 opinion?
10     MS. PALLIOS ROBERTS: Objection. Form.
11     THE WITNESS: No, it's my -- it's my opinion
12 that that person would have found it obvious -- given
13 the motivation, given the aim -- would have found it
14 obvious to try combining those elements.
15     It would have been obvious, looking around at
16 the field, to try combining the various elements that we
17 identified into a single whole to create an invention of
18 this kind.
19     And maybe it would have worked; maybe it would
20 not have worked; but it would have been obvious to try
21 that combination.
22     MR. FENSTER: Q. I see. So in reaching your
23 conclusion regarding obviousness, you -- do you have any
24 opinion as to whether one of skill in the art would have
25 actually been able to successfully make the

160

1 combination -- the claimed invention based on the prior
2 art?
3     A. Well, I explained in another section of my
4 report my concerns about the usefulness. But -- and --
5 so I do have -- I do have doubts about whether they
6 could have succeeded. But I certainly don't think that
7 it would have been anything but obvious if they had the
8 goal that this inventor had to try combining those
9 things -- those elements.
10     And if they had succeeded in actually doing
11 this, what they would have needed to disclose, in my
12 opinion, about their invention would be a great deal
13 more information through worked-out examples and
14 explicit guidance for these kinds of tuning that I've
15 been describing of how to do that in order to lead to
16 success.
17     Q. So --
18     A. In the absence of that, I don't think, you
19 know, they would have deserved a patent for their
20 invention.
21     Q. Okay. Your conclusion on obviousness is that
22 one of skill in the art, someone like one of your former
23 students, it would have been obvious to such a person to
24 make this invention based on the prior art that existed
25 as of 1999, correct?

161

1     MS. PALLIOS ROBERTS: Objection. Form.
2     THE WITNESS: It would have been obvious for
3 them, that's right, to try and combine those elements to
4 create an invention for this purpose.
5     MR. FENSTER: Q. Okay. And do you have any
6 opinion as to whether such a person, a person of
7 ordinary skill in the art, would have actually been able
8 to make, successfully, the claimed invention based on
9 the prior art?
10     A. Successfully make it. That would be really
11 pure speculation on my part. I find it surprising, but
12 that would be pure speculation.
13     Q. Okay. So you have not reached any affirmative
14 opinion that one of skill in the art in 1999 would have
15 been able to successfully make any of the claimed -- any
16 of the inventions claimed in the asserted claims based
17 on the prior art available in 1999?
18     MS. PALLIOS ROBERTS: Objection. Form.
19     MR. FENSTER: Q. Is that right?
20     A. Well, let's be careful here. What I'm -- what
21 is it that's supposed to not be obvious? Is it --
22     Q. Can you answer my question?
23     A. I'm trying to. You know, I'm trying to be
24 careful about exactly what the question is.
25     Q. Okay.

162

1    A.  So can you rephrase it.
2    Q.  Do you believe that a person of skill in the
3  art would have been able to successfully make the
4  inventions claimed in the '067 patent based on the prior
5  art available as of 1999?
6    A.  So by "successfully make the inventions
7  claimed," you mean not only to assemble the component
8  parts as described, but that they would actually have
9  returned search results that did match the user's
10  background and psychological profile.
11    Q.  Yes.
12    A.  So as I say, I don't -- I -- it would be
13  speculation on my part.  I would find it very surprising
14  if one of ordinary skill could do that.
15    Q.  As of the date of the invention, correct?
16    A.  That's correct, yes.
17    Q.  If you could turn to paragraph 207.
18    A.  Okay.
19    Q.  You state first that "The '067 patent,
20  however, does not teach how to use the parts
21  of speech that comprise the linguistic
22  patterns in order to return search results
23  that correspond to a user's social
24  background."
25        Do you see that?

163

1    A.  Yes.
2    Q.  You continue, "The match factor, as
3  described by the '067 patent, would merely
4  return results that had similar combinations
5  of nouns, verbs and adjectives."
6        Do you see that?
7    A.  Yes.
8    Q.  So if I'm understanding you right, you're
9  saying that the patent wouldn't succeed at delivering
10  documents that match the user's background; it would
11  only succeed in returning results that had linguistic
12  patterns that matched the user's background.  Is that
13  right?
14        MS. PALLIOS ROBERTS:  Objection.  Form.
15        THE WITNESS:  So -- yes.  I'm saying -- I'm
16  saying that it would succeed -- and let's say it will
17  succeed.  I think it's clear enough that you could -- a
18  person of ordinary skill could make it succeed in
19  matching patterns that were the same patterns that were
20  extracted, for example, from the user's linguistic data.
21        But, now, depending on what those patterns
22  are -- remember, all that the patent says about the
23  choice of patterns is, "Well, this is a matter of design
24  choice."  And it doesn't give any guidance on how to
25  make these design choices.

