# EXHIBIT A

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
                        MARSHALL DIVISION

---------------------------
                                :  NO.2:07-CV-480-DF
PA ADVISORS, LLC,               :
                                :
            Plaintiff,          :
                                :
        VS.                     :
                                :
GOOGLE INC., et al.,            :
                                :
            Defendants.         :
                                :
- - - - - - - - - - - - - - -  -

                    DATE:  August 19, 2009

                    TIME:  9:47 a.m.


            Deposition of ILYA GELLER, taken by and

before JOYCE SILVER, a Certified Shorthand Reporter

and Notary Public of the State of New York, and,

PHILIP GLAUBERSON, Videographer, held at the office

of STROOCK, STROOCK & LAVAN, 767 Third Avenue, New

York, New York.









        Job No.: 212395

## 2

APPEARANCES:
Attorneys for Plaintiff
RUSS AUGUST & KABAT
    12424 Wilshire Boulevard
    Los Angeles, California 90025
BY:  MARC A. FENSTER, ESQ.

Attorneys for Defendant, Google Inc.
QUINN, EMANUEL, URQUHART, OLIVER & HEDGES, LLP
    555 Twin Dolphin Drive
    Suite 560
    Redwood Shores, California 94065
BY:  BRIAN C. CANNON, ESQ.
    And
    EUGENE NOVIKOV, ESQ.

Attorneys for Defendant Yahoo

HOWREY LLP
    321 North Clark Street
    Chicago, Illinois 60654
BY: JASON C. WHITE, ESQ.

ALSO PRESENT:  Erich Spangenberg

## 4

S T I P U L A T I O N S

        IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the respective
parties hereto that filing and sealing be one and the
same are hereby waived.

        IT IS FURTHER STIPULATED AND AGREED that
all objections except as to the form of the question,
shall be reserved to the time of the trial.

        IT IS FURTHER STIPULATED AND AGREED that
the within examination may be signed and sworn to
before any officer authorized to administer an oath
or notary public, with the same force and effect as
though signed and sworn to before the officer before
whom the within deposition was taken.

## 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ILYA GELLER | | | | |
| BY MR. CANNON | 6 | | 154 | |
| BY MR. FENSTER | 128 | | | |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 16, | Patent Purchase agreement, Bates Nos. PA 0001210-22 | 101 |
| Exhibit 17, | Panel Summary No. 1 | 119 |
| Exhibit 18, | Letter, Bates Nos. Geller 031979-91 | 137 |
| Exhibit 19, | Letter, Bates No. Geller 033081 | 139 |
| Exhibit 20, | Letter, Bates Nos. Geller 033083 | 140 |
| exhibit 21, | Letter, Bates Nos. Geller 034109-10 | 140 |
| Exhibit 22, | Document entitled, "The New Search Technology," Bates Nos. Geller 054521-28 | 141 |
| Exhibit 23, | E-mail dated 8/27/01, Bates No. Brin 00000001 | 143 |
| Exhibit 24, | Letter dated 6/14/05 | 147 |
| Exhibit 25, | Documents Bates Nos. PA 0001419-1530 | 152 |

## 5

        THE VIDEOGRAPHER:  My name is Philip
Glauberson of Veritex Corporate Services.  The date
today is August 19, 2009 and the time is
approximately 9:47 a.m.
        This deposition is being held in the
office of Stroock, Stroock and Lavan located at
767 Third Avenue, New York, New York.
        The caption of this case is PA Advisors
LLC versus Google Inc., et al., in the United States
District Court, Eastern District of Texas, Marshall
Division, No. 2:07-CV-480-DF.
        The name of the witness is Ilya Geller.
At this time the attorneys will identify themselves
and the parties they represent, after which our court
reporter, Joyce Silver of Veritex, will swear in the
witness and we can proceed.
        MR. FENSTER:  My name is Marc Fenster
with Russ, August and Kabat on behalf of the
Plaintiff nXn Technology, LLC, formally known as PA
Advisors LLC, and for the witness.
        MR. PRIDHAM:  David Pridham appearing
today on behalf of nXn and Mr. Geller.
        MR. CANNON:  My name is Brian Cannon.
I'm with the Quinn Emanuel law firm.  I represent

2 (Pages 2 to 5)

Veritext Corporate Services
800-567-8658                                                                973-410-4040