164

1        And it goes on to say that then the preferred
2  embodiment, there's really just one very simple form of
3  pattern.  Now -- so the question is, would matching
4  patterns in the documents that are retrieved to the
5  patterns that were in the user's linguistic data --
6  well, first of all, would that even return relevant
7  documents?
8        The patterns might be so crude that the
9  documents that were returned were not even relevant to
10  the query.  But then if you -- you know, so there is
11  actually a literature on how to -- how to adjust the
12  parameters, you know, how to do things like
13  normalization by document length and text frequency by
14  inverse document frequency.  And you can do similar
15  things with patterns.
16        So there's a literature on how to deal with at
17  least the relevance question.  But there's the further
18  personalization issue here, which is what the patent's
19  really about.
20        And so to make the retrieved documents actually
21  be the ones that are relevant to the user would require
22  additional tuning, about which there's not much relevant
23  literature, and there's certainly none in the patent.
24        MR. FENSTER:  Q.  So you think that there is
25  enough of a blueprint for the -- for one of skill in the

165

1  art to make a system that retrieved documents that
2  matched the linguistic patterns of the user profile, but
3  that that wouldn't necessarily correspond -- that
4  wouldn't necessarily result in results correlating to
5  the user's background and profile; is that right?
6        MS. PALLIOS ROBERTS:  Objection.  Form.
7        THE WITNESS:  Yes, I'm prepared to stipulate to
8  the first part, and I -- and I believe it would not
9  necessarily correlate.  In fact, I know it wouldn't.  It
10  would depend heavily on what the patterns were that you
11  chose to look for.
12        MR. FENSTER:  Got it.
13    Q.  And skipping ahead to the utility -- your
14  utility opinion, I think -- building off what I just
15  understood, is it fair to say that you find that it
16  wouldn't -- that it's invalid for lack of utility
17  because it wouldn't work, because just finding a
18  document that has matching linguistic characteristics
19  may not necessarily give you a document that matches the
20  user's background and profile?
21        MS. PALLIOS ROBERTS:  Objection.  Form.
22        THE WITNESS:  Yes, that's a -- that's a
23  critical part of this.  There really are two parts as
24  regards utilities.  One is that, as you say, it's not
25  just enough for the particular patterns that happen to

42 (Pages 162 to 165)

**166**

1  be -- happen to have been selected in a particular
2  instantiation of this to match, but that has to result
3  in people of similar backgrounds getting similar
4  documents, but furthermore -- I mean, that must happen
5  not just by accident; it has to happen systematically,
6  right. In other words, people of different backgrounds
7  need to get documents that are appropriate to their
8  different backgrounds, so they'll need to get different
9  documents.
10     MR. FENSTER: Q. Does the claim require that
11  last bit? I noticed that you said that in -- for
12  example, in paragraph 207 that it has to be adequate to
13  discriminate between people of varying backgrounds. Is
14  that a requirement of the claim, in your view?
15     A. Well, just think about it. The dashes the --
16  as the patents itself explains -- let's say you have a
17  12-year-old child and a physician, who are both
18  searching for something. Let's say, for example,
19  they're both searching for, I don't know, Hodgkin's
20  lymphoma or something like this.
21     So one of the problems with a lot of the
22  current search is the 12-year-old child is going to get
23  things way above the child's reading level, completely
24  inappropriate, not match that child's background for
25  that query.

**167**

1     And conversely, the physician is going to get
2  lots of stuff that is for laypeople; it's not technical,
3  not what he was looking for, given his extensive medical
4  background.
5     So if the system can't, for the same query,
6  produce different documents for people that have
7  different backgrounds in the cases where different
8  documents are suitable, it's not doing what it's claimed
9  to do. It's not providing the utility that it says that
10  it will provide.
11     You know, if it only -- it always provides
12  professor-like documents and so, you know, I get good
13  documents when I use it. It's working fine for me. But
14  it's not an invention of the kind that it claims to be,
15  because when an elementary school student or when
16  somebody who is very highly educated but doesn't know
17  about my particular field makes the same kind of search,
18  they get the same documents I do.
19     Q. And is it your understanding that in order to
20  meet the utility requirement of section 101 of the
21  patent code, that an invention -- that this invention
22  would have to meet that requirement of giving different
23  results for different people?
24     A. So -- yes. I mean, the invention was found by
25  the examiner, and so that's presumed to be new and

**168**

1  useful and nonobvious, right. All of those things.
2     So why would -- why is it useful? Well, the
3  invention states what it's for. It's to provide, to a
4  variety of different users, documents that are
5  appropriate to their background and psychological
6  profile. And so to really be useful, it should do
7  exactly that. That's my understanding.
8     Q. How well does an invention have to work for its
9  stated purpose in order to be valid under section 101,
10  in your view?
11     MS. PALLIOS ROBERTS: Objection. Form.
12     THE WITNESS: I don't know, you know, what the
13  cutoff is.
14     MR. FENSTER: Q. Does it have to work most of
15  the time?
16     MS. PALLIOS ROBERTS: Objection. Form.
17     MR. FENSTER: Q. Some of the time?
18     A. I would think it would at least have to work
19  some of the time, yes. I would think it has to work
20  some of the time.
21     Q. Do you have any -- seriously, do you have any
22  understanding as to what degree an invention should work
23  for its stated purpose in order to meet the utility
24  requirement of section 101?
25     A. No, I -- I don't know exactly what standard the

**169**

1  examiner applies.
2     Q. Do you have any understanding as to -- as to
3  what degree the claimed invention works for its stated
4  purpose?
5     MS. PALLIOS ROBERTS: Objection. Form.
6     THE WITNESS: I haven't seen it tested
7  anywhere.
8     MR. FENSTER: Q. So you don't know?
9     A. So I don't know how well it actually works.
10     MS. PALLIOS ROBERTS: Counsel, if we're at a
11  natural breaking point, can we take a break.
12     MR. FENSTER: Sure.
13     THE VIDEOGRAPHER: We are now off the record at
14  4:35.
15     (Recess taken.)
16     THE VIDEOGRAPHER: We are now on the record at
17  4:52.
18     MR. FENSTER: Q. Dr. Peters, can I ask you to
19  turn to pages 14 and 15 of your report.
20     A. All right. Yes.
21     Q. Okay. So in the middle of page 14, you have
22  the characteristics of the system claimed by the '067
23  patent, and you state, "I will discuss the steps,"
24  slash, "elements of the claims below."
25     Do you see that?