ILYA GELLER

2 Google in this matter. With me is Eugene Novikov,
3 also from the Quinn Emanuel firm.
4     MR. WHITE: My name is Jason White on
5 behalf of defendant Yahoo.
6 MARK BERELEKHIS and LENNY KUSHNER, Interpreters of
7 the Russian language, are duly sworn by the Notary:
8 I L Y A  G E L L E R, residing at 2442 East 26th
9 Street, Brooklyn, New York 11235, having been duly
10 sworn by the Notary, testifies as follows:
11 DIRECT EXAMINATION BY MR. CANNON:
12     Q.    Good morning --
13     MR. FENSTER: Brian, excuse me one
14 second. Let me just make a statement for the record.
15 This notice -- this deposition was originally noticed
16 by plaintiff. It was cross-noticed by defendants, by
17 Google for defendants. We have agreed that
18 defendants will proceed first for three hours, that
19 they will have three hours to split for all
20 defendants; and that they will go first, and that
21 plaintiffs will take three hours to the extent the
22 witness is available -- able to go on after the
23 morning questioning, and that's how we will proceed
24 today; is that correct?
25     MR. CANNON: That is correct for today.

ILYA GELLER

2 Obviously we understand the witness is ill and we
3 will do what we need to do to accommodate his illness
4 and make this as pain free as possible. To the
5 extent we need additional time, we can work
6 cooperatively with you to make that happen.
7     MR. FENSTER: I have also advised that,
8 while you're certainly free to -- we will discuss
9 with you whether additional time is appropriate or
10 possible after today. I have advised defendants they
11 should regard the time they have today as if it's the
12 time they will get with the witness and should
13 proceed accordingly.
14     MR. CANNON: Let's proceed.
15     Q.    Good morning, Mr. Geller.
16     A.    Good morning.
17     Q.    My name is Brian Cannon. I am an
18 attorney for Google. I will be asking you a series
19 of questions today. Have you ever been deposed
20 before?
21     A.    Never.
22     Q.    This is the first time?
23     A.    Yes.
24     Q.    So I will be asking you a series of
25 questions, and you've taken an oath which is the same

ILYA GELLER

2 oath that's given in court as if you were testifying
3 in court. Do you understand that?
4     A.    I do.
5     Q.    And you are currently testifying in
6 English and we have two translators here today. So
7 if a problem arises with a question or an answer in
8 English, we have translators that can help us. Okay?
9     If you need a break at any point, please
10 let me know. I understand you are -- you are ill, so
11 I will try -- do my best to -- to move things along
12 and accommodate that as best I can. I understand
13 you're suffering from multiple sclerosis; is that
14 correct?
15     A.    Yes, I do.
16     Q.    Will that illness affect your testimony
17 today in any way?
18     MR. FENSTER: Object to the form.
19     A.    I think yes.
20     Q.    How will it effect the testimony?
21     A.    I have MS. I have problems with my
22 memory and I have problems with my thinking. Because
23 you see this weather is very bad for me. It's
24 exactly the weather -- the kind of weather that is
25 bad for MS because with people with MS cannot -- you

ILYA GELLER

2 are looking all of you. All of you are looking at
3 me. It's bad weather for me. It's very bad. I am
4 bad in hot and humid weather. I am very bad, with my
5 memory.
6     Q.    Are you taking any medications that might
7 effect your testimony today?
8     A.    Yes. I take stem cells in Russia for MS,
9 and actually with stem cells start to work a few
10 weeks ago and it affects a lot -- it affects my
11 health a lot.
12     Q.    Was -- does the stem cell treatment you
13 referenced, affect your ability to provide testimony
14 today?
15     A.    Nobody knows. I'm the only one who tries
16 this kind of cure of treatment. No statistics --
17 nobody knows. So I can't say for sure does or does
18 not. My treatment influences my health condition, my
19 ability to think and to remember things.
20     Q.    Mr. Geller, we're going to -- I'm going
21 to be asking you questions today, and we are going to
22 be looking at some documents. So I'm going to pass
23 you the first document. It's -- it's already been
24 marked as Exhibit 6 in this lawsuit and it is US
25 Patent 6199067.

3 (Pages 6 to 9)

126

1      ILYA GELLER
2   the page that bears the label Etkin 000239.
3      A.    002.
4      Q.    239 are the final three digits.
5      A.    239, right.
6      Q.    And let me know when you're there.
7   Perfect.
8          This is the results of a -- of an
9   international search report, and my question to you
10  is: Have you seen this -- do you have a memory of
11  seeing this page back in the 2001-2000 time frame?
12     A.    This page, I don't remember.  Perhaps I
13  saw it, but he didn't -- I don't remember he said
14  something specific about this.  What is it?
15     Q.    Did you ever instruct Mr. Etkin not to
16  pursue a European patent application, that you
17  remember?
18     A.    Ah, yes, I paid a lot of money.  I paid
19  him a lot of money.  He promised me -- he filed for
20  Europe and he filed for Canada.  He filed for Israel.
21  It worth me something like $12,000 -- yes, or
22  $18,000.  I don't remember.  I lost all this money.
23  Right.
24     Q.    But you paid him to do that work?
25     A.    Uh-huh.

127

1      ILYA GELLER
2      Q.    Could you answer audibly?
3      A.    Yes, I -- I paid him.
4          MR. CANNON:  Let's take a short break.
5          THE VIDEOGRAPHER:  We are going off the
6   record.  The time is approximately 2:22 p.m.
7          (Recess taken.)
8          THE VIDEOGRAPHER:  We're going on the
9   record.  The time is approximately 2:38 p.m.
10  BY MR. CANNON:
11     Q.    Mr. Geller, I only have a few more
12  minutes the three hours that I have today, and I
13  would like to reserve whatever time I have left for
14  potential cross-examination after counsel may ask you
15  questions, but thank you for your time today.
16         MR. FENSTER:  You had to go on the record
17  with that.  All right.  Why don't we go off the
18  record and -- okay, let's go off the record and take
19  a break.
20         THE VIDEOGRAPHER:  We are going off the
21  record.  The time is approximately 2:38 p.m.
22         (Recess taken.)
23         THE VIDEOGRAPHER:  We're going on the
24  record.  The time is approximately 2:52 p.m.
25  CROSS-EXAMINATION BY MR. FENSTER:

128

1      ILYA GELLER
2      Q.    Good afternoon, Mr. Geller.  I'd like to
3   ask you a few questions.  I understand that it's
4   getting later in the day and you mentioned that
5   you're getting tired.  Can you tell us how you're
6   feeling?
7      A.    Yes, I am tired a lot because, you see.
8      Q.    Are -- are you okay to answer questions
9   for a little bit?
10     A.    Just a little, yes, a little bit, please.
11     Q.    Where did you grow up?
12     A.    Russia, Ulyanovsk, middle Russia.
13     Q.    And when did you immigrate to the
14  United States?
15     A.    12th of December, 1992.
16     Q.    When were you born, Mr. Geller?
17     A.    4th of June, 1969.
18     Q.    1969?
19     A.    Yes.
20     Q.    So you're about 23 years old when you
21  immigrated; is that right?
22     A.    Yes, I am.
23     Q.    Did you -- so you did your early
24  education in -- in Russia?
25     A.    Yes, I did.

129

1      ILYA GELLER
2      Q.    What did you study in Russia?
3      A.    Civil engineering and also I study
4   mainframe computer.  Mainframe.  Mainframe and civil
5   engineering.  A little bit.
6      Q.    Tell us a little bit about your
7   education.  I don't know how the education system
8   works in Russia, so tell us a little bit about how
9   the education system works from early school,
10  elementary or grammar school on.
11     A.    I studied a lot of science.  I studied
12  mathematics, physics.  I studied civil engineering, I
13  studied different kinds of mechanics, whatever,
14  because it was required in high school, but it was
15  not the one -- it wasn't the education -- the -- the
16  education I looked for because I -- because it didn't
17  give me what I looked for.  And actually I was in
18  college for only four years because usually five
19  years are required.  At the end of my fourth year, I
20  left the college and actually I didn't study anything
21  else in Russia.  It was '90 -- '94, '93, I don't
22  remember exactly.
23     Q.    That was 1990 or 1991; is that right?
24     A.    Yes, I believe so, but I'm not sure.  I'm
25  not sure.

ILYA GELLER

1
2    Q.    Where did you go to college in Russia?
3    A.    The same college in the same city
4    Ulyanovsk Polytechnical Institute.
5    Q.    And tell me a little bit about your
6    family.  Your -- did you come from a big family?  How
7    many brothers and sisters did you have?
8    A.    I -- I have only one brother -- brother.
9    The family is in Russian at the time.  We are not big
10   and my parents had only two children, me and my
11   brother.  My brother was a civil engineer and he --
12   he continues the same career.  He became estimator in
13   the companies -- a company.  I don't know which one.
14   He became an estimator, he makes money, right.
15          And my father, he was also a civil
16   engineer.  Civil engineer and he build factories,
17   whatever.  My mother was a teacher.  She taught
18   economy in college.  Right.  But finally we
19   immigrated to this country and my brother, like I
20   told you, continued his career and my mother
21   become -- she's old and she became -- she got SSI and
22   now she retires.  Father died in here.
23   Q.    When did your father pass away?
24   A.    '97, September of '97.
25   Q.    And did your mother work when she came

ILYA GELLER

1
2    here?
3    A.    Yes, she did.
4    Q.    And what did she do?
5    A.    She was a teacher in college.
6    Q.    And tell me a little bit about your --
7    your mother and father, if you can, sort of their
8    background.
9    A.    Nothing special.  My father was just a
10   manager, civil engineer.  He managed something called
11   factory.  Factories.  He built factories and my
12   mother, she was just a teacher.  Nothing -- nothing
13   extraordinary.  Nothing -- nothing that special.
14   Q.    Were your parents survivors of the
15   concentration camps?
16   A.    Yes, my mother was in a concentration
17   camp but, fortunately for her, she survived.  She was
18   two years old and -- when it began and actually she
19   lost a lot in the concentration camp.
20          My father, he was more lucky than my
21   mother.  He was lucky -- luckier then my mother.  He
22   could escape Germans and spend what time in the part
23   that wasn't occupied.  So I was just -- my parents
24   were lucky, yes, and -- but, actually, my parents'
25   families were killed by Germans in concentration

ILYA GELLER

1
2    camps and during the war.  Yes.
3    Q.    What was it like for you growing up as a
4    Jewish person in -- in Russia?
5    A.    Not pleasant, not pleasant at all because
6    all the -- of anti-Semitism.  And also I grew up in a
7    small provincial town and it was awful.  Because you
8    see I had nothing to do.  I am a creator.  I have a
9    spirit of creator.  I -- yes, and it wasn't -- could
10   I ask the translator?
11          (Speaks Russian.)
12          MR. BERELEKHIS:  It was a very stifling
13   atmosphere I grew up.
14   A.    Yes, definitely stifling atmosphere in
15   this town.  Right.  And I decided -- finally I
16   decided that I have nothing to find in Russia,
17   especially after Perestroika, and I decided to escape
18   to the United States because I had nothing in there.
19   Q.    What did you want to do when you came --
20   why did you decide to come to the United States?
21   A.    I -- it's very strange, I know,
22   especially it was strange for my parents and for all
23   my relatives.  I wanted to become a scientist and
24   I -- I decided to start from philosophy because I
25   studied precise sciences like math and physics for

ILYA GELLER

1
2    many years, and -- but they didn't give me
3    satisfaction, and I decided to try philosophy.  So
4    when I came to America, I tried to go -- to go to
5    college and to study philosophy.
6    Q.    And did you go to college in America when
7    you came here to study philosophy?
8    A.    Yes, I came to Brooklyn College and I
9    studied philosophy in Brooklyn College till I could.
10   Q.    Until what?
11   A.    Till I could, until I can do it -- could
12   do it.
13   Q.    And when did you start in college?  You
14   immigrated in 1992?
15   A.    '94.  '94.  Before I started another
16   college I start computer science, I don't remember
17   mostly mainframe.  I don't remember the name of the
18   college.  I can't give you the dates -- dates, but I
19   studied computer science for half of the year goes
20   something like this.
21   Q.    Is it common or was it common in your
22   experience for -- you mentioned that you studied
23   precise sciences earlier?
24   A.    Uh-huh.
25   Q.    And that you spent many years doing that.

34 (Pages 130 to 133)

ILYA GELLER
1
2 Right?
3    A.   Yes, right.
4    Q.   And is it sort of a natural progression
5 to study philosophy after that in your experience?
6         MR. CANNON:  Objection, leading.
7    Q.   Go ahead.
8    A.   I think, yes.  Yes, because I didn't find
9 anything what I looked for, I didn't find it.  I
10 couldn't find it in precise sciences.  In math or
11 physics or whatever, I couldn't find what -- or
12 chemistry, I studied a lot of things because in
13 Russia in college we teach you everything.  I knew
14 chemistry.  I knew physics.  I knew mathematics.  I
15 knew many other disciplines.  If you want, I can tell
16 you.
17    Q.   Did many of the other students or
18 teachers of philosophy that you met and encountered
19 during your study of philosophy, have such
20 backgrounds in precise sciences?
21    A.   None.  None at all.  Nobody.
22    Q.   Do you have any understanding as to why
23 that is?
24    A.   Yes, I do.  Because -- because
25 humanities, humanities are dead for the past 60

ILYA GELLER
1
2 years, 70, 80 years.  Nothing new is going on in
3 humanities.  Psychology, philosophy, and people
4 ambitions do not come to philosophy because you can't
5 find money or honor in philosophy, nothing.
6    Q.   You mentioned earlier in your testimony
7 that you had a feeling during this cab ride in 1998,
8 August 1998, that you might be able to develop an
9 idea to apply philosophy to Internet search; is that
10 right?
11         MR. CANNON:  Objection to form and
12 leading.
13         MR. WHITE:  If one of us objects, it is
14 for both of us so I don't have to say it.
15         MR. FENSTER:  Certainly.
16    A.   Yes, it is.
17    Q.   And to your knowledge, are you the first
18 to have the idea that you did about applying
19 philosophy to Internet search?
20         MR. CANNON:  Objection to form.  Leading.
21    A.   Absolutely.  I know it for sure.
22 Absolutely.  I know, I know what happened in
23 philosophy for the past 3,000 years and I know I'm
24 the first.
25    Q.   So why do you think that no one came to

ILYA GELLER
1
2 that idea before you?
3         MR. CANNON:  Objection, form.
4    A.   Because, first of all, computers -- our
5 last great philosophers lived, let's say, 80 years
6 ago, 70 years ago.  And at that time, computers
7 didn't exist, first of all.
8         And, second, today all of them, except
9 Wittgenstein, followers of Hegel, followers of Hegel
10 and -- what -- and Google actually helped me to prove
11 it, Google and Yahoo, because we did it and I
12 couldn't -- I couldn't -- I didn't have money and I
13 was ill, but they helped me to prove that Hegel was
14 wrong.  And also Russell and all his Vienna cycle are
15 wrong.  The computer didn't exist at that time.
16         So in the -- like I told you, no money in
17 philosophy, nobody came to philosophy.  It happened
18 this way.  So nobody, I can say it for sure,
19 absolutely.
20    Q.   Is it your belief that it was your
21 background in philosophy that enabled you to
22 transform Internet search?
23         MR. CANNON:  Objection, form, leading.
24    A.   Yes, it is.  It's the only thing that
25 helped me to come to the idea because

ILYA GELLER
1
2 personalization, I couldn't come to the idea -- how
3 many thousands, tens of thousands of very good paid
4 scientists in the world and none of them could do --
5 could come to the idea of personalization, nobody.
6 It's practically impossible.
7    Q.   You testified earlier that you tried to
8 commercialize your invention; is that right?
9    A.   All the time.  All of the time.
10    Q.   And you mentioned some of the things that
11 you did to try to commercialize that.  I would like
12 to show you some documents and ask you a few
13 questions about that with respect to your efforts to
14 commercialize.
15    A.   Uh-huh.
16         MR. FENSTER:  Do you know the next in
17 order that we are up to?
18         MR. CANNON:  18, it is.
19         MR. FENSTER:  I would like to ask the
20 court reporter to mark as the next exhibit a document
21 bearing Bates Nos. Geller 31979 through 319881.
22         (Exhibit 18, Letter, Bates Nos. Geller
23 031979-91 is received and marked for identification.)
24    Q.   Mr. Geller, do you recognize Exhibit 18?
25    A.   I think yes, I do.  Yes.

35 (Pages 134 to 137)

1      ILYA GELLER
2   Search Technology," Bates Nos. Geller 054521-28 is
3   received and marked for identification.)
4      Q.    Mr. Geller, I -- I know it's getting late
5   in the day, but I need you to wait for a question and
6   just respond to the questions.  Okay?
7      A.    Uh-huh.
8      Q.    I'll try to wrap up as soon as I can.
9         Do you recognize Exhibit 22?
10     A.    Yes, I do.
11     Q.    What is it?
12     A.    It's an exception from my business plan
13  exception.
14         MR. BERELEKHIS:  Excerpt.
15     A.    Excerpt, right.
16     Q.    It's an excerpt from your business plan?
17     A.    Yes, it is.
18     Q.    And it's entitled, or it says at the top,
19  "White Paper."
20     A.    It is.
21     Q.    What does that mean?
22     A.    It means that I look for money, and
23  people that wrote the business plan for me, they're
24  people that wrote the business plan for me said that
25  I could put this on my site for people who would

1      ILYA GELLER
2   come.  I don't remember which site is it.  Is it --
3   could be -- ah, LexiClone.  So I already have -- had
4   LexiClone.  LexiClone already existed, so I put it at
5   LexiClone site so people come to my site could read
6   it and invest money with me.
7      Q.    This -- this document was posted on
8   lexiclone.com?
9      A.    Yes.
10     Q.    And do you know approximately when it was
11  posted on lexiclone.com?
12     A.    I have no -- honestly, I don't remember,
13  but it was posted some -- between, let's say, 2005,
14  somewhere in 2004.
15         MR. FENSTER:  I will ask the court
16  reporter to mark as Exhibit 23, a document bearing
17  Bates numbers Brin, B-r-i-n 1.
18         (Exhibit 23, E-mail dated 8/27/01, Bates
19  No. Brin 00000001 is received and marked for
20  identification.)
21     A.    Yes, I already saw this document.
22     Q.    Do you recognize Exhibit 23?
23     A.    Yes.
24     Q.    What is it?
25     A.    It's a letter to Sergey Brin, Sergey

1      ILYA GELLER
2   Brin.
3      Q.    So earlier, defendant's counsel was
4   asking you about -- about communications with
5   Mr. Brin or with Google and you referred to an E-mail
6   from 2001.  Do you recall that testimony?
7         MR. CANNON:  Objection, form.  Misstates
8   the testimony.
9      A.    Yes, I do.
10     Q.    Is this the E-mail that you were
11  referring to?
12     A.    Yes --
13         MR. CANNON:  Objection to form.  Leading.
14     Q.    Go ahead.
15     A.    Yes, I did.
16     Q.    Did you prepare this E-mail?
17         MR. CANNON:  Objection, form, leading.
18     A.    Yes, I did.
19     Q.    Did you send it?
20     A.    Yes, I did.
21     Q.    To whom did you send it?
22     A.    Sergey Brin.
23     Q.    When did you send it?
24     A.    27th of July, 2001.
25     Q.    Why did you send it?

1      ILYA GELLER
2      A.    I wanted -- I told you, I saw that Google
3   is very ambitious company -- actually, I liked -- I
4   liked Google.  I liked Google and I liked what they
5   did and how they did and I put to communicate to
6   incorporate in Google somehow.  I thought we would
7   buy license, we will combine our efforts because I
8   saw what Ser- -- Sergey Brin went in my direction,
9   went to personalization and went to all this stuff.
10  I just saw that they are so bright, I knew I couldn't
11  conduct Yahoo because Yahoo is not a company with --
12  Yahoo is not a company with -- is very -- could I say
13  to you in Russian?
14         (Speaks Russian.)
15         MR. BERELEKHIS:  Yahoo is not a very
16  prospective company, promising.
17     A.    Promising.  Promising.  Promising company
18  and I decided to -- I tried to conduct Google.
19  Right.  I -- I thought Sergey -- I told you, I --
20  Sergey, he speaks Russian and at that time I afraid I
21  couldn't speak English at all and even my memory was
22  compromised -- was compromised and -- uh-huh.
23         MR. WHITE:  Objection, non-responsive.
24     Q.    Mr. Geller, you mentioned this morning
25  and just now a few times that in maybe the early

37 (Pages 142 to 145)

ILYA GELLER

1
2 2000s you couldn't speak English?
3    A.    Yes.
4    Q.    Was your English less good than it is
5 now?
6        MR. CANNON:  Objection, form, leading.
7    A.    A lot.
8    Q.    Why?
9    A.    MS, multiple sclerosis.  It's one of --
10        (Speaks Russian.)
11        MR. BERELEKHIS:  Consequences.
12    A.    Consequences of the multiple sclerosis.
13 It's one of the strongest -- people can speak -- with
14 multiple sclerosis we can speak foreign languages and
15 you see if I could, it means that -- if not multiple
16 sclerosis, English would be -- my English would be
17 perfect.
18    Q.    Was your English -- strike that.
19        Did your English deterio -- deteriorate
20 as a result of MS?
21        MR. CANNON:  Objection, leading, form.
22    A.    (Speaks Russian.)
23        A lot.
24        MR. FENSTER:  Let me ask the court
25 reporter to mark Exhibit 24, a document that has been

ILYA GELLER

1
2 produced as Bates No. Geller 057383, a letter dated
3 June 14, 2005 from Joseph Diamante to David Drummond,
4 D-r-u-m-m-o-n-d, at Google.
5        MR. CANNON:  I will just lodge an
6 objection on the record to this document.  I
7 understand this was produced just -- just yesterday
8 and we haven't had a chance to look at it.
9        (Exhibit 24, Letter dated 6/14/05 is
10 received and marked for identification.)
11    A.    Yes, I recognize this document.
12    Q.    What is this document?
13    A.    I tried to license my -- to license my
14 technology to Google because I saw Google begin to
15 use my technology to -- to full scale.  I mean Google
16 began this.  Edward started with -- Edward and Google
17 started personalization.  And I -- is it privilege?
18 Could I say what I hired the lawyer?
19    Q.    Not the fact that you hired him, but any
20 communications, you shouldn't reveal any
21 communications that you had with counsel.
22    A.    Right.  And Joseph Diamante sent this
23 letter for -- for me because I thought Google would
24 be interested to license my technology.
25    Q.    And to your knowledge, was there a

ILYA GELLER

1
2 response to this letter?
3    A.    No, no.
4        MR. CANNON:  Objection, form, to the
5 preceding question.
6    Q.    Why didn't -- why didn't you sue Google
7 when you didn't get a response in 2005?
8    A.    First of all, I didn't think about suing
9 Google.  Actually, I wanted to do business.  Listen,
10 it's waste of time -- I'm sorry, you are lawyers, I'm
11 very sorry but listen, I didn't think to sue
12 somebody.  I thought how to develop the business.
13 I -- because business brings much more money, it does
14 something.  Suing somebody, sorry, you're lawyers,
15 I'm sorry, is no good.  Is no good at all.  Suing
16 someone, I didn't thought to sue somebody.  I didn't
17 think to sue Google.  I thought to sell the license
18 and to -- to build the business.
19    Q.    And why didn't you build the business
20 with Google?
21        MR. CANNON:  Objection to the form.
22    A.    Google didn't respond and at -- at that
23 time I began to travel to Russia and it was -- you
24 see this treatment that I got in Russia is a tricky
25 one.  I mean when -- when I had this treatment I

ILYA GELLER

1
2 couldn't think about anything because you see before
3 that I was in bad condition.  It was awful.  I --
4 I -- I felt very bad.  I could work only one or two
5 hours per day.  And after I went to Russia, it was
6 like I came from prison, from prison for life.  You
7 see, I just began to breathe.  I began to think.
8 I -- sorry, I just couldn't think about anything at
9 that time.
10    Q.    Let me ask you to take a look quickly at
11 the patent purchase agreement which was marked
12 earlier as Exhibit 16.
13    A.    Uh-huh.
14    Q.    So in 2007, you sold your patent to PA
15 Advisors; is that right?
16    A.    Yes, I did.
17    Q.    And why did you do that?
18    A.    First of all, I saw people from PA
19 Advisors.  I saw -- I met Dave.  I met Eric.  I saw
20 what these are very competent people and they
21 understand the stuff.  And I knew with my patent will
22 be in good hands.  It won't lie as a dead burden.
23        And secondly, I needed money to continue
24 coming to Russia because at that time I didn't have
25 any.  I didn't have money.

38 (Pages 146 to 149)

ILYA GELLER

1
2    Q.    What did you need the money for?
3    A.    For Russian, because the treatment in
4 Russia is astronomically expensive.  It's
5 outrageously expensive.  Right.  It's so expensive.
6    Q.    And you didn't have money to pay for the
7 treatment?
8    A.    No, not at all.  I had only Social
9 Security and disability and my annual income from
10 social security by disability is enough only for --
11 for two -- my social security by disability for two
12 years is enough to come to Russia once, so I didn't
13 have any money.  I didn't have any money.  I couldn't
14 get money from anywhere because I couldn't go even to
15 work because, listen, I was -- I was a long time.  So
16 the patent was the only commodity what I could sell.
17    Q.    And what do you think would have happened
18 to you if you didn't get --
19        THE VIDEOGRAPHER:  I'm sorry, we need to
20 change tape.  This will end videotape number three of
21 the deposition of Ilya Geller.  We are going off the
22 record at approximately 3:37 p.m., August 19, 2009.
23        (A discussion is held off the record.)
24        THE VIDEOGRAPHER:  We are now on the
25 record, beginning approximately 3:45 p.m., August 19,

ILYA GELLER

1
2 2009.  This will begin videotape number four of the
3 deposition of Ilya Geller.
4 BY MR. FENSTER:
5    Q.    Mr. Geller, referring back to Exhibit 16,
6 the patent purchase agreement, Google's counsel
7 referred you to Section 2.2?
8    A.    Uh-huh.
9    Q.    Do you see that?
10    A.    Uh-huh.
11    Q.    What's your understanding of that
12 provision?
13    A.    Actually, I rely on my legal counsel.  He
14 did everything.
15    Q.    Do you understand that you're entitled to
16 a portion of any proceeds that are generated, either
17 from this lawsuit or from your patents?
18        MR. CANNON:  Objection, leading.
19    A.    Yes, I do.
20    Q.    Did you have any other way to monetize
21 your patents when you sold it?
22        MR. CANNON:  Objection, leading.
23    A.    No.
24        MR. FENSTER:  Let me ask the court
25 reporter to mark as Exhibit 25, a collection of

ILYA GELLER

1
2 documents bearing Bates Nos. PA 1419 through 1530
3        (Exhibit 25, Documents Bates Nos. PA
4 0001419-1530 is received and marked for
5 identification.)
6    Q.    Mr. Geller, could you look through
7 Exhibit 25 and tell me if you recognize it.
8    A.    I recognize page number one of one.  It's
9 Unisearch my site before LexiClone came.  It's
10 Unisearch.
11    Q.    Are those printouts of the Unisearch --
12 do you recognize these as printouts of your website
13 unisearch.net at various points in time?
14        MR. CANNON:  Objection, leading.  Form.
15    A.    Yes, these uniseach.net.  Searched on
16 the Internet.
17    Q.    And do you recognize this?  Do they look
18 like accurate copies of your website?
19        MR. CANNON:  Objection, form.
20    A.    I'm not quite sure because a lot of time
21 passed away -- passed away but I think, yes, because
22 I have this Internet search.  I remember.  Search on
23 the Internet trial version.  And also I remember this
24 presentation of the Unisearch, right.  Yes.  And I
25 remember this article.  It's in Russian.  Right.

ILYA GELLER

1
2 It's my old Unisearch.
3    Q.    I'll represent to you, Mr. Geller, that
4 these are printouts from the way back machine which
5 is an Internet archive.  Looking, for example, at the
6 second page which is PA 1420, do you see that?
7    A.    1420, yes, I do.
8    Q.    Does this look to be a copy of your
9 website as it existed on November 28, 1999?  And I'm
10 referring to the date that's listed in the url at the
11 bottom of the page?
12        MR. CANNON:  Objection, leading.
13    A.    Excuse me, I'm confused.  Which date,
14 this -- this one (indicating).
15    Q.    I am referring you to the url at the
16 bottom which is http?
17    A.    This one.  Uh-huh.  Yes, exactly.  Yes,
18 it is.  Yes.
19        MR. FENSTER:  Brian, as I mentioned
20 during the break, the witness informed me that he's
21 not feeling well and would like to adjourn soon.  So
22 I'm going to have to reserve my time.  I had about
23 50 minutes by my count or so.  But out of respect for
24 the -- the witness' request and your request to do
25 another five minutes, I'm going to adjourn now and

39 (Pages 150 to 153)

```
 1        ILYA GELLER
 2   reserve my time for if and when the deposition is
 3   continued.
 4        MR. CANNON:  Understood.
 5   REDIRECT EXAMINATION BY MR. CANNON:
 6        Q.    Mr. Geller, counsel showed you a number
 7   of exhibits that appeared to reflect correspondence
 8   that you had either written or prepared to send out
 9   to people, potential investors or potential
10   purchasers.  Do you remember that -- those exhibits
11   that we looked at, the correspondence?  An example of
12   which --
13        A.    Do you mean this one (indicating)?
14        Q.    No, prior to that.  Exhibit --
15        A.    This one (indicating).
16        Q.    21, yes, Exhibit 23, 21, Exhibit 18, a
17   number of the correspondents.
18        A.    Yes.
19        Q.    Do you recall the time frame that --
20   in -- in which you sent out that correspondence?
21        MR. FENSTER:  Object to form.
22        A.    A few years, a few years.  Many years.
23   Many years.  I believe I -- I began to send these
24   letters as soon as my -- my program was ready and we
25   decide unisearch.net was ready.  I began to send it
```

```
 1        ILYA GELLER
 2   and not only these letters.  I believe much more
 3   letters.  I sent thousands of letters.  I sent them
 4   thousands of places.
 5        Q.    And over what period of time did you send
 6   those letters?
 7        A.    Many years, for many years.  I sent these
 8   letters for many, many years.
 9        MR. CANNON:  I have no further questions
10   at this time.  And I appreciate working with counsel
11   to schedule a follow-up deposition, if we can.
12        MR. FENSTER:  In light of -- many of the
13   documents that were marked have been designated as
14   attorneys eyes only by both sides or by various
15   parties, so I propose -- let's provisionally mark the
16   deposition as attorney's eyes only subject to review
17   and designation upon review of the transcript.
18        MR. CANNON:  Okay, let's -- let's do
19   that.  I think only portions of it relate to
20   attorneys eyes only, but that's after the fact we
21   will figure that out.
22        MR. FENSTER:  I agree.
23        THE VIDEOGRAPHER:  This will end
24   videotape number four of the deposition of Ilya
25   Geller and conclude the recording of this deposition.
```

```
 1        ILYA GELLER
 2   We are going off the record at approximately
 3   3:54 p.m., August 19, 2009.
 4        (Adjourned.)
 5        J U R A T
 6
 7        I, ILYA GELLER, the witness herein,
 8   having read the foregoing testimony of the pages of
 9   this deposition, do certify it to be a true and
10   correct transcript, subject to the corrections, if
11   any, shown on the attached pages.
12
13
14              ILYA GELLER
15
16   Dated:
17
18
19   sworn and subscribed before me
20   on this     day of            , 2009.
21
22   Notary Public of the State of            .
23
24   My commission expires on: ____
25
```

```
 1        ILYA GELLER
 2        E R R A T A
 3   STATE OF NEW YORK    )
                          ) ss:
 4   COUNTY OF NEW YORK   )
 5        I wish to make the following changes, for
     the following reasons:
 6
 7   PAGE LINE
 8   ____ ____   CHANGE:_____
 9              REASON:_____
10   ____ ____   CHANGE:_____
11              REASON:_____
12   ____ ____   CHANGE:_____
13              REASON:_____
14   ____ ____   CHANGE:_____
15              REASON:_____
16   ____ ____   CHANGE:_____
17              REASON:_____
18   ____ ____   CHANGE:_____
19              REASON:_____
20   ____ ____   CHANGE:_____
21              REASON:_____
22
23   _____  _____
24    WITNESS' SIGNATURE              DATE
25
```

40 (Pages 154 to 157)